**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 8, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JAMSHID MUHTOROV,                                        No. 18-1366

    Defendant - Appellant.

------------------------------

PETER FENN; LOCH JOHNSON;
DAVID MEDINE; SHARON
BRADFORD FRANKLIN; BRENNAN
CENTER FOR JUSTICE AT NYU
SCHOOL OF LAW; NATIONAL
ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS,

    Amici Curiae.
_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:12-CR-00033-JLK-1)**
_____

Patrick Toomey, American Civil Liberties Union Foundation, New York, New York
(Ashley Gorski, American Civil Liberties Union Foundation, New York, New York,
Virginia L. Grady, Federal Public Defender, Denver, Colorado, John C. Arceci,
Assistant Federal Public Defender, Denver, Colorado, with him on the briefs), for
Defendant-Appellant.

Joseph Palmer, National Security Division, U.S. Department of Justice, Washington, D.C. (Steven L. Lane, National Security Division, U.S. Department of Justice, Washington, D.C., Jason R. Dunn, former United States Attorney, Denver, Colorado, Matthew R. Kirsch, United States Attorney, Denver, Colorado, James C. Murphy, Assistant United States Attorney, District of Colorado, Denver, Colorado, John C. Demers, Assistant Attorney General, Denver, Colorado, with him on the briefs), for Plaintiff-Appellee.

Andrew Crocker and Aaron Mackey, Electronic Frontier Foundation, San Francisco, California, filed an amicus brief on behalf of Church Committee Staff in support of Defendant-Appellant.

Andrew C. Lillie, Jessica Black Livingston, Nathaniel H. Nesbitt, and Mark D. Gibson of Hogan Lovells US LLP, Denver, Colorado filed an amicus brief on behalf of David Medine and Sharon Bradford Franklin in support of Defendant-Appellant.

Elizabeth Goitein, of The Brennan Center for Justice at NYU School of Law, Washington, D.C., filed amicus brief in support of Defendant-Appellant.

Norman R. Mueller of Haddon, Morgan and Foreman, P.C., Denver, Colorado, and John D. Cline, Law Office of John D. Cline, San Francisco, California, filed an amicus brief on behalf of National Association of Criminal Defense Lawyers in support of Defendant-Appellant.

———————————————————

Before **MATHESON**, Circuit Judge, **LUCERO**, Senior Circuit Judge, and **EID**, Circuit Judge.

———————————————————

**MATHESON**, Circuit Judge.

———————————————————

**TABLE OF CONTENTS**

BACKGROUND..................................................................................................1
   A.  Factual and Investigative Background.......................................................1
   B.  Procedural History.....................................................................................3
   C.  Issues on Appeal........................................................................................4
I.     Fourth Amendment Challenge to Section 702-Derived Evidence..................6
   A.  Historical and Legal Background ..............................................................6
      1.  Pre-FISA Developments .........................................................6
      2.  Traditional FISA .....................................................................8
      3.  Executive Order 12333 .........................................................10
      4.  The Terrorist Surveillance Program and the PATRIOT Act ...............10
      5.  The Protect America Act.........................................................11
      6.  The FISA Amendments Act of 2008 .......................................12
         a. Mechanics of Section 702 ....................................................13
            i. Step One – Development of procedures .........................14
            ii. Step Two – Submission for FISC review ......................16
            iii. Step Three – Section 702 surveillance .........................16
            iv. Step Four – Database storage .....................................19
         b. Differences between Section 702 and traditional FISA ...................19
   B.  Investigative Background..........................................................................20
   C.  Procedural History...................................................................................20
   D.  Challenge on Appeal................................................................................21
   E.  Standard of Review and Fourth Amendment Background ......................25
   F.  Discussion................................................................................................26
      1. No Warrant Required................................................................27
         a. No warrant required to surveil a foreign target..............................27
         b. Incidental collection of Mr. Muhtorov's communications................29
            i. Legal background – incidental overhear and plain view ..............30
               1)  Incidental overhear.....................................................30
                  a)  Title III case law ...............................................30
                  b)  Applying the *Kahn* and *Donovan* dicta to the Fourth Amendment.................................................................31
                  c)  Applying the *Kahn* and *Donovan* dicta to foreign intelligence surveillance – FISCR, Second Circuit, and Ninth Circuit...32
               2)  Plain view....................................................................34
            ii. Analysis ...............................................................................36
                1)  Plain view and incidental collection without a warrant..........37
                2)  Foreign intelligence surveillance context – Section 702's statutory requirements..............................................................39
                3)  Incidental overhear.....................................................40
                 4)  Mr. Muhtorov's objections ............................................41
      2. Collection of Mr. Muhtorov's Communications Passed the Reasonableness Balancing Test....................................................45

a. Reasonableness balancing test ........................................................ 46
   i. Government's interest.................................................................. 46
   ii. Mr. Muhtorov's privacy interest................................................. 47
   iii. Privacy safeguards.................................................................... 47
   iv. Totality of the circumstances..................................................... 48
b. Mr. Muhtorov's reasonableness arguments ..................................... 49
II. Article III Challenge ................................................................................ 52
  A. FISC Background............................................................................... 53
  B. Discussion ......................................................................................... 54
    1. Prohibition of Advisory Opinions................................................. 54
     a. Advisory opinions background ..................................................... 55
     b. Analysis........................................................................................ 56
      i. Not advisory opinions ................................................................ 57
      ii. Mr. Muhtorov's counterarguments............................................ 62
    2. Separation of Powers and Article III ........................................... 63
     a. Separation of powers background................................................ 65
     b. Analysis........................................................................................ 68
      i. FISC does not trench upon executive prerogatives ..................... 69
      ii. FISC performs appropriate judicial functions ........................... 70
      iii. Additional considerations.......................................................... 72
       1) Deference to Congress ......................................................... 72
       2) Section 702 furthers privacy interests................................... 74
III. Nondisclosure of FISA and Section 702 Application Materials ...................... 76
  A. Legal Background ............................................................................... 76
  B. Procedural History.............................................................................. 78
  C. Standard of Review ............................................................................ 80
  D. Discussion ......................................................................................... 80
    1. Disclosure Under FISA................................................................. 81
     a. Traditional FISA application materials............................................ 81
     b. Section 702 application materials ................................................... 83
    2. Due Process................................................................................ 85
     a. Due process and Brady ................................................................ 86
      i. Legal background........................................................................ 86
      ii. Analysis .................................................................................... 86
     b. Due Process and § 1806(f) – Mathews ........................................... 88
      i. Legal background........................................................................ 88
      ii. Analysis .................................................................................... 89
     c. Due process and Franks ................................................................ 90
      i. Legal background........................................................................ 90
      ii. Analysis .................................................................................... 90
IV. Notice of Surveillance Methods and Discovery of Communications Therefrom
................................................................................................................... 92
  A. Legal Background ............................................................................... 93
    1. 18 U.S.C. § 3504............................................................................ 93

ii

2.  Federal Rule of Criminal Procedure 16 ................................................ 95
3.  CIPA........................................................................................................ 95
B.  Additional Procedural History .................................................................... 97
C.  Standard of Review ...................................................................................... 98
D.  Discussion ..................................................................................................... 99
1.  Due Process............................................................................................. 99
2.  18 U.S.C. § 3504 .................................................................................. 101
3.  Federal Rule of Criminal Procedure 16 ............................................ 102
4.  CIPA...................................................................................................... 104
V. Speedy Trial.......................................................................................................... 106
A.  Background ................................................................................................. 107
1.  Legal Background................................................................................. 107
a.  Sixth Amendment .......................................................................... 107
b.  Speedy Trial Act ............................................................................ 108
2.  Procedural History ............................................................................. 109
a.  Initial proceedings......................................................................... 109
b.  Speedy Trial Act orders ............................................................... 109
c.  Superseding indictment................................................................. 110
d.  Discovery ....................................................................................... 111
e.  Section 702 notice and motion to suppress................................. 111
f.  Third superseding indictment and second trial setting.............. 112
g.  Severance and third trial setting.................................................. 112
h.  Fourth trial setting........................................................................ 112
i.  District judge's medical condition and final trial setting ................ 113
j.  Disposition of speedy trial motions ............................................. 113
k.  Convictions and sentence.............................................................. 115
B.  Discussion ................................................................................................... 115
1.  First *Barker* Factor:  Length of the Delay.......................................... 115
a.  Additional legal background.......................................................... 115
b.  Analysis........................................................................................... 116
2.  Second *Barker* Factor:  Reasons for the Delay................................. 118
a.  Additional legal background.......................................................... 118
i.  Quantifying the delay................................................................ 119
1)  Caused by defendant .......................................................... 120
2)  Caused by the prosecution ................................................. 120
3)  Caused by neither the defendant nor the prosecution............ 120
4)  Overall considerations ....................................................... 121
ii.  Weighing the delay.................................................................... 121
b.  Additional procedural background – discovery............................. 122
c.  Analysis........................................................................................... 126
i.  Quantifying the pretrial periods .............................................. 127
1)  Discovery period................................................................. 127
a)  Mr. Muhtorov's discovery requests .................................. 128
b)  CIPA .................................................................................. 129

   c) Translation issues ............................................................. 130
   d) Government's discovery conduct ..................................... 133
  2) District judge's medical condition ......................................... 136
  3) Overall quantification .......................................................... 138
 ii. Weighing the pretrial periods ..................................................... 138
 d. The Dissent .................................................................................... 138
3. Third *Barker* Factor: Assertion of Speedy Trial Right ..................... 140
 a. Additional legal background ............................................................ 140
 b. Additional procedural history .......................................................... 142
 c. Analysis .......................................................................................... 144
4. Fourth *Barker* Factor: Prejudice to the Defendant ........................... 147
 a. Additional legal background ............................................................ 147
  i. Presumption of prejudice ........................................................... 147
  ii. Specific evidence of prejudice – three types .............................. 148
   1) Oppressive pretrial incarceration ......................................... 148
   2) Anxiety and concern .............................................................. 149
   3) Impairment to the defense ...................................................... 149
    a) Particularity ..................................................................... 150
    b) Causation .......................................................................... 150
    c) Steps to preserve evidence ............................................... 150
 b. Additional procedural history .......................................................... 151
 c. Analysis .......................................................................................... 152
  i. Presumptive prejudice ............................................................... 152
  ii. Specific prejudice ...................................................................... 152
   1) Oppressive pretrial incarceration ......................................... 152
   2) Anxiety and concern .............................................................. 155
   3) Impairment of the defense ...................................................... 155
5. Balancing the *Barker* Factors .......................................................... 158
CONCLUSION ......................................................................................... 163

## TABLE OF ACRONYMS

| Acronym | Title |
|---------|-------|
| AG | Attorney General |
| AUMF | Authorization for the Use of Military Force |
| CIA | Central Intelligence Agency |
| CIPA | Classified Information Procedures Act |
| DNI | Director of National Intelligence |
| FAA | FISA Amendments Act of 2008 |
| FBI | Federal Bureau of Investigation |
| FISA | Foreign Intelligence Surveillance Act of 1978 |
| FISC | Foreign Intelligence Surveillance Court |
| FISCR | Foreign Intelligence Surveillance Court of Review |
| FOIA | Freedom of Information Act |
| IJU | Islamic Jihad Union |
| ISP | Internet Service Provider |
| NSA | National Security Agency |
| PAA | Protect America Act of 2007 |
| Section 702 | Section 702 of the Foreign Intelligence Surveillance Amendments Act of 2008 |
| STA | Speedy Trial Act of 1974 |
| TSA | Transportation Security Administration |
| TSP | Terrorist Surveillance Program |

A jury convicted Jamshid Muhtorov on three counts of conspiring and providing material support to the Islamic Jihad Union ("IJU"), a State Department-designated foreign terrorist organization with ties to al-Qaeda, in violation of 18 U.S.C. § 2339B. On appeal, he argues the foreign intelligence surveillance methods the government used to collect his communications were unconstitutional. He also questions the district court's refusal to disclose the classified materials the government used to secure approvals for the surveillance, the types of surveillance techniques used, and the evidence derived therefrom. Finally, Mr. Muhtorov claims his Sixth Amendment speedy trial right was violated. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

The following provides an overview of (A) Mr. Muhtorov's criminal conduct and the government's investigation, (B) the procedural history between arrest and trial, and (C) the issues Mr. Muhtorov raises on appeal. We provide additional background during our discussion of each issue.

### A.  *Factual and Investigative Background*

Mr. Muhtorov arrived in the United States in 2007 as a political refugee from Uzbekistan and became a legal permanent resident. In 2009, he met Bakhtiyor Jumaev, a fellow Uzbekistan refugee with a similar background. The two became friends and developed a shared interest in the IJU.

The government first became aware of Mr. Muhtorov's connection to the IJU through warrantless surveillance conducted under Section 702 of the Foreign Intelligence Surveillance Amendments Act of 2008 ("Section 702"), Pub. L. No. 110-261, 122 Stat.

1

2436 (codified at 50 U.S.C. § 1881a).  The Section 702 surveillance did not target Mr. Muhtorov.  Rather, the government targeted a non-United States person living abroad, and in the process the government incidentally collected Mr. Muhtorov's communications with the target.  The government then used those communications to support applications to surveil Mr. Muhtorov under the Foreign Intelligence Surveillance Act of 1978 ("FISA" or "traditional FISA"), Pub. L. No. 95-511, 92 Stat. 1783.

After securing approval under FISA, the government intercepted email communications between Mr. Muhtorov and an administrator of the IJU's official website beginning in 2011.  In these communications, Mr. Muhtorov expressed his "support of the [IJU], his profession of allegiance to them, and his profession of wanting to provide whatever support he could to them."  ROA, Vol. XI at 411.  He discussed his intention to purchase portable satellite equipment and send $300 in cash, which he had received from Mr. Jumaev.  He swore his "Bay'ah," or allegiance, to the IJU and said "he would do whatever is necessary for them or whatever they asked of him, even to the point of death."  *Id.* at 447.[1]

The government captured emails and roughly 39,000 audio recordings—mostly in the Russian, Uzbek, and Tajik languages—including emails and phone calls between Mr. Muhtorov and Mr. Jumaev regarding the IJU.  They talked about joining the "wedding" (a common code word for the jihadist movement, martyrdom operations, or an armed struggle) and referenced the "wedding house" and the "wedding gift" (a common code

---

[1] "Bay'ah" sometimes is spelled in the record as "bayot" or "bayat."

word for financial support). They discussed Mr. Muhtorov's going to Turkey to study at a madrassa—a religious school—along with Mr. Jumaev's son, and their desire to martyr themselves.

In December 2011, Mr. Muhtorov told an ostensible IJU sympathizer—in reality, an informant for the Federal Bureau of Investigation ("FBI")—that he planned to travel to Turkey, and from there to join the IJU. On January 21, 2012, FBI agents arrested him at the Chicago airport as he was preparing to fly to Turkey on a one-way ticket. He was carrying nearly $3,000 in cash, two new iPhones, and a new iPad. His own phone contained videos showing combat against coalition forces, instructions on how to make explosive devices, and graphic images of jihadists beheading captured men.

## B. *Procedural History*

Following Mr. Muhtorov's arrest, he and Mr. Jumaev were charged with conspiracy to provide material support, providing, and attempting to provide material support in the form of $300 to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B. Mr. Muhtorov was also charged with providing and attempting to provide material support to the IJU, including his own services and communications equipment.

Mr. Muhtorov remained incarcerated until his trial began with jury selection on May 14, 2018. The jury convicted him on June 21, 2018. In the years leading up to trial, the government made voluminous discovery disclosures that required significant resources to translate documents and communications from Russian, Uzbek, and Tajik into English. The district court oversaw the discovery process. Due to the nature of the

3

investigative materials, the court conducted ex parte hearings in compliance with the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3 §§ 1-16, to balance the government's interest in keeping classified materials secret against Mr. Muhtorov's right to certain kinds of information.  During the pretrial period, Mr. Muhtorov and Mr. Jumaev sought, unsuccessfully, to suppress evidence derived from Section 702 surveillance.

After the jury convicted Mr. Muhtorov, the district court sentenced him to 11 years of incarceration.  He was released from prison on June 18, 2021.

## C. *Issues on Appeal*

Mr. Muhtorov does not contest the sufficiency of the evidence, but he challenges his conviction on five grounds.[2]

___First___, he asserts that the collection of his communications through Section 702 surveillance violated the Fourth Amendment.  Although the government did not introduce Section 702 evidence at trial, Mr. Muhtorov claims the FISA evidence used at trial would not have been collected without the Section 702 surveillance.  We reject this argument because the Section 702 surveillance of Mr. Muhtorov was lawful.  The government did not need a warrant for the incidental collection of Mr. Muhtorov's communications

---

[2] Mr. Muhtorov's appeal was procedurally consolidated with *United States v. Jumaev*, No. 18-1296.  In a separate trial, a jury convicted Mr. Jumaev of two counts of violating § 2339B, and the court sentenced him to time served on both counts—that is, 76 months and 3 days (to be served concurrently)—and 10 years of supervised release on both counts (to be served concurrently).  We resolve that appeal by separate opinion.

during the Section 702 surveillance of the foreign target located abroad. And the Section

702 surveillance was reasonable under the Fourth Amendment.

Second, he argues that Section 702 violates Article III of the Constitution and the

separation of powers. Under Section 702, the Foreign Intelligence Surveillance Court

("FISC") does not issue individualized warrants. Instead, it approves procedures in

advance under which the government conducts warrantless foreign intelligence

surveillance. Although the FISC's role under Section 702 is novel, it comports with

Article III and the separation of powers.

Third, he contends the district court should have granted him access to the

classified applications and other related materials that supported the government's

Section 702 and traditional FISA surveillance. He claims disclosure was required under

the FISA provision governing disclosure, 50 U.S.C. § 1806(f), and as a matter of due

process. We find that the district court did not err in denying disclosure.

Fourth, he argues the district court should have required the government to

provide him notice of the specific surveillance techniques the government may have used

during its investigation and the evidence collected using those techniques. We reject this

argument because Mr. Muhtorov has failed to point to authority that required disclosure

of the government's surveillance techniques. To the extent Mr. Muhtorov seeks the fruits

of surveillance, the government has complied with its discovery obligations.

Fifth, he claims that his Sixth Amendment speedy trial right was violated because

nearly six-and-a-half years elapsed from his arrest in January 2012 until his conviction in

June 2018, during which time he was incarcerated. After careful review of the record, we

5

conclude there was no violation. Although six-and-a-half years is an unusually lengthy period of pre-conviction detention, it was principally due to Mr. Muhtorov's requests for broad discovery, the time and resources needed to translate voluminous materials, and the district court's need to comply with CIPA and manage classified information. On the unique facts of this case, those circumstances justified the length of the pretrial period.

## I.  FOURTH AMENDMENT CHALLENGE TO SECTION 702-DERIVED EVIDENCE

Mr. Muhtorov argues the traditional FISA evidence that was presented at trial should have been suppressed as fruit of the poisonous tree because it was derived from the incidental collection of his communications during Section 702 surveillance. He challenges the Section 702 surveillance under the Fourth Amendment.

### A. *Historical and Legal Background*

The following provides historical and legal background for our discussion of the electronic surveillance that occurred in this case.

### 1. **Pre-FISA Developments**

In *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court held that the Fourth Amendment applies to electronic surveillance of oral communications because such surveillance "violate[s] the privacy upon which [one] justifiably relie[s]." *Id.* at 353; *see id.* at 360 (Harlan, J., concurring) (finding an enclosed telephone booth is an area where one "has a constitutionally protected reasonable expectation of privacy").

Shortly thereafter, Congress enacted Title III of the Omnibus Crime Control Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 (codified as amended at 18 U.S.C. §§ 2510-23),

which requires judicial warrants to authorize wiretaps for law enforcement purposes. "Title III authorizes the interception of private wire and oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval, an approval that may not be given except upon compliance with stringent conditions." *Gelbard v. United States*, 408 U.S. 41, 46 (1972).

In *United States v. U.S. District Court for the Eastern District of Michigan ("Keith")*, 407 U.S. 297 (1972), the Supreme Court addressed the Fourth Amendment limits on executive authority to conduct surveillance for domestic security. The Attorney General ("AG") had authorized electronic surveillance regarding domestic security matters without prior judicial approval. *See id.* at 299. The Court rejected the government's reliance on any inherent executive authority found in Article II of the Constitution, and held that "Fourth Amendment freedoms cannot properly be guaranteed if domestic security surveillances may be conducted solely within the discretion of the Executive Branch." *Id.* at 316-17.

The *Keith* Court expressly limited its opinion to "domestic aspects of national security," and gave "no opinion as to[] the issues which may be involved with respect to activities of foreign powers or their agents." *Id.* at 321-22. The Court "recognize[d] that domestic security surveillance may involve different policy and practical considerations from the surveillance of 'ordinary crime.'" *Id.* at 322. It left open the possibility that "[d]ifferent standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens." *Id.* at 322-23. The "warrant

7

application may vary according to the governmental interest to be enforced and the nature of citizen rights deserving protection." *Id.* at 323.

## 2. **Traditional FISA**

In the aftermath of *Keith*, Congress enacted FISA in 1978 "to authorize electronic surveillance to obtain foreign intelligence information." 92 Stat. at 1783; *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) (noting that in enacting FISA, "Congress legislated against the backdrop of [*Keith*]," which had "implicitly suggested that a special framework for foreign intelligence surveillance might be constitutionally permissible"). Before FISA, "electronic surveillance undertaken for national security or foreign intelligence purposes was subject to little or no judicial or legislative oversight." David S. Kris & J. Douglas Wilson, *National Security Investigations and Prosecutions* ("Kris & Wilson") § 3:1 (3d ed. Sept. 2019 update).

As enacted in 1978, FISA applied to communications "sent by or intended to be received by a . . . United States person who is in the United States" or "to or from a person in the United States . . . if such acquisition occurs in the United States." 50 U.S.C. § 1801(f)(1)-(2).[3] FISA originally did not regulate electronic surveillance conducted abroad and directed at non-United States persons, even if the government happened to

---

[3] FISA originally addressed only electronic surveillance, but amendments in 1994 added physical searches of places within the United States. *See* Intelligence Authorization Act for Fiscal Year 1995, Pub. L. No. 103-359, § 807, 108 Stat. 3423, 3443-53 (1994) (codified, as amended, at 50 U.S.C. §§ 1821-29).

collect information from a communication with a United States person.[4]  And it did not apply to communications occurring entirely outside the country.

FISA required the government to seek ex parte approval from the FISC to conduct electronic surveillance aimed at foreign intelligence.  FISA created the FISC as a court of federal district judges appointed by the Chief Justice to review government surveillance applications in camera.  *See id.* § 1803.  A FISC judge could grant an application for an order approving electronic surveillance to obtain foreign intelligence information if "there [wa]s probable cause to believe that . . . the target of the electronic surveillance is a foreign power or an agent of a foreign power."  *Id.* § 1805(a)(2)(A).  The FISC judge needed to determine that the government would employ adequate "minimization" measures.  *Id.* §§ 1805(a)(3), 1824(a)(3).[5]  This process is now known as "traditional" FISA surveillance.  *See* Kris & Wilson §§ 16:2, 17:18.

Traditional FISA is akin to the familiar warrant process in criminal cases.  But instead of needing to show probable cause of criminality, the government must show probable cause that the surveillance would be directed at a foreign power or agent of a foreign power.  *See United States v. Cavanagh*, 807 F.2d 787, 789-90 (9th Cir. 1987);

---

[4] A "United States person" includes citizens, aliens lawfully admitted for permanent residence, and United States corporations.  *See* 50 U.S.C. § 1801(i).

[5] The government could appeal the denial of a FISA application to the newly created Foreign Intelligence Surveillance Court of Review ("FISCR"), and then to the Supreme Court.  *See* 50 U.S.C. § 1803(b), (j)-(k).

*United States v. Megahey*, 553 F. Supp. 1180, 1191-92 (E.D.N.Y. 1982), *aff'd sub nom.*,

*United States v. Duggan*, 743 F.2d 59 (2d Cir. 1984).

3. **Executive Order 12333**

FISA did not address "foreign-to-foreign electronic communications, foreign

intelligence collection at home and abroad outside of FISA's definition of 'electronic

communications,' and the incidental collection of U.S. persons' communications

[through the acquisition of international communications]." Laura K. Donohue, *Section*

*702 and the Collection of International Telephone and Internet Content* ("Donohue"),

38 Harv. J.L. & Pub. Pol'y 117, 145 (2015).

President Ronald Reagan's Executive Order 12333 provided the framework for

this kind of surveillance. It directed "[a]gencies within the Intelligence Community [to]

use the least intrusive collection techniques feasible within the United States or directed

against United States persons abroad." Exec. Order No. 12333, 3 C.F.R. 200, § 2.4

(1982). The Order required each agency to establish procedures to govern collection

methods that "protect constitutional and other legal rights and limit use of such

information to lawful governmental purposes," subject to the AG's approval. *Id.*

4. **The Terrorist Surveillance Program and the PATRIOT Act**

Following the September 11, 2001 terrorist attacks, President George W. Bush

issued a secret executive order in early 2002 authorizing the National Security Agency

("NSA") "to conduct warrantless wiretapping of telephone and e-mail communications

where one party to the communication was located outside the United States" and one

party was believed to be a member of al-Qaeda or an affiliated terrorist organization. *Clapper*, 568 U.S. at 403.

Around the time this Terrorist Surveillance Program ("TSP") was launched and implemented, but before Congress became aware of it, Congress amended FISA to provide greater flexibility to uncover terrorist plots. The USA PATRIOT Act provided extra judges, authorized roving and multi-point surveillance, and lowered the surveillance threshold from a primary purpose of securing foreign intelligence to "a significant purpose." Pub. L. No. 107-56, 115 Stat. 272, §§ 201-225 (2001).

5. **The Protect America Act**

Congress and the public became aware of the TSP through a *New York Times* article in December 2005. *See* Donohue, 38 Harv. J.L. & Pub. Pol'y at 126. To justify the program, the AG explained to congressional leaders that traditional FISA lacked the flexibility needed to identify potential threats. *Id.* at 126-27.

At the time, Congress determined that FISA restricted the government's agility in responding to terrorist threats in a post-9/11 world. It also recognized that FISA, by its own terms, increasingly applied to foreign-to-foreign communications due to the use of servers located in the United States to store communications even when the sender and recipient were located abroad. *See United States v. Hasbajrami*, 945 F.3d 641, 650 (2d Cir. 2019). Previously, FISA procedures did not constrain surveillance of foreign-to-foreign communications if the communications were not stored on servers in the United States. *See id.*

11

Congress temporarily replaced the TSP with the Protect America Act of 2007 ("PAA"), Pub. L. No. 110-55, 121 Stat. 552, as a stop-gap measure to stay in place until February 2008 pending further review of the NSA wiretapping program. *See In re Directives Pursuant to Section 105B of the Foreign Intelligence Surveillance Act ("In re Directives")*, 551 F.3d 1004, 1006-07 (FISA Ct. Rev. 2008). The PAA empowered the Director of National Intelligence ("DNI") and the AG to authorize, without court order and for one year, "acquisition of foreign intelligence information concerning persons reasonably believed to be outside the United States." Pub. L. No. 110-52, § 2 (codified at 50 U.S.C. § 1805b (2007)).

6. **The FISA Amendments Act of 2008**

Congress enacted the FISA Amendments Act of 2008 ("FAA"), a major overhaul of FISA that set up two tracks for foreign intelligence surveillance. Under the FAA, traditional FISA continues to require a FISC-approved warrant for individual surveillance applications to target United States persons. The FAA added Section 702, 50 U.S.C. § 1881a, which provides the intelligence community with "additional authority to meet the challenges of modern technology and international terrorism." *Clapper*, 568 U.S. at 403-04; *see generally* Kris & Wilson ch. 16 (discussing FISA modernization).

Section 702 is structurally similar to the PAA. It broadens wiretap authority to allow warrantless surveillance of foreign targets reasonably believed to be overseas even if they may be communicating with people in the United States so long as the "purpose" is not to "target a particular, known person reasonably believed to be in the United States." 50 U.S.C. § 1881a(a), (b)(2). The FISC must annually preapprove the

procedures used to conduct the warrantless surveillance as reasonably designed to target foreigners outside the United States and to minimize the risk of surveilling United States persons. *Id.* § 1881a(a), (d)-(f), (j). Congress also included a technical fix to allow wiretapping of communications that are routed through United States telecommunications switches if the target is a non-United States person located abroad. *See* Kris & Wilson § 16:17.[6]

    a. *Mechanics of Section 702*

Under Section 702, the government may compel telecommunications service providers located in the United States (including internet service providers and companies that maintain communications infrastructure) to provide emails or other electronic communications to, from, or about individuals the government believes are (a) not United States persons and (b) located abroad. *See Hasbajrami*, 945 F.3d at 650-51. Section 702 surveillance is subject to procedures relating to targeting, collection, minimization (including retention and dissemination), storage, and, beginning in 2018, querying databases containing Section 702 communications. In addition, the acquisition of foreign intelligence information must "be conducted in a manner consistent with the fourth amendment." 50 U.S.C. § 1881a(b)(6).

---

[6] Congress reauthorized Section 702 in January 2018 for six years. *See* FISA Amendments Reauthorization Act of 2017, Pub. L. No. 115-18, 132 Stat. 3 (2018). The Reauthorization Act enhances foreign intelligence collection and safeguards, accountability, and oversight; increases penalties for the unauthorized removal and retention of classified materials; and amends and improves the FISCR's procedures. These changes were not in effect during the investigation of the foreign target who communicated with Mr. Muhtorov.

13

The Section 702 process works as follows:

    i.   <u>Step One – Development of procedures</u>

The AG and DNI must develop "targeting," "minimization," and, beginning in 2018, "querying" procedures. *Id.* § 1881a(d)(1), (e)(1), (f)(1). These procedures "govern how the program functions at each agency tasked with Section 702 surveillance"—the NSA, the FBI, and the Central Intelligence Agency ("CIA"). The procedures are tailored to each agency's mission. *See Hasbajrami*, 945 F.3d at 652-53.

**Targeting** procedures must be "reasonably designed" to

> (A) ensure that any acquisition [of electronic communications] is limited to targeting persons reasonably believed to be located outside the United States; and
>
> (B) prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States.

50 U.S.C. § 1881a(d)(1). These requirements implement Section 702's directive that the government may not "intentionally target" anyone located in the United States or a United States person located abroad. *Id.* § 1881a(b)(1), (3). Likewise, the government "may not intentionally target a person reasonably believed to be located outside the United States if the purpose of such acquisition is to target a particular, known person reasonably believed to be in the United States." *Id.* § 1881a(b)(2). The targeting procedures are intended to prevent acquisition of the communications of United States persons or anyone in the United States. *See Hasbajrami*, 945 F.3d at 652. The

14

procedures must "protect the constitutional privacy rights of Americans and comply with the Fourth Amendment inside the United States." *Id.*

**Minimization** "describes the manner in which the government processes communications after they have been collected and seeks to provide safeguards against the misuse of Section 702 information." *Id*. at 655 (emphasis omitted). Section 702 minimization procedures must "meet the definition of minimization procedures" for traditional FISA electronic surveillance or traditional FISA physical searches. 50 U.S.C. § 1881a(e)(1). They are "specific procedures . . . adopted by the Attorney General[] that are reasonably designed . . . to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information." *Id*. § 1801(h).

**Querying** involves searching through collected communications databases to find information relevant to a particular investigation or agency function. "[Q]uerying procedures do not govern the acquisition of information, but only the searches of already-acquired information contained in storage." Kris & Wilson § 17:3 n.15. Querying procedures must be "consistent with the requirements of the fourth amendment." *Id.* § 1881a(f)(1)(A).[7]

---

[7] Congress added the requirement to develop querying procedures in 2018 when it extended Section 702. *See* Pub. L. No. 115-18, § 101 (codified at 50 U.S.C. § 1881a(f)). It was not in place when the foreign target under investigation communicated with Mr. Muhtorov.

### ii. Step Two – Submission for FISC review

The AG and DNI submit their targeting, minimization, and, beginning in 2018, querying procedures to the FISC for review. 50 U.S.C. § 1881a(d)(2), (e)(2), (f)(1)(C), (j)(2)(B)-(D). If the FISC finds the procedures "are consistent with the [statutory] requirements . . . and with the fourth amendment," the court enters an order approving them. *Id.* § 1881a(j)(3)(A). "[J]udicial review of Section 702 functions as a form of programmatic pre-clearance." *Hasbajrami*, 945 F.3d at 652. This pre-clearance is effective for one year. 50 U.S.C. § 1881a(a). The AG and DNI must therefore submit Section 702 procedures to the FISC annually.[8]

### iii. Step Three – Section 702 surveillance

Subject to limited exceptions, FISC approval is required to surveil targets under Section 702. "[T]he Attorney General and the Director of National Intelligence can execute a Section 702 authorization only after the FISC enters an order approving the proposed acquisition." *In re DNI/AG 702(h) Certifications 2018*, 941 F.3d 547, 552 (FISA Ct. Rev. 2019) (per curiam).[9]

After it receives FISC pre-clearance or an exigent-circumstances authorization, an intelligence agency "can begin surveilling individuals it seeks to target." *Hasbajrami*,

---

[8] As is the case for traditional FISA, the government may appeal an adverse ruling to the FISCR, and then to the Supreme Court. 50 U.S.C. § 1881a(j)(4).

[9] In exigent circumstances, the AG and DNI may issue their own authorization to begin collecting Section 702 intelligence without first obtaining FISC approval. 50 U.S.C. § 1881a(c)(2). Such an authorization also lasts for one year. *Id.* § 1881a(a).

945 F.3d at 653. "Section 702 surveillance usually begins when an agency 'tasks' a specific 'selector' or 'facility,' usually an e-mail address or telephone number." *Id.* The AG and DNI may then "direct, in writing, an electronic communication service provider to . . . immediately provide the Government with all information, facilities, or assistance necessary to accomplish the acquisition" from that selector or facility. 50 U.S.C. § 1881a(i)(1)(A). A service provider may challenge directives before the FISC, and the FISC may order compliance. *Id.* § 1881a(i)(4)-(5). The service provider may appeal the FISC's order. *Id.* § 1881a(i)(6).

The NSA operates two collection programs under Section 702: (1) "PRISM collection" and (2) "upstream collection." *See Hasbajrami*, 945 F.3d at 653.

If the government issues a directive to an internet service provider ("ISP"), such as Google or Microsoft, the resulting surveillance is known as "PRISM collection." *Id*. "PRISM collection does not include the acquisition of telephone calls." Privacy and Civil Liberties Oversight Board, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* 7 (July 2, 2014) ("PCLOB-2014"); *see also Schuchardt v. President of the U.S.*, 839 F.3d 336, 350 (3d Cir. 2016) ("NSA analysts receive the content of emails collected as part of the [PRISM] program.").

Under PRISM, the government sends a certain identifier, such as an email address, to the ISP. The ISP then provides all communications sent to or from that identified email account. *See Hasbajrami*, 945 F.3d at 653. "PRISM, therefore, collects only the

17

e-mails a given user sends from his or her account, and the e-mails he or she receives from others through that account." *Id.*

For upstream collection, the government does not compel information from an ISP, but instead from the providers that control the underlying infrastructure over which telecommunications take place. *See* PCLOB-2014 at 7. Unlike PRISM, which collects only those communications that are sent from or to a target account hosted on a particular ISP, upstream collection casts a wider net not limited to a single ISP. It can capture communications that are *about* the target, even if the target is not the sender or recipient of the communication. *See* Kris & Wilson § 17:11. The scope of upstream collection is thus much broader than PRISM. *See id.*

"While the government cannot target U.S. persons or people located in the United States, it is permitted to acquire and in some cases retain and use communications in which a U.S. person is in contact with a target." PCLOB-2014 at 114. This "incidental collection" concerns communications of a United States person or someone in the United States that are swept up through Section 702 surveillance because the person is communicating with a targeted non-United States person located abroad. *See Hasbajrami*, 945 F.3d at 654. Incidental collection "would occur under PRISM, for instance, if the NSA has targeted the e-mail address of a non-United States person in another country, and a United States person e-mails that targeted individual." *Id.* In such situations the "ISP would be required to provide the NSA with any such e-mails as part of its compliance with a Section 702 directive targeting the non-United States party to the communication." *Id.*

18

iv.  Step Four – Database storage

"Once communications are acquired under Section 702, they go into one or more databases at the NSA, CIA, and FBI."  PCLOB-2014 at 127.  In theory, minimization procedures should lead to deletion of incidentally collected communications that have no relevance to foreign intelligence.  *See Hasbajrami*, 945 F.3d at 655 (in the Section 702 context, "information is 'minimized' by non-retention").  But deletion rarely happens.  PCLOB-2014 at 128-29.  "Instead, those communications often remain in the agency's databases unreviewed until they are retrieved in response to a database query, or . . . deleted upon expiration of their retention period, without ever having been reviewed."  *Id.* at 129.

Thus, through Section 702, the government amasses large databases of communications, including communications to or from United States persons in the United States.  And the government may later query these databases, such as for a name or email address.  After-the-fact queries are sometimes called "backdoor searches."  *Hasbajrami*, 945 F.3d at 657 (quotations omitted).

b.  *Differences between Section 702 and traditional FISA*

Section 702 differs from traditional FISA procedures in several key respects.  *See id.* at 650-51.  First, traditional FISA requires a FISA warrant for a specific target supported by probable cause and specifying the nature and location of the facilities to be surveilled.  But under Section 702, the FISC approves "procedures in advance, targeting non-United States persons located abroad as a category, and the government does not have to return to the FISC to seek approval before it undertakes surveillance of any

specific individual or his or her accounts under those Section 702 procedures." *Id.* at 651. <u>Second</u>, traditional FISA does not apply to targets located abroad. Section 702 authorizes surveillance of foreign targets and "eliminates the need for a traditional FISA order even if the surveillance (or other acquisition activity) targeting a non-U.S. person located abroad occurs inside the United States." Kris & Wilson § 17:18.

## B. *Investigative Background*

Details of how Section 702 surveillance was used in this case are classified. In its brief, the government explained what occurred in broad strokes:

> In this case, the government acquired under Section 702 the communications of a non-U.S. person abroad and, in so doing, incidentally collected communications to which Muhtorov was a party. The government used some of these incidentally collected communications to support its application for traditional FISA orders. The fruits of that traditional FISA collection were therefore partially "derived from" information collected under Section 702. Evidence obtained and/or derived from that traditional FISA collection was, in turn, used at trial.

Aplee. Br. at 11 (citations omitted). The government's well-supported representation that no upstream collection occurred, *see* Aplee Br. at 29 n.12, indicates that the Section 702 surveillance involved PRISM collection only.

## C. *Procedural History*

Before he knew about the Section 702 surveillance, Mr. Muhtorov moved to suppress the information collected through traditional FISA. The district court reviewed

that information in camera under the procedures set out in 50 U.S.C. § 1806(f), found no infirmities, and denied the motion.  Mr. Muhtorov does not challenge that ruling.[10]

A month later, the government filed notice that it had used Section 702 to develop evidence against Mr. Muhtorov.  He again moved to suppress the traditional FISA surveillance, arguing it was fruit of the poisonous tree because it was derived from warrantless Section 702 surveillance.  Mr. Muhtorov argued that Section 702 violates the Fourth Amendment on its face because its purpose and effect is to give the government access to United States persons' communications without a warrant and probable cause. And he contended that even if the Fourth Amendment does not require a warrant, Section 702 fails the Fourth Amendment's reasonableness balancing test.  He further argued that the Section 702 surveillance in this case violated the Fourth Amendment as applied to him.

The district court found the collection of Mr. Muhtorov's communications under Section 702 did not violate the Fourth Amendment, so it denied the motion.

D. *Challenge on Appeal*

Mr. Muhtorov claims the government violated the Fourth Amendment when it incidentally collected his communications under Section 702.  Because the government relied on those communications to obtain traditional FISA surveillance orders, he contends the resulting traditional FISA evidence introduced at trial should have been

---

[10] The district court also denied Mr. Muhtorov's request for disclosure of classified FISA application materials.  As explained below, he appeals this denial.

21

suppressed as fruit of the poisonous tree. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (discussing the fruit of the poisonous tree doctrine); *United States v. Hatfield*, 333 F.3d 1189, 1194 (10th Cir. 2003) (discussing suppression of evidence obtained using a warrant when unconstitutionally collected evidence tainted the warrant application). He asserts two Fourth Amendment violations concerning the Section 702 surveillance.

First, Mr. Muhtorov argues the government violated the Fourth Amendment when it incidentally collected his communications through Section 702 surveillance without a warrant. And even if a warrant was not required, he contends the surveillance was unreasonable. As in the district court, Mr. Muhtorov brings facial and as-applied challenges. We need address only the latter—whether the collection of his communications violated the Fourth Amendment.[11]

Second, he asserts the government unconstitutionally queried Section 702 databases using identifiers associated with his name without a warrant. He contends that querying led to retrieval of communications or other information that were used to support the traditional FISA applications. But this is sheer speculation. There is nothing

---

[11] In *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), the Supreme Court stated that a Fourth Amendment facial challenge to a statute authorizing warrantless searches succeeds when a challenger establishes that a "law is unconstitutional in all of its applications," considering only those "searches that the law actually authorizes, not those for which it is irrelevant." *Id.* at 418. Because we conclude that the incidental collection of Mr. Muhtorov's communications during surveillance authorized by Section 702 and properly carried out according to the statute was constitutional, Mr. Muhtorov's facial challenge necessarily fails. *See United States v. Durham*, 902 F.3d 1180, 1192 n.3 (10th Cir. 2018).

in the record to support that evidence derived from queries was used to support the

traditional FISA applications.[12]

The government affirmatively represents that "the Section 702-derived evidence at

issue was not obtained or derived from queries using terms associated with Muhtorov."

Aplee. Br. at 45. The government further explains that "the Section 702 communications

that the government described in the FISA applications were not the fruit of any queries

using search terms associated with Muhtorov" and that "[t]he record therefore shows that

---

[12] The dissent joins Mr. Muhtorov in speculating that "the decision to seek traditional FISA authority" may have been "influenced by . . . querying of § 702 databases by the FBI using identifiers associated with [Mr.] Muhtorov" or "by information collected in other intelligence surveillance programs[.]" Dissent at 31. Without finding any support in the record, it instead suggests querying may have happened based on its reading of the PCLOB report. *See id.* at 33. But whatever light that report sheds on national security surveillance programs generally, it is not evidence in the record here. Nor is the *FBI Domestic and Investigations Guide* dated December 16, 2008, which the dissent cites (Dissent at 30), but the district court and the parties never mentioned.

The dissent also states "there is no evidence in the record either that querying did not occur or that the government agents who directed or sought the traditional FISA application did not know of its existence." *Id.* at 33. We generally do not require parties to prove a negative, *see Elkins v. United States*, 364 U.S. 206, 218 (1960), especially here where the record supports that querying was not used to prepare the traditional FISA applications. Appellate courts should not "speculate about what might have been." *See Davis v. Ayala*, 576 U.S. 257, 281 (2015).

Indeed, the dissent goes beyond asking the government to prove a negative. It accuses the government, without substantiation, of "fail[ing] . . . to introduce any evidence that it complied with . . . record-keeping responsibilities" regarding queries, *see* Dissent at 33 & n.29. But there were no statutory record-keeping requirements during the investigation in this case. Some were added to Section 702 years later in 2018. *See* Pub. L. No. 115-118, § 101 (codified at 50 U.S.C. § 1881a(f)(1)(A), (B)). And the dissent's reference to FBI minimization procedures in the 2014 PCLOB report similarly tells us nothing about what rules may have applied during the Section 702 surveillance here, let alone whether there was FBI "non-compliance." Dissent at 33. None of this changes that querying, as we have determined based on our independent review of the record, is not an issue in this case.

the Section 702 information submitted to the FISC was not based on queries using terms associated with Muhtorov." Redacted Aplee. Suppl. Br. at 10-11. "Thus, the evidence Muhtorov sought to suppress was not obtained or derived from any queries associated with him." *Id.* at 11.

Our careful and independent review of the classified record, including the traditional FISA applications, confirms these representations are accurate. The record confirms that the relevant evidence did not arise from querying. We therefore do not address Mr. Muhtorov's second Fourth Amendment argument. *See United States v. Thomas*, 475 F.2d 115, 117 (10th Cir. 1973) (declining to entertain a contention for reversal where "the record below reflect[ed] that th[e] contention [wa]s unfounded").[13]

The Fourth Amendment question turns, "as so often in Fourth Amendment cases, [on] what precisely the facts show." *United States v. Lyles*, 910 F.3d 787, 793 (4th Cir. 2018). Here, the record shows that Mr. Muhtorov's communications were incidentally collected under Section 702 and were used to support the traditional FISA applications. Mr. Muhtorov's as-applied challenge thus begins and ends with whether the incidental collection of his Section 702 communications was constitutional. It was. We thus reject Mr. Muhtorov's Fourth Amendment argument.

---

[13] The dissent thus incorrectly asserts that we are "avoid[ing] difficult constitutional questions by accepting as true unsupported factual assertions" in the government's brief, *see* Dissent at 24, or "pay[ing] mere lip service" to reviewing the classified record, *id.* at 29 n.25. We have conducted a careful and thorough de novo review of the classified and public records and disagree with the dissent's unfounded assertions.

### E.  *Standard of Review and Fourth Amendment Background*

"When reviewing a denial of a defendant's motion to suppress, we view the evidence in the light most favorable to the government." *United States v. Cruz*, 977 F.3d 998, 1003 (10th Cir. 2020).  We review the district court's factual findings for clear error. *Id.* at 1003-04.  But "we review de novo the ultimate question of reasonableness under the Fourth Amendment," *id*. at 1004, and other legal conclusions, *United States v. Soza*, 643 F.3d 1289, 1291 (10th Cir. 2011).  "The final determination whether a warrantless search was reasonable under the Fourth Amendment is a question of law to be reviewed de novo." *United States v. Palmer*, 360 F.3d 1243, 1245 (10th Cir. 2004).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause[.]" U.S. Const. amend. IV.  A search or seizure satisfies the Fourth Amendment if it is reasonable. *See Riley v. California*, 573 U.S. 373, 381-82 (2014).  "[R]easonableness generally requires the obtaining of a judicial warrant." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995).  "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley*, 573 U.S. at 382.  "Because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—

25

subject only to a few specifically established and well-delineated exceptions." *Katz*, 389

U.S. at 357 (footnote omitted).

Even when a warrant is not required, the "search is not beyond Fourth Amendment

scrutiny; for it must be reasonable in its scope and manner of execution." *Maryland v.*

*King*, 569 U.S. 435, 448 (2013). "To say that no warrant is required is merely to

acknowledge that 'rather than employing a *per se* rule of unreasonableness, we balance

the privacy-related and law enforcement-related concerns to determine if the intrusion

was reasonable.'" *Id.* (quoting *Illinois v. McArthur*, 531 U.S. 326, 331 (2001)).

## F. *Discussion*

Based on the foregoing, our analysis proceeds in two steps. First, we must

determine whether the absence of a warrant rendered the incidental collection of Mr.

Muhtorov's communications "*per se* unreasonable." *See Katz*, 389 U.S. at 357. We

determine that a warrant was not required, and the incidental collection was therefore not

*per se* unreasonable. Second, we apply the *Maryland v. King* reasonableness balancing

test to the surveillance in this case. We conclude that it passes the reasonableness

balancing test.

In rejecting Mr. Muhtorov's argument that the warrantless collection of his

communications during Section 702 surveillance violated the Fourth Amendment, we

join the Ninth Circuit in *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016), and the

Second Circuit in *United States v. Hasbajrami*, 945 F.3d 641 (2d Cir. 2019). Those

courts found that similar warrantless incidental collection of a United States person's

26

communications during the lawful Section 702 surveillance of a non-United States person did not violate the defendant's Fourth Amendment rights.

1. **No Warrant Required**

In the course of surveilling a non-United States person located abroad under Section 702, the government incidentally collected Mr. Muhtorov's communications. We conclude no warrant was required for (a) the Section 702 surveillance of the foreign target and (b) the incidental collection of Mr. Muhtorov's communications.

a. *No warrant required to surveil a foreign target*

In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court held that the Fourth Amendment had "no application" to a search in Mexico of a citizen and resident of Mexico who had no voluntary attachment to the United States. *Id.* at 274-75. The Court held the Fourth Amendment does not apply to foreign persons outside the United States, but only "to 'the people'"—a constitutional "term of art" that "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 265.

The Court further explained that the Fourth Amendment "protect[s] the people of the United States against arbitrary action by their own Government" and "restrict[s] searches and seizures which might be conducted by the United States in domestic matters." *Id*. at 266. But "it was never suggested that the provision was intended to restrain the actions of the Federal Government against aliens outside of the United States territory" or "to apply to activities of the United States directed against aliens in foreign

27

territory." *Id*. at 266-67. Applying the Fourth Amendment to law enforcement operations designed to protect national security "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest." *Id.* at 273-74.

Thus, "aliens receive constitutional protections [only] when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271; *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) ("[I]t is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution.").

*Mohamud* and *Hasbajrami* applied *Verdugo-Urquidez* to Section 702 surveillance of foreigners abroad. The Ninth Circuit observed that "the Fourth Amendment does not apply to searches and seizures by the United States against a non-resident alien in a foreign country." *Mohamud*, 843 F.3d at 439 (quotations omitted). Thus, "the government's monitoring of the overseas foreign national's email fell outside the Fourth Amendment." *Id.* Similarly, the Second Circuit noted that "the Fourth Amendment does not apply extraterritorially to the surveillance of persons abroad." *Hasbajrami*, 945 F.3d at 662.

We agree with *Mohamud* and *Hasbajrami*. When the target of Section 702 surveillance is a foreign national located abroad having no substantial connections with the United States, that target is not entitled to Fourth Amendment protections. Even if the instrumentalities of surveillance were located in the United States, the foreign target

28

does not have Fourth Amendment protection because "what matters here is the location

of the *target*, and not where the government literally obtained the electronic data."

*Mohamud*, 843 F.3d at 439 (quotations omitted). In this case, therefore, the government

was not required to obtain a warrant before conducting the surveillance that targeted a

non-United States person located abroad.

    b. *Incidental collection of Mr. Muhtorov's communications*

We turn to whether the government needed a warrant to collect Mr. Muhtorov's

communications during the lawful Section 702 PRISM surveillance targeting a non-

United States person located abroad.[14] It did not.

The courts in *Mohamud* and *Hasbajrami* reached the same conclusion about

similar incidental collections during lawful Section 702 surveillance. They relied on the

"incidental overhear" doctrine developed in Title III wiretap cases. Although that

doctrine lends support to our holding, we further rely on the "plain view" doctrine and the

---

    [14] As discussed above, PRISM and upstream collection are two different ways to collect communications under Section 702. The government represents that "[t]his case does not involve upstream collection." ROA, Vol. III at 600; *accord* Aplee. Br. at 29 n.12. The dissent contends this assertion is "unsupported," Dissent at 29 n.24, noting that "no evidence in the record excludes" the possibility that upstream collection was used to gather Mr. Muhtorov's communication, *id.* But our own independent review of the public and classified records supports the government's representation. As an appellate court, we rely on the record and avoid conjecture about extra-record occurrences. *See Davis*, 576 U.S. at 281.

    Just as we decline to address possible constitutional issues regarding querying of Section 702 databases, we decline to consider possible constitutional issues concerning upstream collection of communications. *See Redacted*, 2011 WL 10945618, at *25-26 (FISC Oct. 3, 2011) (discussing constitutional issues raised by upstream collection). The record contains no indication that either upstream collection or querying Section 702 databases led to the traditional FISA applications.

foreign surveillance context of the investigation.  To explain our rationale, we first provide legal background on incidental overhear and plain view.

### i.  Legal background – incidental overhear and plain view

#### 1)  Incidental overhear

##### a)  Title III case law

The Supreme Court first discussed how the Fourth Amendment applies when the government incidentally overhears non-targets during electronic surveillance in two Title III cases:  *United States v. Kahn*, 415 U.S. 143 (1974), and *United States v. Donovan*, 429 U.S. 413 (1977).

In *Kahn*, the Supreme Court heard a challenge to Title III surveillance when the Title III order omitted the name of a person whose communications were collected.  The Court found that such collection does not offend the statutory text of Title III because "[a] requirement that the Government fully investigate the possibility that any likely user of a telephone was engaging in criminal activities before applying for an interception order would greatly subvert the effectiveness of the law enforcement mechanism that Congress constructed."  *Id.* at 153; *see also Donovan*, 429 U.S. at 423 ("[T]he Government is not required to identify an individual in the application unless it has probable cause to believe (i) that the individual is engaged in the criminal activity under investigation and (ii) that the individual's conversations will be intercepted over the target telephone.").

In *Kahn*, the Court noted in dicta that the Title III order was not a "general warrant" forbidden by the Fourth Amendment.  Analogizing to physical searches, it

stated that if there had been a warrant to search a home for records of a gambling operation, "a subsequent seizure of such records" bearing the handwriting of someone not identified in the warrant would comport with the Fourth Amendment. *Id.* at 155 n.15. Similarly, in *Donovan*, the Court noted in dicta that the Fourth Amendment requirement that a warrant specify the "place to be searched, and persons or things to be seized" does not require "that all those likely to be overheard engaging in incriminating conversations be named." *Id.* at 427 n.15.

> b) Applying the *Kahn* and *Donovan* dicta to the Fourth Amendment

Courts have applied the *Kahn* and *Donovan* dicta to Fourth Amendment challenges.

For example, the Second Circuit considered a Fourth Amendment challenge to a Title III order permitting the interception of calls made by persons not explicitly named in the Title III order from a particular prison phone suspected to be used to coordinate a narcotics conspiracy. Citing the *Kahn* and *Donovan* dicta, the court said the order did not violate the Fourth Amendment. *See United States v. Figueroa*, 757 F.2d 466, 472-73 (2d Cir. 1985).

As another court put it, "in the Title III context, incidental interception of a person's conversations during an otherwise lawful surveillance is not violative of the Fourth Amendment." *United States v. Bin Laden*, 126 F. Supp. 2d 264, 280 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157 (2d Cir. 2008); *see also United States v. Reed*, No. Cr. 07-10221-19-MLB, 2009 WL

31

10695690, at *1 (D. Kan. Sept. 29, 2009) (declining to suppress the communications of an individual not named in the Title III order); *United States v. Butenko*, 494 F.2d 593, 608 (3d Cir. 1974) (en banc) (holding incidental overhearing during surveillance under the Communications Act of 1934 did not violate the Fourth Amendment).

> c) Applying the *Kahn* and *Donovan* dicta to foreign intelligence surveillance – FISCR, Second Circuit, and Ninth Circuit

Three courts have extended the "incidental overhear" doctrine discussed in the *Kahn* and *Donovan* dicta to Fourth Amendment challenges to foreign intelligence surveillance.

In *In re Directives*, the FISCR applied the Title III incidental overhear doctrine to a Fourth Amendment challenge to incidental collections under the PAA, a statute substantially the same as Section 702. Citing *Kahn*, the FISCR held that "[i]t is settled beyond peradventure that incidental collections occurring as a result of constitutionally permissible acquisitions do not render those acquisitions unlawful." *In re Directives*, 551 F.3d at 1015.

Next, citing *In re Directives*, the Ninth Circuit in *Mohamud* held that "where a search was not directed at a U.S. person's communications, though some were incidentally swept up in it," no warrant was required "because the search was targeted at a non-U.S. person with no Fourth Amendment right." 843 F.3d at 439. The Ninth Circuit acknowledged the defendant's argument that "prior cases [in the Title III wiretapping context] upholding incidental collection involved prior judicial review or a narrowly drawn exception to the warrant requirement, as opposed to the collection here."

*Id.* at 440 (quotations omitted). But it disagreed that the lack of prior judicial review under Section 702 raised a Fourth Amendment concern because "the guiding principle behind [the Title III incidental overhear cases] applies with equal force here: when surveillance is lawful in the first place—whether it is the domestic surveillance of U.S. persons pursuant to a warrant, or the warrantless surveillance of non-U.S. persons who are abroad—the incidental interception of non-targeted U.S. persons' communications with the targeted persons is also lawful." *Id.* at 440-41 (quoting *United States v. Hasbajrami*, No. 11-cr-623 (JG), 2016 WL 1029500, at *9 (E.D.N.Y. Mar. 8, 2016)).

Finally, the Second Circuit in *Hasbajrami* joined the Ninth Circuit in rejecting a Fourth Amendment challenge to the incidental collection of a United States person's communications during Section 702 surveillance. It found no warrant was required because "law enforcement officers do not need to seek an *additional* warrant or probable cause determination to continue surveillance when, in the course of executing a warrant or engaging in other lawful search activities, they come upon evidence of other criminal activity outside the scope of the warrant or the rationale justifying the search, or the participation of individuals not the subject of that initial warrant or search." 945 F.3d at 662.

The Second Circuit also noted, with little elaboration, that "[t]he 'incidental overhear' doctrine is closely related to the 'plain view' doctrine applied in connection with physical searches." *Id.* at 664 n.17 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465-67 (1971)). Just as the "seizure of evidence of a crime in plain view without a warrant is a reasonable seizure . . . , when evidence of a potential crime involving an

33

American comes to light during the lawful surveillance of a foreign operative abroad, it is entirely reasonable within the meaning of the Fourth Amendment for the government to continue monitoring the conversations of that operative with the American . . . ." *Id.* at 667.

### 2) Plain view

In *Coolidge*, the Supreme Court explained the reasoning behind the "'plain view' exception to the warrant requirement," 403 U.S. at 464, stating that "[i]t is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Id.* at 465. The plain view doctrine applies when "the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Id.* The plain view exception also applies "[w]here the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement," such as the "hot pursuit" exception or the "search incident to arrest" exception. *Id.* The crucial point is that "the police officer . . . had a prior justification for an intrusion." *Id.* at 466. But "plain view *alone* is never enough to justify the warrantless seizure of evidence." *Horton v. California*, 496 U.S. 128, 136 (1990) (quotations omitted).

There is no requirement that officers come across the evidence in plain view inadvertently. "The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is

34

confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." *Id.* at 138.[15]

The plain view doctrine has three requirements before an item may be lawfully seized. "A warrantless seizure of evidence is sustainable if (1) the police officer was lawfully located in a place from which to plainly view the item; (2) the officer had a lawful right of access to the item; and (3) it was immediately apparent that the seized item was incriminating on its face." *United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002); *see also United States v. Naugle*, 997 F.2d 819, 822 (10th Cir. 1993). In addition, "a warrantless search [must] be circumscribed by the exigencies which justify its initiation," whether it be hot pursuit, search incident to arrest, or some other exception to the warrant requirement. *Horton*, 496 U.S. at 139-40. This and the "immediately apparent" requirement prevent a reasonable search from becoming an unreasonable general exploratory search. *See United States v. Carey*, 172 F.3d 1268, 1272-76 (10th Cir. 1999) (rejecting a plain view argument, and finding the search of a computer for files was "general exploratory rummaging," when the incriminating nature

---

[15] Although *Coolidge* characterized the plain view doctrine as an "exception to the warrant requirement," a Supreme Court plurality has suggested that "this description may be somewhat inaccurate." *Texas v. Brown*, 460 U.S. 730, 738 (1983) (plurality opinion). Under that view, the plain view doctrine "provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment." *Id.* Thus, plain view is perhaps "better understood, . . . not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be." *Id.* at 738-39.

of the files was not immediately apparent and the computer was out of the defendant's

control so there was no exigency).

Although the typical plain view scenario occurs when an officer sees an

incriminating object and then seizes it, courts have applied the doctrine to the full range

of senses, including plain hearing, *see, e.g.*, *United States v. Ceballos*, 385 F.3d 1120,

1124 (7th Cir. 2004), plain smell, *see, e.g.*, *United States v. Gault*, 92 F.3d 990, 992 (10th

Cir. 1996), and plain feel, *see, e.g.*, *United States v. Campbell*, 549 F.3d 364, 373 (6th

Cir. 2008).

Overall, "[t]he plain view doctrine merely reflects an application of the Fourth

Amendment's central requirement of reasonableness to the law governing seizures of

property." *Soldal v. Cook Cnty.*, 506 U.S. 56, 66 (1992) (quotations omitted).  When a

warrantless seizure complies with the plain view requirements, it is upheld because it

complies with the "ultimate touchstone of the Fourth Amendment," that is,

reasonableness.  *Brigham City*, 547 U.S. at 403.[16]

ii.  Analysis

We explain why (1) the plain view doctrine, (2) the foreign intelligence

surveillance context, and (3) the incidental overhear cases justify the incidental collection

---

[16] Thus, once a court determines that the government satisfied the plain view doctrine's requirements, it does not continue to determine whether the warrantless seizure was reasonable under the Fourth Amendment balancing test because the test already accounts for the interests of the government and the defendant embodied in the "central requirement of reasonableness." *Soldal*, 506 U.S. at 66; *see also, e.g.*, *Naugle*, 997 F.2d at 822-23.
We apply the reasonableness balancing test below because we do not rely solely on the plain view doctrine to conclude no warrant was required.

of Mr. Muhtorov's communications under Section 702 without a warrant.  Then we address (4) Mr. Muhtorov's objections.

### 1)  Plain view and incidental collection without a warrant

The incidental collection of Mr. Muhtorov's communications without a warrant during the course of otherwise lawful Section 702 surveillance was consistent with the justifications for the plain view doctrine.

The "initial intrusion" that brought the government into contact with Mr. Muhtorov's communications was "supported . . . by one of the recognized exceptions to the warrant requirement."  *See Coolidge*, 403 U.S. at 465.  It was lawful because, under *Verdugo-Urquidez*, no warrant is required to surveil foreigners located abroad.

It was then reasonable for the government to collect Mr. Muhtorov's communications during the otherwise lawful Section 702 surveillance.[17]  As discussed above, the government did not conduct upstream collection, only PRISM collection. Once it was targeting the foreign national under PRISM, the government was lawfully "in" the two-way communications.  *See Naugle*, 997 F.2d at 822.  In that position, it collected communications sent to and from the target.  If Mr. Muhtorov happened to be the sender of a communication received by the target, or was the recipient of a communication sent by the target, then his communications could not be disentangled

---

[17] Our analysis of whether a warrant was required and our discussion below about whether the surveillance in this case passed the reasonableness balancing test overlap. The touchstone of any determination that a warrant was not required is "reasonableness," *Brigham City*, 547 U.S. at 403, and even when a warrant was not required, the search must still be "reasonable" under the balancing test in *Maryland v. King*, 569 U.S. at 448.

from the target's.  The nature of PRISM surveillance and the commonsense notion that a communication involves at least two people means that Mr. Muhtorov's communications were necessarily in "plain view" of the government's Section 702 surveillance targeting the foreign national.

Moreover, it is impracticable to require the government to cease PRISM surveillance of a foreign target communicating with a United States person and immediately seek a traditional FISC warrant or Title III order.  This is particularly so in cases like Mr. Muhtorov's, in which the "prevention or apprehension of terrorism suspects" is at the heart of the government's surveillance efforts.  *See In re Directives*, 551 F.3d at 1011.  "Compulsory compliance with the warrant requirement would introduce an element of delay, thus frustrating the government's ability to collect information in a timely manner."  *Id.* at 1011-12.

As the Second Circuit put it, "the overall practice of surveilling foreigners abroad of interest to the legitimate purpose of gathering foreign intelligence information may predictably lead to the interception of communications with United States persons." *Hasbajrami*, 945 F.3d at 665.  This predictability does not undermine the government's argument that no warrant was required for the incidental collection of Mr. Muhtorov's communications.  *See United States v. Khan*, 989 F.3d 806, 818 (10th Cir. 2021) (discussing the lack of an inadvertent discovery requirement for the plain view doctrine to apply).

2) Foreign intelligence surveillance context – Section 702's
statutory requirements

Two of Section 702's statutory requirements limited the scope of the incidental

collection of Mr. Muhtorov's communications. Consistent with the plain view doctrine,

these statutory limitations prevented the surveillance from becoming a "general

exploratory search from one [communication] to another until something incriminating at

last emerge[d]." *See Carey*, 172 F.3d at 1272 (quoting *Coolidge*, 403 U.S. at 466).

First, Section 702 surveillance must be intended to "acquire foreign intelligence

information." 50 U.S.C. § 1881a(a). This requirement limits Section 702 surveillance to

situations in which the government's power "to collect time-sensitive information" is

paramount. *See In re Directives*, 551 F.3d at 1011. The statute's restriction to the

foreign intelligence context, where the "government has the greatest need for speed,

stealth, and secrecy," *United States v. Hung*, 629 F.2d 908, 915 (4th Cir. 1980), confines

Section 702 surveillance to the "exigencies which justify its initiation"—that is, the

foreign intelligence surveillance of foreigners located abroad, *see Horton*, 496 U.S. at

139-40.

Second, Section 702 requires that surveillance be conducted "to minimize the

acquisition and retention . . . of nonpublicly available information concerning

unconsenting United States persons." 50 U.S.C. § 1801(h)(1). It forbids the government

from "intentionally target[ing]" persons located in the United States, or outside the

United States if the "purpose of such acquisition is to target a particular" person in the

United States. *Id.* § 1881a(b)(1)-(2). The minimization and targeting limitations on

39

Section 702 surveillance are similar to the requirements described above that prevent plain view searches from becoming unreasonable general exploratory searches.

In sum, Section 702's statutory requirements—surveillance limited to foreign intelligence, and minimization and targeting limitations—helped to make the incidental collection of Mr. Muhtorov's communications "minimally intrusive[,] and [the] operational necessities render[ed] it the only practicable means of detecting certain types of crime." *See Arizona v. Hicks*, 480 U.S. 321, 327 (1987).

### 3) Incidental overhear

The Fourth Amendment principles discussed in the *Kahn*, *Donovan*, and later "incidental overhear" cases are rooted in the plain view doctrine and support our conclusion that no warrant was required.

First, plain view has been a mostly unspoken premise of the "incidental overhear" cases. *Kahn* and *Donovan* suggested that, once the surveilling officers obtained a Title III order and were lawfully listening to a conversation, they could seize a non-target's incriminating statements in "overheard" conversations without a warrant because the Fourth Amendment does not require "that all those likely to be overheard engaging in incriminating conversations be named." *Donovan*, 429 U.S. at 427 n.15. Such a warrantless seizure would satisfy all three plain view requirements. *See Castorena-Jaime*, 285 F.3d at 924. As the Second Circuit noted in *Hasbajrami*, the "'incidental overhear' doctrine is closely related to the 'plain view' doctrine applied in connection with physical searches." 945 F.3d at 664 n.17.

40

Second, the cases finding no warrant was required to seize communications of persons overheard on a wiretap are factually similar to the incidental collection of Mr. Muhtorov's communications. Both involve lawfully initiated electronic surveillance in which a non-target communicates with the target. Just as "surveillance under a [Title III] order that authorizes interception of calls of 'others as yet unknown' is not strictly limited to only those who are specifically named in the authorizing order," *Figueroa*, 757 F.2d at 473, neither is lawfully initiated Section 702 surveillance that authorizes collection of a foreign target's communications strictly limited to collecting only that target's communications with non-United States persons.

*   *   *   *

Based on the foregoing, we find no warrant was required for the incidental collection of Mr. Muhtorov's communications.

4)  Mr. Muhtorov's objections

Mr. Muhtorov's objections to the absence of a warrant lack merit.

First, he contrasts the absence of any warrant in this case with cases in which a Title III order supported the initial intrusion. But the lack of a warrant is not dispositive of the Fourth Amendment question. Rather, a search that proceeds in two steps—an initial intrusion and then a warrantless seizure of materials in plain view—is constitutional when each of them independently complies with the Fourth Amendment. That can occur when the first step is lawful—either because there was a warrant or because a warrant was not required.

41

Even though the government did not obtain a warrant before surveilling the non-United States target, *Verdugo-Urquidez* supported the initial warrantless intrusion. Just as the plain view doctrine can apply when "the initial intrusion that brings the police within plain view . . . is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement," *Horton*, 496 U.S. at 135, here the initial intrusion was justified at its inception.[18]

Second, Mr. Muhtorov argues that "multiple preconditions [in Title III] strictly limit the extent of any 'overhearing.'" Aplt. Reply Br. at 15. But, like *Mohamud* and *Hasbajrami*, we draw on Fourth Amendment reasonableness, the touchstone for the warrant requirement and its exceptions, not the particularities of Title III surveillance. Section 702 targeting and minimization requirements are akin to the statutory limits placed on Title III overhearing.

Third, Mr. Muhtorov contends the communications were not "incidental" because the monitoring of communications between foreign targets and United States persons was contemplated and desired. Although Mr. Muhtorov cites a report suggesting this may sometimes happen under Section 702, *see* Aplt Br. at 29-30 & n.14 (citing PCLOB-2014 at 82, 86-87), there is no evidence this occurred here.

---

[18] Mr. Muhtorov also asserts that courts have required the government to obtain a warrant after an initial seizure of an electronic device to conduct a further search of the device's contents. For example, in *Riley*, 573 U.S. at 401, the Supreme Court said that law enforcement usually must get a warrant to search a cell phone that had been seized in a search. But Mr. Muhtorov has not explained why *Riley*'s discussion of cell phones applies to this situation, in which the government first lawfully seized the contents of Mr. Muhtorov's communications.

42

In addition, the subjective motivations of the surveilling officers normally are not material to whether a particular item was seized in compliance with the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). The government may anticipate that it might discover and collect evidence found in plain view. That does not, however, render a seizure unconstitutional so long as the "warrantless search [is] circumscribed by the exigencies which justify its initiation." *See Horton*, 496 U.S. at 139-40. Further, Section 702 forbids the government from "intentionally target[ing] a person reasonably believed to be located outside the United States if the purpose of such acquisition is to target a particular, known person reasonably believed to be in the United States." 50 U.S.C. § 1881a(b)(2). Nothing in the record suggests the government did not follow that directive here.

Fourth, Mr. Muhtorov contends that the sheer volume of communications gathered under Section 702 makes their collection unconstitutional. He does not explain how quantity renders the collection unconstitutional. He simply notes that the quantity "dwarfs that of communications intercepted incidentally under the original provisions of FISA or Title III." Aplt. Br. at 30. Rather than bear on whether we should find that the incidental collection of Mr. Muhtorov's communications was lawful without a warrant, this argument concerns whether the overall search was reasonable. But as explained below, Section 702 has adequate minimization and targeting procedures to prevent it from becoming an unreasonably broad surveillance program.

43

\*    \*    \*    \*

For these reasons, the government was not required to obtain a warrant before it incidentally collected Mr. Muhtorov's communications during lawful Section 702 surveillance conducted for foreign intelligence purposes. A contrary holding would result in the suppression of evidence obtained through lawful foreign intelligence collection simply because the government did not have earlier knowledge that a United States person was corresponding with a foreign target.

In concluding that no warrant was required, we heed this court's admonition against adopting "an amorphous 'reasonableness' test." *United States v. Bute*, 43 F.3d 531, 534-35 (10th Cir. 1994). Through case-by-case Fourth Amendment reasonableness determinations, the Supreme Court has developed the plain view doctrine. *See Coolidge*, 403 U.S. at 465. The Court also has recognized the incidental overhear doctrine in the Title III surveillance context. Though the plain view doctrine arose from physical search cases, and though courts initially recognized an incidental overhear doctrine in Title III cases, those doctrines along with the foreign intelligence surveillance context justify finding that no warrant was required here.

Our conclusion that the incidental collection of Mr. Muhtorov's communications under Section 702 PRISM surveillance did not require a warrant, like the plain view doctrine, "merely reflects an application of the Fourth Amendment's central requirement of reasonableness to the law governing seizures of property." *See Soldal*, 506 U.S. at 66 (quotations omitted). Though the Fourth Amendment disfavors warrantless searches and seizures, we find that the nature of Section 702 PRISM surveillance, the foreign

44

intelligence context of the surveillance, and long-standing Fourth Amendment principles demonstrate that a warrant was not required.

2. **Collection of Mr. Muhtorov's Communications Passed the Reasonableness Balancing Test**

Although we find that the lack of a warrant did not render the incidental collection of Mr. Muhtorov's communications under Section 702 per se unreasonable, that does not end the analysis. The search must still be "reasonable in its scope and manner of execution." *Maryland v. King*, 569 U.S. at 448. The incidental collection of Mr. Muhtorov's communications was reasonable due largely to Section 702's provisions that constrained the government.

"As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist.*, 515 U.S. at 652. In assessing reasonableness, we examine the totality of the circumstances. *Samson v. California*, 547 U.S. 843, 848 (2006); *see also United States v. Duka*, 671 F.3d 329, 339 (3d Cir. 2011) ("What is reasonable . . . depends on the nature of the search."). We balance "the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy." *Maryland v. King*, 569 U.S. at 448 (brackets and quotations omitted); *see also McArthur*, 531 U.S. at 331 ("[W]e balance the privacy-related and law enforcement-related concerns.").

The reasonableness balancing test is particularly concerned with ensuring that a search and seizure is "both limited and tailored reasonably to secure law enforcement

needs while protecting privacy interests." *McArthur*, 531 U.S. at 337; *see also id.* at 332-33.[19]

    a.  *Reasonableness balancing test*

      i.  <u>Government's interest</u>

The Supreme Court has labeled "the Government's interest in combating terrorism . . . an urgent objective of the highest order." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010); *accord Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." (quotations omitted)); *see also Hasbajrami*, 945 F.3d at 663 (discussing "the paramount national interest in preventing foreign attacks on our nation and its people"); *Duka*, 671 F.3d at 340 ("The government's interests in security and intelligence are entitled to particular deference."); *In re Directives*, 551 F.3d at 1012 ("[T]he relevant governmental interest—the interest in national security—is of the highest order of magnitude."). "Efforts to monitor the activities of [agents of terrorist organizations] to detect and forestall possible terrorist attacks on this country present a paradigm case of a compelling government interest." *Hasbajrami*, 945 F.3d at 663.

---

[19] As explained below, Mr. Muhtorov's reasonableness argument focuses on the government's alleged ability to "retain, use, and deliberately query" Section 702 databases. Aplt. Br. at 36. He does not specifically argue that the incidental collection of his communications, as opposed to the post-seizure use of those communications, fails the Fourth Amendment's balancing test. We conduct the reasonableness balancing test for the sake of completeness before addressing Mr. Muhtorov's specific arguments.

This interest is implicated when the target of surveillance communicates with persons in the United States, such as Mr. Muhtorov, because "[t]he recruitment of persons inside the United States or the placement of agents here to carry out terrorist attacks is one of the very threats that make it vital to surveil terrorist actors abroad." *Id.* at 666-67.

#### ii.  Mr. Muhtorov's privacy interest

We assume Mr. Muhtorov had a reasonable expectation of privacy in his communications that were monitored and intercepted through Section 702 surveillance. *See id.* at 666 (assuming the defendant had a privacy interest in his email communications and "that the government may not eavesdrop, without reasonable justification, on the conversations of United States persons (even abroad) with foreign nationals, simply because the United States person is interacting with a foreigner").

#### iii.  Privacy safeguards

"An important component of the reasonableness inquiry is whether the FISC-approved targeting and minimization measures sufficiently protect the privacy interests of U.S. persons." *Mohamud*, 843 F.3d at 443; *see, e.g.*, *In re Directives*, 551 F.3d at 1015 (the minimization procedures under the PAA "serve . . . as a means of reducing the impact of incidental intrusions into the privacy on non-targeted United States persons").

Section 702 requires safeguards for privacy interests.  The targeting and minimization procedures are designed to limit Section 702 surveillance only "to acquire foreign intelligence information."  50 U.S.C. § 1881a(a).  Section 702 requires the AG and DNI to develop procedures to comply with the statute's targeting, minimization, and

47

querying requirements, and the FISC to review and approve these procedures.  In addition, though intercepted communications might be voluminous, PRISM collection, unlike other surveillance programs, is more targeted and narrow in scope.  *See* PCLOB-2014 at 33-36 (contrasting PRISM and upstream collection).

### iv. Totality of the circumstances

Under the totality of the circumstances, we find Mr. Muhtorov's privacy interest was "outweighed by the government's manifest need to monitor the communications of foreign agents of terrorist organizations operating abroad"—a need that "makes the incidental collection of communications between such foreigners and United States persons reasonable."  *Hasbajrami*, 945 F.3d at 666 (quotations omitted).  The government has a strong interest in conducting foreign intelligence surveillance targeting those abroad.

The threat to the United States when foreign actors coordinate with and recruit United States persons bolsters the reasonableness of the incidental collection of United States persons' communications during lawful foreign intelligence surveillance directed at foreign nationals abroad.  The "immediate objective" of the Section 702 surveillance here was to safeguard national security rather than "to generate evidence for law enforcement purposes."  *See Ferguson v. City of Charleston*, 532 U.S. 67, 83 (2001) (emphasis omitted); *United States v. Ning Wen*, 477 F.3d 896, 899 (7th Cir. 2007) ("Interception of [the defendant's] conversations was adequately justified under FISA's terms, so there is no constitutional obstacle to using evidence of any domestic crimes he committed.").

48

In addition, the Section 702 program used to surveil Mr. Muhtorov is subject to targeting and minimization procedures and the overarching requirement that it be used for foreign intelligence gathering only.  This is particularly true for PRISM collection.  *See Schuchardt v. Trump*, No. 14-705, 2019 WL 426482, at *2 (W.D. Pa. Feb. 4, 2019) ("[I]n light of the record now before the Court, PRISM has *not* been shown to be the dragnet-type collection mechanism suggested.").

\* \* \* \*

We find the warrantless incidental collection of Mr. Muhtorov's communications was constitutional under the reasonableness balancing test.

b.  *Mr. Muhtorov's reasonableness arguments*

Mr. Muhtorov principally focuses on the alleged lack of post-seizure restrictions and the government's "ability to retain, use, and deliberately query its massive Section 702 databases for the emails of known Americans, without ever satisfying bedrock Fourth Amendment requirements."  Aplt. Br. at 36, 40.  His arguments are inapposite or unpersuasive.

First, his argument about post-seizure querying is inapposite because, as explained above, the trial evidence was not derived from querying a Section 702 database.  Querying might raise difficult Fourth Amendment questions that we need not address here.  *See Hasbajrami*, 945 F.3d at 672-73.[20]

---

[20] In *Hasbajrami*, the Second Circuit remanded "[b]ecause the district court was not even aware whether such querying had occurred," and the district court had to determine, in the first instance, whether a constitutional violation had occurred.  *See* 945 F.3d at 676.  This case is different.  As the government points out, Mr. Hasbajrami's

49

Second, Mr. Muhtorov argues "reasonableness requires" that "agents must obtain individualized judicial approval at the point when they seek to . . . use an American's communications." Aplt. Br. at 37. We reject this argument because mere "use" of already collected Section 702 communications without reliance on querying does not trigger the Fourth Amendment.

The Fourth Amendment does not apply unless there has been a "search," *see United States v. Jones*, 565 U.S. 400, 404-05 (2012), or a "seizure," *see Torres v. Madrid*, 141 S. Ct. 989, 995 (2021). The later use of Mr. Muhtorov's lawfully collected communications resembles use of seized evidence to prepare affidavits for warrants to obtain additional evidence for trial, which is not a separate Fourth Amendment event. *See Bell v. City of Chicago*, 835 F.3d 736, 741 (7th Cir. 2016) (rejecting a Fourth Amendment challenge to post-seizure police procedures because "once an individual has been meaningfully dispossessed, the seizure of the property is complete" (brackets and

_____

guilty plea and resulting lack of a trial "limited the reviewing court's ability to determine whether there might have been evidence potentially derived from queries." Redacted Aplee. Suppl. Br. at 12. Here, there was a trial, and we have determined, based on our own independent review of the classified record (including the government's classified brief, the traditional FISA applications, and the chronology filed with the district court on November 10, 2015), that the only Section 702 evidence at issue—the incidentally collected communications that supported the traditional FISA applications—was not the product of querying.

The dissent believes the government's representation that it did not use querying to prepare the traditional FISA applications is "directly contradicted by other government representations in its classified brief." Dissent at 25. We discern no contradiction. We also disagree that "we are left to guess at the answers to critically important questions in the derivative evidence inquiry, e.g., which communications the government received at which times, whether and when querying occurred, and what information motivated the government to seek traditional FISA authorization." *Id.* at 32 n.28.

50

quotations omitted)); *United States v. Leon*, 468 U.S. 897, 906 (1984) (noting that "the use of fruits of a past unlawful search or seizure works no new Fourth Amendment wrong" as the wrong was "fully accomplished by the unlawful search or seizure itself" (brackets and quotations omitted)).[21]

Third, Mr. Muhtorov's argument that Section 702 surveillance "abandons three core safeguards—individualized judicial review, a finding of probable cause, and particularity"—lacks merit. Aplt. Br. at 38. Although these safeguards are embodied in the warrant requirement, they are "presumption[s] [that] may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quotations omitted). As discussed above, it is a reasonable extension of long-standing Fourth Amendment

---

[21] Querying is a technical term defined as "the use of one or more terms to retrieve the unminimized contents or noncontents located in electronic and data storage systems of communications of or concerning United States persons obtained through acquisitions authorized [in Section 702]." 50 U.S.C. § 1881a(f)(3)(B). "Use" of already collected evidence, as distinct from querying, does not constitute a separate Fourth Amendment event. The dissent appears to concede that the use of already collected Section 702 communications without reliance on querying does not trigger the Fourth Amendment. We agree. *See* Dissent at 36 n.31.

Apart from this apparent concession, the dissent misreads *Hasbajrami*'s discussion of querying. In questioning our analysis upholding the government's use of incidentally collected Section 702 communications to support traditional FISA applications, the dissent relies on the Second Circuit's discussion of querying, which is not pertinent to this case. *See* Dissent at 36 n.30 (citing *Hasbajrami*, 945 F.3d at 670-73). Instead, the relevant portion of *Hasbajrami* fully supports our position: "[B]oth the collection of such communications and the dissemination of information from such collection about potential criminal actions within the country to domestic law enforcement are reasonable under the Fourth Amendment." 945 F.3d at 667-68. The dissent makes the same mistake with *Riley*, which concerned the search of a phone after it had been seized. *See* Dissent at 37-38. For why *Riley* does not apply here, see footnote 18, *supra*.

51

doctrines—including *Verdugo-Urquidez* and plain view—to exempt incidental Section 702 collection of a United States person's communications from the warrant requirement.

*    *    *    *

The Section 702 surveillance here was appropriately particularized and "narrowly tailored to the government's foreign intelligence-gathering prerogatives." ROA, Vol. III at 119. The warrantless incidental collection of Mr. Muhtorov's communications through Section 702 surveillance was reasonable in its purpose, operation, and restrictions and did not violate the Fourth Amendment.[22]

## II.  **ARTICLE III CHALLENGE**

In addition to his Fourth Amendment challenge to the Section 702 surveillance, Mr. Muhtorov urges suppression of trial evidence derived from the fruits of the Section 702 surveillance on a separate constitutional ground.

He argues Section 702 is unconstitutional to the extent it "assigns to an Article III court a role that is fundamentally incompatible with the case-or-controversy requirement." Aplt. Br. at 48. Mr. Muhtorov contends that Section 702 "requires the [FISC] to review the legality and constitutionality of the government's procedures in the abstract," *id.* at 47, and thus "requires FISC judges to issue advisory opinions addressing the constitutionality of abstract procedures in the absence of concrete facts," Aplt. Reply

---

[22] Because we find there was no Fourth Amendment violation, and therefore no need to suppress evidence, we need not address the government's alternative argument that the good faith exception to the exclusionary rule applies.

Br. at 24.[23]  We construe his argument to assert that (1) the FISC's role under Section 702 violates Article III's prohibition on advisory opinions; and (2) Section 702 violates the separation of powers.[24]  We disagree as to both.[25]

## A.  *FISC Background*

Under Section 702, the FISC has jurisdiction to review the government's targeting, minimization, and, as of 2018, querying procedures that apply to Section 702 surveillance.  *See* 50 U.S.C. § 1881a(d)-(f), (j).  Section 702 "requires the AG and the DNI to adopt [such] procedures each year that will govern how the program functions at each agency tasked with Section 702 surveillance."  *Hasbajrami*, 945 F.3d at 652.

Thus, "the FISC approves Section 702 procedures in advance, targeting non-United States persons located abroad as a category, and the government does not have to return to the FISC to seek approval before it undertakes surveillance of any specific

---

[23] The district court discussed these arguments but "le[ft] to a higher court" to determine whether Section 702 violates Article III.  ROA, Vol. III at 137.  It stated that, "[f]or purposes of [this case], my judgment is that it does not."  *Id.*

[24] As explained below, Article III justiciability is rooted in separation of powers principles.

[25] In so doing, we join the Ninth Circuit in *Mohamud*, the only other circuit court to address a similar challenge.  In a brief footnote, it first found that "FISC opinions are not advisory because the FISC either approves or denies the requested acquisition (and electronic communication service providers must follow the directives or challenge them)."  *Mohamud*, 843 F.3d at 444 n.28.  It also found "the FISC survives separation of powers and non-delegation challenges, as FISC review of § 702 surveillance applications does not 'interfere with the prerogatives of another branch of government beyond requiring the executive branch to conform to the statute,' and is 'central to the mission of the judiciary' as it is similar to 'the review of search warrants and wiretap applications.'"  *Id.* (brackets omitted) (quoting *Mistretta v. United States*, 488 U.S. 361, 388 (1989)).

individual or his or her accounts under those Section 702 [procedures]." *Id.* at 651.

"[T]he FISC reviews for more than form, and must determine whether the targeting procedures are indeed 'reasonably designed' to achieve their statutory goals, and whether the minimization procedures and querying procedures 'meet the definition' and 'comply with the requirements in the statute.'" Kris & Wilson § 17:9 (quoting 50 U.S.C. § 1881a(j)(2)(B)-(D)).

The FISC "has repeatedly noted that the government's targeting and minimization procedures must be considered in light of the communications actually acquired." *Redacted*, 2011 WL 10945618, at *9. It considers the procedures in light of the "volume and nature" of communications being acquired. *Id.* In making this determination, the FISC considers not only the government's proposed procedures and accompanying affidavits, but also "responses to FISC orders to supplement the record, and the sworn testimony of witnesses at hearings." PCLOB-2014 at 28-29 (footnotes omitted).

## B. *Discussion*

We explain why Section 702 (1) complies with Article III, and (2) conforms to the separation of powers.

### 1. **Prohibition of Advisory Opinions**

The FISC's role under Section 702 complies with the Article III prohibition on advisory opinions. The FISC decides matters that "are traditionally thought to be capable of resolution through the judicial process." *See Flast v. Cohen*, 392 U.S. 83, 97 (1968). It applies law to facts to render binding Section 702 decisions that authorize or

disapprove of foreign surveillance procedures, and thus does not render advisory opinions.[26]

    a.  *Advisory opinions background*

Article III of the Constitution vests the "judicial Power of the United States" in the "supreme Court, and [the] inferior Courts." U.S. Const. art. III, § 1. It further provides that the "judicial Power shall extend" only to certain "Cases" and "Controversies." *Id.* § 2. Article III limits the judicial power to disputes that are "consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast*, 392 U.S. at 97. That is, "[w]henever the law provides a remedy enforceable in the courts according to the regular course of legal procedure, and that remedy is pursued, there arises a case within the meaning of the Constitution." *Tutun v. United States*, 270 U.S. 568, 577 (1926).

One limitation on the judicial power is the prohibition of advisory opinions, which requires that courts must adjudicate only "concrete legal issues, presented in actual cases,

---

[26] The parties do not dispute that the FISC is an Article III court. Indeed, the FISC and FISCR have long recognized that it is. *See, e.g.*, *In re Opinions & Orders*, No. Misc. 13-08, 2020 WL 897659, at *4 (FISC Feb. 11, 2020) (describing the ancillary and inherent powers the FISC possesses "[a]s an Article III court"); *In re Sealed Case*, 310 F.3d 717, 731, 732 n.19 (FISA Ct. Rev. 2002) (per curiam) (rejecting an argument that "the statutory responsibilities of the FISA court are inconsistent with Article III case and controversy responsibilities"). Other federal courts also have so recognized. *See ACLU v. Clapper*, 785 F.3d 787, 828 (2d Cir. 2015) (Sack, J., concurring) ("The FISC, like the quotidian federal district courts and courts of appeals, is established under Article III of the Constitution."); *Megahey*, 553 F. Supp. at 1196-97 (rejecting arguments that the FISC is not properly constituted under Article III).

not abstractions." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (quotations omitted).

This court described the origins of the advisory opinion doctrine as follows:

> The rule prohibiting federal courts from rendering advisory opinions was first enunciated in 1793 when the Supreme Court refused to answer questions of international law submitted to Chief Justice Jay by Secretary of State Jefferson on behalf of President Washington. 3 *Correspondence and Public Papers of John Jay,* 488–89 (1890). Since then, the Court has sought on numerous occasions to delineate factors which separate a "case" or "controversy" from a dispute that is hypothetical, abstract or academic in character.

*Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1273 (10th Cir. 1989).

Thus, a case must be a "present, live controversy" for courts to "avoid advisory opinions on abstract propositions of law." *Hall v. Beals*, 396 U.S. 45, 48 (1969) (per curiam). "[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quotations omitted). In short, Article III requires that judicial power be exercised only in the "application of principles of law or equity to facts." *Vermont v. New York*, 417 U.S. 270, 277 (1974).

   b. *Analysis*

We acknowledge that FISC's Section 702 role does not conform to traditional notions of Article III adjudication. But on close inspection, its Section 702 role is constitutional because the FISC applies legal principles to facts and its Section 702 determinations are not merely advisory but instead have immediate and legally binding consequences.

i.  Not advisory opinions

The FISC's Section 702 pre-clearance rulings are not advisory opinions.  The

FISC applies law to real-world issues, not abstract questions, and makes decisions that

bind the executive.

First, the FISC applies "principles of law" to "facts."  *Vermont v. New York*, 417

U.S. at 277.  It must examine the detailed factual submissions of the government—the

proposed targeting, minimization, and querying procedures—to ensure compliance with

Section 702 and applicable constitutional provisions.  *See, e.g.*, *Redacted*, 2011 WL

10945618, at *9 (finding that the NSA's proposed targeting procedures were "consistent

with the requirements of" Section 702, proposed minimization procedures were

inconsistent with the requirements of Section 702, and the targeting and minimization

procedures were inconsistent with the Fourth Amendment).[27]  The FISC thus does not

"decide hypothetical issues," *Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982), or

proceed from "speculative contingencies," *Hall*, 396 U.S. at 49.  It determines whether

the government's proposed procedures, which are revised each year and embody specific

approaches to targeting, minimization and (as of 2018) querying, comply with Section

702 and the Constitution.

---

[27] As noted above, Congress added the requirement for the government to adopt, and the FISC to approve, querying procedures in 2018.  *See* Kris & Wilson § 3:9.  Before 2018, only targeting and minimization procedures were reviewed in Section 702 proceedings.

Relatedly, the questions that the FISC must answer during Section 702 review are "pressed before the [FISC] with . . . clear concreteness." *See United States v. Fruehauf*, 365 U.S. 146, 157 (1961). Section 702 does not call on the FISC to express "[a]dvance expressions of legal judgment upon issues which remain unfocused." *See id.*

For example, in 2011, the FISC reviewed targeting and minimization procedures submitted by the AG and DNI to ensure compliance with Section 702. *See Redacted*, 2011 WL 10945618, at *5. To assess the proposed targeting and minimization procedures for Section 702 surveillance, the FISC considered the factual realities of proposed upstream surveillance. It said that newly revealed factual developments—the "government's revelations as to the manner in which NSA acquires Internet communications"—required it to change its legal conclusion. *See id.* at *9. This example shows that the FISC must answer concrete questions based on factual developments concerning electronic surveillance.[28]

In sum, the FISC's Section 702 determinations resemble non-advisory judicial adjudication. They are grounded in evidentiary submissions, not abstract and hypothetical questions.[29]

---

[28] The FISC's most recent certification decisions confirm that it continues to apply law and its own precedent to the government's specific factual submissions. *See Redacted* (FISC Nov. 18, 2020), https://perma.cc/G9NQ-XTLS; *Redacted* (FISC Dec. 6, 2019), https://perma.cc/49X6-5N5G; *Redacted*, 402 F. Supp. 3d 45, 52 (FISC 2018).

[29] Although the dissent notes "the absence of adverse parties or adverse legal interests," Dissent at 47 & 44 n.34, Mr. Muhtorov does not object to the non-adversarial nature of Section 702 proceedings, *see* Aplt. Reply Br. at 24 ("The problem is not that the FISC's review is one-sided . . . ."). We agree with Mr. Muhtorov.

The ex parte Section 702 proceedings are comparable to other adjudication that does not raise Article III concerns, such as courts' issuing traditional warrants and Title III orders, and the FISC's issuing traditional FISA orders. *See Megahey*, 553 F. Supp. at 1196 (rejecting an Article III challenge to traditional FISA and finding no "basis for concluding that a court exercising exclusively *ex parte* powers is constitutionally improper because of the case or controversy jurisdictional requirement inherent in Article III"); *In re Sealed Case*, 310 F.3d at 732 n.19 ("[W]e do not think there is much left to an argument made by an opponent of FISA in 1978 that the statutory responsibilities of the FISA court are inconsistent with Article III case and controversy responsibilities of federal judges because of the secret, non-adversary process."); James E. Pfander & Daniel D. Birk, *Article III Judicial Power, the Adverse-Party Requirement, and Non-Contentious Jurisdiction*, 124 Yale L.J. 1346, 1416 (2015) ("[T]he uncontroversial decision to include equity and admiralty 'cases' in the federal constitutional catalog provides solid evidence that non-contentious jurisdiction was considered an acceptable dimension of the business of Article III courts.").

As the Supreme Court observed:

> [F]ederal courts and judges have long performed a variety of functions that, like the functions involved here, do not necessarily or directly involve adversarial proceedings within a trial or appellate court. For example, federal courts have traditionally supervised grand juries and assisted in their "investigative function" by, if necessary, compelling the testimony of witnesses. Federal courts also participate in the issuance of search warrants, and review applications for wiretaps, both of which may require a court to consider the nature and scope of criminal investigations on the basis of evidence or affidavits submitted in an *ex parte* proceeding.

*Morrison v. Olson*, 487 U.S. 654, 681 n.20 (1988) (citations omitted).

The dissent relies on a distinction between "adverse legal arguments" and "adverse legal interests." *See* Anne Woolhandler, *Adverse Interests and Article III*, 111 Nw. U. L. Rev. 1025, 1032 (2017). The Supreme Court has drawn a similar distinction between the "prudential" preference for concrete adverseness, "which sharpens the presentation of the issues," and "adequate Art. III adverseness." *United States v. Windsor*, 570 U.S. 744, 760 (2013) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). The latter is present when the court's decision "will have real meaning." *INS v. Chadha*, 462 U.S. 919, 939-40 (1983). Section 702 proceedings have "real meaning" for the government, the ISPs that respond to Section 702 orders, and the individuals to be surveilled. The ISPs and the individual targets of surveillance are not known at the time of the Section 702 proceedings and thus cannot present "adverse legal arguments." But they have "adverse legal interests" to the government, which satisfies Article III.

59

Second, the FISC's decision to grant, deny, or modify the government's proposed Section 702 procedures has immediate consequences that are legally binding on the executive. The FISC can approve the procedures and authorize acquisitions under § 1881a(j)(3)(A), or it can direct the government to correct deficiencies or "cease, or not begin, the implementation of the authorization for which such certification was submitted" under § 1881a(j)(3)(B). If authorized, the AG and DNI can immediately direct an electronic communication provider to comply with an authorization under § 1881a(i)(1), which providers can then challenge under § 1881a(i)(4). Without pre-authorization or a relevant exception, any surveillance is unlawful under the statute. *See In re 702(h) Certifications 2018*, 941 F.3d at 552 ("[T]he [AG] and [DNI] can execute a Section 702 authorization *only* after the FISC enters an order approving the proposed acquisition." (emphasis added)). Also, a criminal defendant may move to suppress any evidence derived from unauthorized Section 702 surveillance. *See id.* § 1806(e).

To illustrate the practical and legally binding effects of the FISC's Section 702 determinations, consider when the FISC in 2011 granted in part and denied in part the government's request for surveillance approval. It said, "the 'upstream collection' of Internet transactions containing multiple communications . . . is, in some respects, deficient on statutory and constitutional grounds." *Redacted*, 2011 WL 10945618 at *29. The FISC ordered the government to correct the deficiencies within 30 days or "cease the implementation of [surveillance under the proposed procedures] insofar as they permit the acquisition" of statutorily and constitutionally suspect communications. *Id.* at *30.

60

The "nature and effect" of these proceedings shows that they constitute judicial activity under Article III. *See In re Summers*, 325 U.S. 561, 567 (1945). The FISC renders "dispositive judgments" that "conclusively resolve[] [a] case," *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995) (quotations omitted).

The FISC thus makes "a present determination of the issues offered [that] will have some effect in the real world." *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005). We agree with the Ninth Circuit that "FISC opinions are not advisory because the FISC either approves or denies the requested acquisition (and electronic communication service providers must follow the directives or challenge them)." *Mohamud*, 843 F.3d at 444 n.28.[30]

In short, by enacting Section 702, Congress "provide[d] a remedy enforceable in the courts" for the government to pursue. *See Tutun*, 270 U.S. at 577. The FISC's Section 702 orders are "remedies" in the sense that the government's inability to conduct Section 702 surveillance in the absence of Section 702 certifications may be "redressed by a favorable judicial decision" from the FISC. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

---

[30] We take guidance from courts addressing whether a plaintiff's request for a declaratory judgment would result in an advisory opinion. This court has explained that "what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109-10 (10th Cir. 2010) (quotations omitted). In other words, judicial resolution "would affect the behavior of the particular parties." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011).

ii. Mr. Muhtorov's counterarguments

Mr. Muhtorov's arguments to the contrary are without merit. He contends that the "FISC's role is limited to evaluating in a vacuum whether the government's proposed targeting and minimization procedures comply with the statute and the Constitution, without any concrete factual context relating to particular targets." Aplt. Br. at 49. But even though the FISC lacks factual information about the particular targets who will be surveilled, its Section 702 review is based on the factual realities of electronic surveillance. Before approving or disapproving the government's proposed procedures, the FISC applies specific statutory criteria to concrete facts about the government's Section 702 procedures to determine whether the proposed procedures are lawful. The FISC does not make that determination in a vacuum, but rather in accord with the role of courts to determine the "lawfulness of the conduct." *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

Mr. Muhtorov's focus on "particular targets," meaning the people who might be surveilled under Section 702 upon the FISC's approval of the government's proposed procedures, is misplaced. The FISC does not make Section 702 determinations with knowledge about the particular people who will be surveilled. But that does not turn the Section 702 determination into an exercise of "advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quotations omitted). The government's proposed targeting, minimization, and (as of 2018) querying procedures are not "hypothetical." The FISC does not give abstract advice about the procedures' legality, but rather offers a definite declaration that the policies either do or

62

do not comply with 50 U.S.C. § 1881a(d)-(f). The FISC adjudicates whether the government's proposed procedures will be approved, rejected, or modified.[31]

\* \* \* \*

The FISC does not issue advisory opinions because its Section 702 determinations involve the application of specific statutory criteria to the concrete facts of the government's proposed Section 702 surveillance procedures, and those determinations have immediate real-world consequences and legally binding force.

## 2. Separation of Powers and Article III

Section 702's compliance with the separation of powers bolsters our conclusion that the FISC's Section 702 orders are not advisory opinions.

The Supreme Court has long emphasized that Article III justiciability doctrines further separation of powers principles. For example, Article III standing furthers "the

---

[31] The dissent asserts there is no difference between Section 702 proceedings and President Washington's attempt in 1793 to obtain an advisory opinion from the Supreme Court on treaty relations with France. *See* Dissent at 45; *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 176 (2016) (Roberts, C.J., dissenting) (describing the circumstances of President Washington's request to the Supreme Court). According to the dissent, "[h]ad the Court answered [President Washington], its answers too would have had immediate real-world consequences and binding legal force." Dissent at 45. But any such answers would not have had any formal legal force. President Washington would have been free to ignore the Supreme Court's advice without immediate legal consequence.

In contrast, a FISC Section 702 order has immediate legal effect on the government's ability to surveil individuals. So long as a Section 702 authorization is in effect, an electronic communication service provider must "immediately provide the Government with all information, facilities, or assistance necessary to accomplish the acquisition" whenever the AG and DNI direct the service provider to do so. 50 U.S.C. § 1881a(i)(1)(A). And a criminal defendant would be able to suppress any evidence derived from unauthorized Section 702 surveillance. *See id.* § 1806(e).

Constitution's central mechanism of separation of powers," which "depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-60 (1992); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) ("The law of Art. III standing is built on a single basic idea—the idea of separation of powers." (quotations omitted)); *Allen v. Wright*, 468 U.S. 737, 750 (1984) ("[T]he 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded.").

Similarly, the Court has repeatedly explained the connection between the separation of powers and the Article III prohibition of advisory opinions, which prevents courts from "expand[ing] their power so as to bring under their jurisdiction ill defined controversies," an "abuse of judicial power [that] would properly meet rebuke and restriction from other branches." *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 90-91 (1947). The prohibition limits judicial power "to those disputes which confine federal courts to a rule consistent with a system of separated powers." *Flast*, 392 U.S. at 97. As the Court said recently, the power to issue advisory opinions "would threaten to grant unelected judges a general authority to conduct oversight of decisions of the elected branches of Government." *California v. Texas*, 141 S. Ct. 2104, 2116 (2021).

Section 702 is consistent with the separation of powers. FISC orders stem from judicial balancing of national security and individual privacy interests. The political branches, legislating in service of our national security, conferred this judicial responsibility on the FISC. Section 702's compliance with the separation of powers

64

bolsters our conclusion that FISC judges do not possess "a general authority to conduct oversight of decisions of the elected branches of Government" by issuing advisory opinions. *See id.*[32]

    a.  *Separation of powers background*

"The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983). "To the legislative department has been committed the duty of making laws, to the executive the duty of executing them, and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts." *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).

Under our constitutional framework, "the separate powers were not intended to operate with absolute independence." *United States v. Nixon*, 418 U.S. 683, 707 (1974).

---

[32] Importantly, unlike the typical situation in which an Article III court restrains itself from issuing an advisory opinion on an issue that a litigant would like answered because the real-world results of the opinion would be non-existent or "speculative," *see, e.g.*, *Preiser*, 422 U.S. at 403-04, the FISC's Section 702 actions are taken at the behest of Congress and the Attorney General under a statutory command, *see generally* 50 U.S.C. § 1881a. Congress's role in directing the AG and DNI to seek FISC review is relevant to the Article III challenge. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986) ("[I]n reviewing Article III challenges, we have weighed a number of factors . . . with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary."). Here, the Article III concern about advisory opinions, which is rooted in the separation of powers, is lessened—not heightened—when the FISC acts with the express authorization and direction of Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("[The Constitution] enjoins upon its branches separateness but interdependence, autonomy but reciprocity.").

Our constitutional structure embodies "the more pragmatic, flexible approach of Madison in the Federalist Papers," *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 442 (1977), that only "where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department [are] the fundamental principles of a free constitution . . . subverted," The Federalist No. 47 at 325-36 (J. Cooke ed. 1961). The Constitution envisions both the separation and sharing of power among the branches. So, "[w]hile the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). This means, for example, that "the exercise of [executive] powers is vindicated, not eroded, when confirmed by the Judicial Branch." *Boumediene v. Bush*, 553 U.S. 723, 797 (2008).

The Supreme Court has upheld novel governmental arrangements under this flexible and pragmatic approach to the separation of powers. For example, in *Mistretta v. United States*, 488 U.S. 361 (1989), the Supreme Court upheld the constitutionality of the United States Sentencing Commission. The Commission was established as "an independent commission in the judicial branch of the United States." *Id.* at 368 (quoting 28 U.S.C. § 991(a)). It consists of seven voting members appointed by the President, including at least three federal judges. *Id.* The Commission's responsibilities include promulgating sentence guidelines, reviewing and revising guidelines, issuing general policy statements about the application of the guidelines, and overseeing the functions of federal sentencing. *See id.* at 369.

The defendant in *Mistretta* challenged his sentence under the guidelines, arguing that the legislation creating the Commission violated the separation of powers by "effect[ing] an unconstitutional accumulation of power within the Judicial Branch while at the same time undermining the Judiciary's independence and integrity." *Id.* at 383. He argued that (1) "Congress unconstitutionally has required the [Judicial] Branch, and individual Article III judges, to exercise not only their judicial authority, but legislative authority—the making of sentencing policy—as well"; and (2) "Congress . . . upset the balance among the Branches by co-opting federal judges into the quintessentially political work of establishing sentencing guidelines, by subjecting those judges to the political whims of the Chief Executive, and by forcing judges to share their power with nonjudges." *Id.* at 383-84.

The Supreme Court rejected this challenge. It first noted that the Commission was "a peculiar institution within the framework of our Government" because it was "placed" in the Judicial Branch but did "not exercise judicial power." *Id.* at 384-85. This placement, however, did not offend the separation of powers. *Id.* at 390. The Court held that "Congress may delegate to the Judicial Branch nonadjudicatory functions that do not trench upon the prerogatives of another branch and that are appropriate to the central mission of the Judiciary." *Id.* at 388. "[T]he sentencing function long has been a peculiarly shared responsibility among the Branches of Government and has never been thought of as the exclusive constitutional province of any one Branch." *Id.* at 390. The Court also held placement of the Commission within the Judicial Branch did not weaken

67

the Branch by preventing it "from accomplishing its constitutionally assigned functions."

*Id.* at 396 (quoting *Nixon v. Admin. of Gen. Servs.*, 433 U.S. at 443).  Thus,

> [S]ince substantive judgment in the field of sentencing has been and remains appropriate to the Judicial Branch, and the methodology of rulemaking has been and remains appropriate to the Branch, Congress' considered decision to combine these functions in an independent Sentencing Commission and to locate that Commission within the Judicial Branch does not violate the principle of separation of powers.

*Id.* at 396-97.

> b. *Analysis*

As explained above, the FISC's Section 702 role does not involve rendering advisory opinions.  This leaves the question whether Congress "violate[d] the constitutional principle of separation of powers" when it enacted Section 702.  *See Mistretta*, 488 U.S. at 380.  It did not.

Section 702 is unusual.  *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1317 (2016).  It grants to an Article III court the power to adjudicate the lawfulness of surveillance procedures ex parte, on a categorical basis, and prospectively.  Still, "[o]ur constitutional principles of separated powers are not violated . . . by mere anomaly or innovation."  *Mistretta*, 488 U.S. at 385.  Indeed, when we are "asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, [we] should only do so for the most compelling constitutional reasons."  *Id.* at 384 (quoting *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) (Stevens, J., concurring)).

The *Mistretta* Court's analysis guides us here as to whether (i) the FISC's Section 702 functions "trench upon the prerogatives of another Branch," *Mistretta*, 488 U.S. at 388; and (ii) those functions "are appropriate to the central mission of the Judiciary," *id.*[33]

### i.   FISC does not trench upon executive prerogatives

The FISC's Section 702 functions do not "trench upon the prerogatives of [the executive] branch." *Id.*

The *Mistretta* Court held that the Sentencing Commission does not encroach upon the prerogatives of the legislative branch because "the sentencing function long has been a peculiarly shared responsibility among the Branches of Government and has never been thought of as the exclusive constitutional province of any one Branch." 488 U.S. at 390. So too has the regulation and implementation of foreign intelligence surveillance long been a governmental function administered jointly by the judiciary and the executive.

Congress passed FISA in 1978 in the aftermath of the Supreme Court's decision in *Keith*. In *Keith*, the Court rejected "the Government's argument that internal security matters are too subtle and complex for judicial evaluation," and found no merit to the idea that "prior judicial approval will fracture the secrecy essential to official intelligence gathering." 407 U.S. at 320. Congress created the FISC to provide judicial oversight of executive surveillance of foreign powers and their agents. Congress passed the FISA Amendments Act of 2008 in the aftermath of the September 11, 2001 attacks and

---

[33] These two inquiries necessarily overlap because the closer courts hew to their "central mission," the less they will "trench upon the prerogatives of another Branch." *Mistretta*, 488 U.S. at 388.

69

President Bush's warrantless surveillance program. Section 702 expanded the executive's ability to conduct foreign surveillance under FISA while preserving the FISC's role in overseeing such surveillance.

Thus, for over 40 years, the FISC has regularly reviewed executive branch applications to conduct electronic surveillance for foreign intelligence purposes. In that time, foreign surveillance has been a "peculiarly shared responsibility among the Branches of Government." *See Mistretta*, 488 U.S. at 390. Section 702, which preserves the FISC's role in placing judicial limits on foreign intelligence surveillance, does not encroach on the traditional prerogatives of the executive because the oversight of foreign surveillance has been a peculiar function of the judiciary, and the FISC in particular, for many decades. In other words, "[t]his is not a case in which judges are given power . . . in an area in which they have no special knowledge or expertise." *Morrison v. Olson*, 487 U.S. 654, 676 n.13 (1988). The FISC's work under Section 702 conforms to the functions that Article III judges perform. *See id.* at 681. The FISC finds facts through witness testimony and documentary evidence and then applies constitutional and statutory law to those facts to determine the lawfulness of imminent government conduct.

## ii. FISC performs appropriate judicial functions

The prospective, ex parte, and categorical nature of the FISC's Section 702 functions does not violate the separation of powers because these functions are "appropriate to the central mission of the Judiciary." *See Mistretta*, 488 U.S. at 388.

In *Mistretta*, the Sentencing Commission promulgated guidelines that would apply prospectively and categorically. Nevertheless, the Supreme Court found that the

"rulemaking" function of the Commission complied with the separation of powers because "federal judges have enjoyed wide discretion to determine the appropriate sentence in individual cases and have exercised special authority to determine the sentencing factors to be applied in any given case." *Id.* at 390. In other words, the Sentencing Commission drew upon its traditional judicial competency in performing its functions. Similarly, the FISC's Section 702 functions draw upon core competencies it uses in the traditional FISA context.

For over 40 years, the FISC has overseen traditional FISA applications, in which it makes ex parte decisions that balance the government's foreign intelligence interests against the privacy and liberty interests of those surveilled. Striking that balance is a critical part of the FISC's Section 702 role as well. *Compare* 50 U.S.C. § 1804(a) (traditional FISA), *with id.* § 1881a(d)-(f) (Section 702).[34]

---

[34] In making this comparison, we do not suggest that the FISC's Section 702 functions are strictly analogous to the issuance of search warrants, Title III wiretap orders, or traditional FISA warrants, all of which may issue only after particularized judicial findings that applicable statutory and constitutional requirements are met with respect to the specific facts of the search or surveillance to be conducted. *See Illinois v. Gates*, 462 U.S. 213, 230 (1983) (holding that a warrant may issue only when probable cause exists under the "totality-of-the-circumstances"); *Donovan*, 429 U.S. at 428 ("[A] wiretap application [under Title III] must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone."); *United States v. Abu-Jihaad*, 630 F.3d 102, 128-31 (2d Cir. 2010) (reviewing on the facts of the case whether a FISA warrant properly complied with the requirements that the "executive . . . is in good faith pursuing foreign intelligence gathering," and that probable cause existed that the individual surveilled was a foreign agent).

Nor is the categorical nature of Section 702 proceedings a departure from traditional judicial functions. In deciding individual cases, courts frequently assess the lawfulness of a governmental program or statute on a broader scale that necessarily accounts for the interests of third parties not before the court. This occurs, for example, when a court finds a statute facially unconstitutional, *see, e.g.*, *United States v. Stevens*, 559 U.S. 460, 482 (2010), or in administrative law cases concerning a rule's lawfulness, *see, e.g.*, *Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019).

### iii. Additional considerations

Two additional considerations show that Section 702 is consistent with the separation of powers. First, we owe Congress deference when it balances individual liberty interests and national security concerns. Second, Section 702 procedures provide some protections for individual privacy interests.

### 1) Deference to Congress

When, in the aftermath of President Bush's warrantless surveillance program, Congress enacted Section 702, it sought to balance national security interests and individual privacy interests. It did so by retaining flexibility for the executive to conduct foreign intelligence surveillance while providing a role for the judiciary. We owe deference to Congress's efforts to balance these interests. *See Boumediene*, 553 U.S. at 796 ("In considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches."); *Rostker v. Goldberg*, 453 U.S. 57, 63-64 (1981) (noting that "in no other

area has the Court accorded Congress greater deference" than "in the context of Congress' authority over national defense and military affairs").

Indeed, the Supreme Court rejected a separation of powers challenge to an "unusual" statute that made assets available to satisfy judgments in an action that the statute expressly identified by docket number. *See Bank Markazi*, 136 S. Ct. at 1328. To bolster its determination that the statute was not one in which Congress was unlawfully prescribing rules of decision in pending cases, *see id.* at 1323, the Court noted the statute was "an exercise of congressional authority regarding foreign affairs, a domain in which the controlling role of the political branches is both necessary and proper," *id*. at 1328. We owe similar deference to Congress's policy judgment "regarding foreign affairs" in designing the FISC's Section 702 role.

The Supreme Court has recognized that separation of powers favors—rather than condemns—the kind of interbranch cooperation that occurred here when Congress defined the executive and judicial branches' roles in implementing and regulating foreign surveillance. *See Nixon v. Admin. of Gen. Servs.*, 433 U.S. at 441 (rejecting a separation of powers argument raised by President Nixon against an act regulating the disposition of presidential materials because the Executive Branch assented to the Act when President Ford signed it into law). The constitutionality of a governmental act is more likely when the branches work together. *See Youngstown*, 343 U.S. at 635-37 (Jackson, J., concurring) (noting that presidential power is at its greatest when acting "pursuant to an express or implied authorization of Congress").

2) Section 702 furthers privacy interests

Section 702 does not infringe the separation of powers in part because the FISC's

Section 702 functions interpose judicial review between government surveillance and the

individuals to be surveilled.  As explained above, warrantless surveillance of foreign

nationals abroad is categorically permissible under *Verdugo-Urquidez*.  Section 702

prevents the government from "intentionally target[ing]" United States persons, 50

U.S.C. § 1881a(b)(1), and requires the government "to minimize the acquisition and

retention" of their communications, *id.* §§ 1801(h), 1881a(e).  It further requires

compliance with the Fourth Amendment, *id.* § 1881a(b)(6), which does not apply to

foreign targets, *see Verdugo-Urquidez*, 494 U.S. at 261.

By requiring FISC oversight of these limitations on foreign intelligence

surveillance, Congress provided judicial protection for United States persons whose

communications were previously surveilled without any judicial check under the TSP.[35]

Congress has thus impeded the "accumulat[ion]" of broad powers in a single

"organ" of government, namely the executive.  *See Chadha*, 462 U.S. at 949.  "Whatever

power the United States Constitution envisions for the Executive in its exchanges with

other nations or with enemy organizations in times of conflict, it most assuredly envisions

---

[35] As one national security law scholar has noted, "there are few, if any, feasible alternatives to the FISC's [Section 702] role," and "[o]ther potential forums for review, such as an executive agency or an Article I court . . . do not possess the independence and institutional credibility that an Article III court commands."  Peter Margulies, *Searching for the Federal Judicial Power:  Article III and the Foreign Intelligence Surveillance Court*, 85 Geo. Wash. L. Rev. 800, 808 (2017).

a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004). Because it interposes judicial review of foreign surveillance programs and provides individuals with at least some privacy protections, Section 702 is "not in derogation of the separation of powers, but . . . maintain[s] their proper balance," to the extent that the separation of powers exists to protect individual liberty and privacy from an overreaching executive branch. *See Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982).[36]

\*    \*    \*    \*

Section 702 complies with Article III.[37]

---

[36] Mr. Muhtorov poses two hypotheticals. First, the Denver Police Department asks a federal court whether proposed use of force polices are constitutional. Second, the Transportation Security Administration ("TSA") asks a federal court whether proposed agency procedures for airport screening are reasonable. Aplt. Reply Br. at 24. The dissent presents a similar hypothetical. Dissent at 46.

The Article III question here is different. Under Section 702, the government is legally powerless to conduct warrantless foreign surveillance previously carried out under the TSP without the FISC's authorization. The government's Section 702 orders to electronic service providers would be void ab initio. Criminal defendants would be entitled to suppression under 50 U.S.C. § 1806(e) without the need for determining whether the surveillance violated the Fourth Amendment. In the hypotheticals, the courts would dispense "advice" with no legal effect on the ability of the Denver Police Department or the TSA to, respectively, use force or screen people. Were the Denver Police Department or TSA to act without judicial authorization, their actions would not be void ab initio.

[37] Because we conclude Section 702 is constitutional, we need not address the proper remedy were we to hold otherwise. The dissent would not invalidate the entire Section 702 program even if the FISC's annual review violates Article III. Dissent at 47. But if Section 702 annual reviews are unconstitutional because the FISC lacks Article III jurisdiction, then surveillance conducted under that section is unlawful under the statute, and the program would effectively be invalidated. The dissent instead proposes "that the Fourth Amendment reasonableness determination be accomplished de novo when an actual case is presented to an Article III court." *Id.* Yet this is precisely what courts—

75

### III.  NONDISCLOSURE OF FISA AND SECTION 702 APPLICATION MATERIALS

Mr. Muhtorov argues the district court erred by not requiring the government to disclose the classified applications, orders, and other materials (the "application materials") that allowed the government to conduct traditional FISA and Section 702 surveillance in this case.[38]  He claims disclosure was required under the FISA provision governing disclosure, 50 U.S.C. § 1806(f), and as a matter of due process.  We disagree and conclude the district court did not err.

### A.  *Legal Background*

Under FISA, when

(1) a party moves "to discover or obtain applications or orders or other materials relating to electronic surveillance or to discover, obtain, or suppress evidence or information obtained or derived from electronic surveillance under" FISA, and

(2) "the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States,"

(3) the district court must "review in camera and ex parte the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted."

---

including the district court and this court in the present case—already do when a criminal defendant seeks suppression of Section 702-derived evidence.

[38] In making this request, Mr. Muhtorov does not seek discovery of the fruits of the traditional FISA and Section 702 surveillance.  As explained below, the government has complied with its discovery obligations.

50 U.S.C. § 1806(f);[39] *see also id.* § 1825(g). "In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." *Id.* § 1806(f). The "lawfully authorized and conducted" requirement entails compliance both with FISA and the Constitution because "[t]he Constitution is law" for purposes of § 1806(f). *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 459, 465 (D.C. Cir. 1991).

In *United States v. Belfield*, 692 F.2d 141 (D.C. Cir. 1982), the D.C. Circuit articulated a standard for courts to apply when considering whether FISA disclosure is "necessary" under § 1806(f). After canvassing the text of FISA and the legislative history, the court concluded that

> disclosure is necessary only where the court's initial review of the application, order, and fruits of the surveillance indicates that the question of legality may be complicated by factors such as indications of possible misrepresentation of fact, vague identification of the persons to be surveilled, or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order.

---

[39] Section 1806(f) applies to Section 702 as well as traditional FISA. *See* 50 U.S.C. § 1881e(a)(1) ("Information acquired from an acquisition conducted under [Section 702] shall be deemed to be information acquired from an electronic surveillance pursuant to [Title] I for purposes of section 1806 of this title, except [in circumstances not relevant here].").

*Id.* at 147 (quotations omitted).  "The language of section 1806(f) clearly anticipates that an *ex parte*, *in camera* determination is to be the rule.  Disclosure and an adversary hearing are the exception, occurring *only* when necessary."  *Id.*  Other circuits have applied *Belfield* to decide questions arising under § 1806(f).  *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 128 (2d Cir. 2009); *United States v. Squillacote*, 221 F.3d 542, 554 (4th Cir. 2000); *United States v. Isa*, 923 F.2d 1300, 1306-07 (8th Cir. 1991).

If, after the in camera and ex parte review required under § 1806(f), "the [district] court determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure."  50 U.S.C. § 1806(g).

## B.  *Procedural History*

Mr. Muhtorov filed separate motions to suppress traditional FISA-acquired evidence and Section 702-derived evidence.  Those motions also sought access to classified application materials to allow defense counsel to assess the legality of the surveillance.  The district court denied Mr. Muhtorov's requests for access to classified application materials when it denied both motions to suppress.

In the first motion, Mr. Muhtorov asked to review applications, extensions, orders, and related materials concerning the traditional FISA surveillance of him, as well as applications related to surveillance of third-party targets in which Mr. Muhtorov's communications were intercepted.  He also requested that, at the very least, his counsel have access to the requested information under CIPA.

78

The AG filed an affidavit under § 1806(f) stating that disclosure would harm national security. The district court then reviewed the application materials in camera and ex parte to assess whether disclosure of the FISA materials was necessary to make an accurate determination of the legality of the collection. The court concluded that "the FISA materials need not and should not be disclosed in the interests of national security" and that the traditional FISA surveillance was lawful. ROA, Vol. I at 480. It also found "no basis for permitting defense counsel to review the FISA materials and no need to order a *Franks* [*v. Delaware*, 438 U.S. 154 (1978)] hearing." *Id.* at 482. Thus, it denied Mr. Muhtorov's motion.

In the second motion, Mr. Muhtorov asked to review the following materials so he could craft a tailored suppression motion and mount a defense at trial:

> the government's applications to the FISC seeking authorization for, and the FISC's orders authorizing, the [Section 702] surveillance that intercepted communications to or from Mr. Muhtorov; notice of all communications to or from Mr. Muhtorov intercepted under [Section 702]; all evidence obtained under [Section 702] that the government intends to use at trial or that is material to Mr. Muhtorov's defense; all evidence derived from communications intercepted under [Section 702] that the government intends to use at trial; and records indicating how Mr. Muhtorov's communications were intercepted and identified under [Section 702] or were derived from communications collected under [Section 702].

*Id.* at 712-13. He again requested that his counsel have access to the application materials under CIPA.

The district court performed an "exhaustive" in camera and ex parte review of the classified application materials and "supplemental classified materials prepared at [the

79

court's] request" and found the Section 702 surveillance was lawful.  ROA, Vol. III at 148.  The court advised that it would address Mr. Muhtorov's request for specific, additional discovery and declassification in a separate order after an upcoming CIPA hearing.  Mr. Muhtorov never received access to the classified application materials he requested.

## C. *Standard of Review*

The parties disagree about the standard of review.  Mr. Muhtorov implied in district court that the court's "discretion" governed the choice to disclose.  *See* ROA, Vol. I at 380.  He now asserts that whether FISA or due process required disclosure is subject to de novo review.  The government asserts that an abuse of discretion standard applies.

This court has not addressed this question.  We join other circuits in reviewing a decision not to disclose materials under § 1806(f) for abuse of discretion.  *See United States v. Ali*, 799 F.3d 1008, 1022 (8th Cir. 2015); *United States v. El-Mezain*, 664 F.3d 467, 567 (5th Cir. 2011); *United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005); *United States v. Badia*, 827 F.2d 1458, 1464 (11th Cir. 1987); *Belfield*, 692 F.2d at 147.

But we evaluate whether due process required disclosure de novo.  *See Ali*, 799 F.3d at 1021-22.  This accords with our normal practice to "review questions of constitutional law de novo."  *ClearOne Comm'cns, Inc. v. Bowers*, 651 F.3d 1200, 1216 (10th Cir. 2011) (quotations omitted).

## D. *Discussion*

We discuss Mr. Muhtorov's arguments that disclosure was required (1) under § 1806(f) and (2) as a matter of due process.

1.  **Disclosure Under FISA**

This court has carefully reviewed the traditional FISA and Section 702 application materials to determine whether the district court acted within its discretion in concluding that disclosure to Mr. Muhtorov was not "necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f).[40] Recognizing that "[d]isclosure and an adversary hearing are the exception, occurring *only* when necessary," *Belfield*, 692 F.2d at 147, we find no abuse of discretion.

a.  *Traditional FISA application materials*

The district court did not abuse its discretion by declining to order disclosure of the traditional FISA application materials.

Mr. Muhtorov argues that disclosure was necessary for the district court "to make an accurate determination of the legality of the [traditional FISA] surveillance." 50 U.S.C. § 1806(f). But on appeal, Mr. Muhtorov does not challenge the traditional FISA surveillance, except to the extent it was tainted by the allegedly unlawful Section 702 surveillance. Mr. Muhtorov's failure to challenge the district court's denial of the first motion to suppress undermines his argument for disclosure on appeal. In addition, Mr. Muhtorov's specific arguments for disclosure are without merit.

---

[40] Because § 1806(f) requires in camera and ex parte review by the district court before deciding whether to order disclosure, our analysis requires us to conduct our own "comprehensive review" of the materials "to determine whether the district court acted within its discretion." *Ali*, 799 F.3d at 1022. We have done so.

First, he argues that the district court "had to evaluate whether the various FISA techniques complied with the Fourth Amendment and the statute," and that the "district court does not appear to have considered the Fourth Amendment issues presented by these techniques." Aplt. Br. at 59. But the district court concluded that there was "probable cause to believe that Defendants Muhtorov and Jumaev . . . were agents of a foreign power as defined by statute." ROA, Vol. I at 481. It said, "there was no basis to question "the near unanimous view that FISA does not violate the Fourth Amendment," particularly when "the electronic surveillance is directed at the activities of a foreign power and its agents and the criminal prosecution is merely incidental to that dominant purpose." *Id.* at 482.

Second, he argues the district court had to assess whether "the government's applications to the FISC contained material omissions or misrepresentations of fact." Aplt. Br. at 59. This argument is without merit for reasons explained below when we discuss Mr. Muhtorov's claim that the Supreme Court's decision in *Franks v. Delaware* required disclosure as a matter of due process.

Third, Mr. Muhtorov argues the district court "had to determine whether the FISA applications were tainted by other unconstitutional searches" using "other novel or illegal techniques, such as the warrantless collection of cell-site location data or the bulk collection of call records." *Id.* at 60. But the court made such a determination. After the AG filed an affidavit stating that disclosure would harm national security, the court conscientiously reviewed the classified materials in camera and ex parte and determined their disclosure was not necessary because it was capable of making an accurate

determination of the legality of the surveillance. The court determined the surveillance was lawfully authorized and conducted under FISA and the Fourth Amendment. No evidence in the record causes us to question the court's findings.

In sum, Mr. Muhtorov has failed to show that the district court, which carefully followed the procedures in § 1806(f), abused its discretion by declining to order disclosure of the traditional FISA materials. Disclosure was not "necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f).

b. *Section 702 application materials*

Mr. Muhtorov has also not shown that the district court abused its discretion by declining to order disclosure of the Section 702 application materials.

Mr. Muhtorov argues that *Belfield* and FISA's legislative history call for disclosure based on three factors allegedly present here: (1) complex and novel legal questions concerning the lawfulness of the Section 702 surveillance, (2) indications of possible misrepresentations of fact, and (3) the volume, scope, and complexity of the surveillance materials. Aplt. Br. at 56. His arguments are unpersuasive.

First, neither the Senate Report relied on in *Belfield* nor *Belfield* itself identify "complex legal questions" as a reason for disclosure. The Report says a court should review "the underlying documentation" and "determin[e] its volume, scope, and complexity" in assessing whether it is necessary to order disclosure. S. Rep. No. 95-701, at 64 (1978). "Complexity" refers to the documentation under review, not the legal issues.

83

Nor is there merit to Mr. Muhtorov's suggestion that the novelty of the legal issues and the presence of "legal issues of first impression in this circuit" warranted disclosure. *See* Aplt. Br. at 55. This kind of novelty was not a basis for disclosure in *Belfield*, which declined to order disclosure just four years after Congress enacted FISA, when nearly all FISA issues were novel. Mr. Muhtorov has not pointed to any authority supporting a rule that the alleged novelty of a legal issue makes it any less likely that the district court "was capable of reviewing the lawfulness of the FISA surveillance without assistance from defense counsel." *El-Mezain*, 664 F.3d at 566.

Second, Mr. Muhtorov's misrepresentation theory is speculative. It is based solely on the government's behavior in other cases. His brief cites *Redacted*, slip op. at 19 (FISC Apr. 26, 2017), https://perma.cc/7X2S-VAS7 (identifying problems with backdoor searches and referencing "an institutional 'lack of candor' on NSA's part"); and *Redacted*, 2011 WL 10945618, at *9 (FISC Oct. 3, 2011) (holding that the upstream collection of certain internet transactions violated the Fourth Amendment and stating that "the volume and nature of the information" the government had been collecting was "fundamentally different from what the Court had been led to believe"). The district court here did not identify any misrepresentations during its in camera and ex parte review. And as explained above, the evidence in this case was not derived from querying or upstream collection techniques.

Third, the alleged volume, scope, and complexity of surveillance materials is not a reason to reverse the district court. These factors could warrant disclosure if "the court's initial review of the application, order, and fruits of the surveillance indicate[d] that the

84

questions of legality may be complicated" by the nature of the materials. *Belfield*, 692

F.2d at 147. But as the district court explained in denying Mr. Muhtorov's motion to

suppress the Section 702-derived evidence, its "exhaustive *in camera* and *ex parte* review

of all relevant additional classified materials provided" led it to conclude the Section 702

surveillance was lawful. *See* ROA, Vol. III at 148. There is no indication that the

existence of an allegedly large quantity of complex surveillance materials hindered the

district court's ability to decide this issue or that disclosure would have aided its analysis.

\*     \*     \*     \*

Disclosure of classified FISA materials is the exception, not the rule. The district

court did not abuse its discretion by declining to order disclosure under § 1806(f) after

carefully reviewing the traditional FISA and Section 702 application materials.

2. **Due Process**

Mr. Muhtorov argues that "due process requires discovery or disclosure," 50

U.S.C. § 1806(g), because

   (a) under *Brady v. Maryland*, 373 U.S. 83 (1963), due process requires a
      meaningful opportunity to pursue suppression as the primary means of
      enforcing the Fourth Amendment;

   (b) under *Mathews v. Eldridge*, 424 U.S. 319 (1976), due process requires the
      disclosure of FISA and Section 702 materials and an adversarial process
      where, as here, the surveillance raises novel or complex factual and legal
      issues; and

   (c) the district court's decision not to disclose classified materials is at odds with
      *Franks v. Delaware*, 438 U.S. 154 (1978), which entitles a criminal defendant
      to an evidentiary hearing upon a substantial preliminary showing that a warrant
      affidavit includes a knowing or reckless false statement.

Aplt. Br. at 63–66. None of these arguments has merit.

85

a. *Due process and* Brady

i. Legal background

Due process requires the government to disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. "To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." *Hooks v. Workman*, 689 F.3d 1148, 1179 (10th Cir. 2012) (quotations omitted).

Although some courts have extended *Brady* to evidence that is material to suppression, *see, e.g.*, *United States v. Gamez-Orduño*, 235 F.3d 453, 461 (9th Cir. 2000); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992), we have stated that "[w]hether *Brady*'s disclosure requirements even apply at the motion to suppress stage is an open question," *United States v. Lee Vang Lor*, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013); *see also United States v. Stott*, 245 F.3d 890, 902 (7th Cir. 2001) (describing a circuit split on the issue).[41]

ii. Analysis

We reject Mr. Muhtorov's *Brady*-based due process argument. Assuming without deciding that *Brady* applies at the motion to suppress stage, no violation occurred.

---

[41] We have hinted the answer is no: "Suppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is material either to guilt or to punishment." *Lee Vang Lor*, 706 F.3d at 1256 n.2 (quotations and citation omitted).

The district court denied both of Mr. Muhtorov's suppression motions. In both motions, Mr. Muhtorov argued that *Brady* required disclosure. The district court did not order disclosure of the traditional FISA or Section 702 application materials.

Our independent review of the traditional FISA and Section 702 application materials confirms that those materials were not "favorable" or "material" to his suppression motions. *See United States v. Brooks*, 727 F.3d 1291, 1300 n.7 (10th Cir. 2013).[42] Thus, the district court did not err under *Brady* when it denied Mr. Muhtorov's requests for disclosure of the application materials because *Brady* did not "require[] discovery or disclosure." 50 U.S.C. § 1806(g).[43]

---

[42] Our determination that the government's Section 702 surveillance did not violate Mr. Muhtorov's Fourth Amendment rights turned largely on questions of law. Had the district court, or we, concluded that the surveillance of Mr. Muhtorov failed to comply with Section 702's minimization and targeting requirements, he would have a stronger *Brady* argument.

[43] Apart from his *Brady*-based argument, Mr. Muhtorov cites to *Roviaro v. United States*, 353 U.S. 53 (1957), to argue he was entitled to "information that is relevant and helpful" to his argument, *see* Aplt. Br. at 64. *Roviaro* provided that courts should determine whether to order disclosure of information about a confidential informant by "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense," taking into account "the particular circumstances of [the] case, . . . the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro*, 353 U.S. at 62. *Roviaro* is far removed from this case, and its balancing test does not favor Mr. Muhtorov because the "strong public interest in furthering effective law enforcement," *United States v. Mendoza-Salgado*, 964 F.2d 993, 1000 (10th Cir. 1992), and Congress's determination that disclosure under FISA is the exception, not the rule, *see* 50 U.S.C. § 1806(f); *Abu-Jihaad*, 630 F.3d at 129, outweigh any general interest that Mr. Muhtorov might have in the materials to prepare his suppression motions.

b. *Due Process and § 1806(f) – Mathews*

Mr. Muhtorov argues that § 1806(f) does not comport with procedural due process guarantees, citing *Mathews*, an argument that applies to both the traditional FISA and Section 702 application materials.

 i. <u>Legal background</u>

Courts have not been consistent as to whether a *Mathews* claim is available in the § 1806(f) context. The Fifth Circuit "[a]ssum[ed] without deciding that the *Mathews* balancing test is applicable." *El-Mezain*, 664 F.3d at 567. The Sixth Circuit found "reliance on *Mathews* is misplaced," and said that "FISA's requirement that the district court conduct an ex parte, in camera review of FISA materials does not deprive a defendant of due process." *Damrah*, 412 F.3d at 624. Like the Fifth Circuit, we will assume that *Mathews* applies here.

Under *Mathews*, whether due process was satisfied "requires analysis of the governmental and private interests that are affected." *Mathews*, 424 U.S. at 334. Courts should consider "three distinct factors":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

88

ii. <u>Analysis</u>

Mr. Muhtorov argues that due process required an adversarial proceeding rather

than the in camera and ex parte proceeding provided for in § 1806(f), because

> (1) he has a substantial interest in accurately determining whether the
> government's surveillance violated his rights;
>
> (2) in camera and ex parte proceedings have an unacceptably high risk of error
> when factual and legal issues are complex; and
>
> (3) the government's interests in secrecy are overblown because the court could
> order disclosure under a protective order and the government has declassified and
> publicly disclosed certain Section 702 procedures, FISC opinions, and FISA
> materials in other cases.

Aplt. Br. at 65-68.

The district court properly weighed Mr. Muhtorov's and the government's

interests in light of the sensitivity of the application materials. We assume that Mr.

Muhtorov has an interest in determining the lawfulness of the government's surveillance.

But his other assertions are misplaced. Mr. Muhtorov's claim that in camera and ex parte

FISA proceedings have a high risk of error is unfounded. It does not help him to the

extent his claim derives from other cases. Nor has Mr. Muhtorov explained why the

government's disclosure in other cases renders Congress's carefully crafted disclosure

scheme in § 1806(f) inapplicable to this case.

In sum, as numerous courts have held, FISA's in camera and ex parte procedures

provide adequate procedural protections for the defendant's due process rights. *See, e.g.*,

*El-Mezain*, 664 F.3d at 567-68; *Abu-Jihaad*, 630 F.3d at 129; *Damrah*, 412 F.3d at 624;

*Isa*, 923 F.2d at 1306-07; *United States v. Ott*, 827 F.2d 473, 476-77 (9th Cir. 1987);

89

*Belfield*, 692 F.2d at 148-49; *see also Ali*, 799 F.3d at 1022 (upholding FISA's in camera,

ex parte procedure and stating that courts have "uniformly" rejected the argument that

such procedure violates a defendant's right to due process).  Mr. Muhtorov has not

provided a convincing basis to deviate from this substantial authority.

    c.  *Due process and* Franks[44]

      i.  Legal background

In *Franks v. Delaware*, the Supreme Court held that a criminal defendant is

entitled to an evidentiary hearing under the Fourth Amendment only after "mak[ing] a

substantial preliminary showing that a false statement knowingly and intentionally, or

with reckless disregard for the truth, was included by the affiant in the warrant affidavit,

and if the allegedly false statement is necessary to the finding of probable cause."  438

U.S. at 155-56.

      ii.  Analysis

Mr. Muhtorov does not contest that he has not made a *Franks* showing for either

the traditional FISA or Section 702 application materials.[45]  Rather, he contends that

---

[44] *Franks* was a Fourth Amendment case, not a due process case.  We assume without deciding that *Franks* may provide a basis for a defendant to obtain "discovery or disclosure" under 50 U.S.C. § 1806(g).

[45] A *Franks* challenge would not succeed here.  In response to such a challenge in the FISA context, "the judge makes the additional determination, based on full access to all classified materials and the defense's proffer of its version of events, of whether it's possible to determine the validity of the *Franks* challenge without disclosure of any of the classified materials to the defense."  *United States v. Daoud*, 755 F.3d 479, 484 (7th Cir. 2014).  Here, the district court found there was "no need to order a *Franks* hearing" with respect to the traditional FISA surveillance.  ROA, Vol. I at 482.  We agree.  And nothing in the record provides any basis to suspect that the Section 702 application materials

defendants like him cannot make the "substantial preliminary showing" needed for a *Franks* hearing because "they cannot identify falsehoods or omissions in FISA affidavits they have not seen." Aplt. Br. at 66.

We note the "difficulty of reconciling [*Franks*] with a proceeding in which the defense has no access to the FISA application [or Section 702 materials] that resulted in court-authorized surveillance of the defendant." *See United States v. Daoud*, 755 F.3d 479, 485-86 (7th Cir. 2014) (Rovner, J., concurring). And it may be that "[a]s a practical matter, the secrecy shrouding the FISA process renders it impossible for a defendant to meaningfully obtain relief under *Franks* absent a patent inconsistency in the FISA application itself or a *sua sponte* disclosure that the FISA application contained a material misstatement or omissions." *Id.* at 486. But we decline to second-guess Congress's determination that "the additional benefit of an unconditional adversarial process was outweighed by the Nation's interest in protecting itself from foreign threats." *United States v. Dhirane*, 896 F.3d 295, 301 (4th Cir. 2018).

Under prevailing law, we detect no error in the district court's handling of Mr. Muhtorov's *Franks* challenge.

*   *   *   *

---

contained any false statement, let alone one made "knowingly and intentionally, or with reckless disregard for the truth." *Franks*, 438 U.S. at 155.

Mr. Muhtorov has not demonstrated that FISA or due process warranted disclosure of the classified traditional FISA and Section 702 application materials.[46]

## IV. **NOTICE OF SURVEILLANCE METHODS AND DISCOVERY OF COMMUNICATIONS THEREFROM**

Mr. Muhtorov argues he should have received notice of "other novel surveillance tools," that the government may have used in its investigation. Aplt. Br. at 69.[47] He bases this request on speculation rather than actual knowledge of the government's use of other investigative techniques. He states that "some of the tools the government *likely* used here," Aplt. Br. at 72 (emphasis added), were Executive Order 12333 surveillance techniques; location tracking, potentially through real-time GPS, cell-site location information, or "stingray" surveillance devices that mimic cell phone towers; and bulk collection of Americans' call records under Section 215 of the PATRIOT Act (codified at 50 U.S.C. § 1861, a part of FISA), *id.* at 72-75.[48]

---

[46] To the extent Mr. Muhtorov suggests that the district court could have disclosed the classified FISA materials only to Mr. Muhtorov's counsel, he points to no supporting authority. As the Seventh Circuit noted, though unlikely that lawyers would brazenly publicize classified information in violation of federal law, "they might in their zeal to defend their client, to whom they owe a duty of candid communication, or misremembering what is classified and what not, inadvertently say things that would provide clues to classified material." *Daoud*, 755 F.3d at 484. It was not error for the district court to decline to disclose information to Mr. Muhtorov's counsel.

[47] Though Mr. Muhtorov describes the surveillance techniques as "novel," he does not explain what he means by "novel." It is thus unclear on appeal what Mr. Muhtorov sought with this request in the district court, which borders on inadequate appellate briefing. Out of an abundance of caution, we construe his request as covering all surveillance techniques the government may have used during its investigation.

[48] Mr. Muhtorov notes that courts have held aspects of these last two techniques to be illegal. *See Carpenter v. United States*, 138 S. Ct. 2206, 2223 (2018) (warrantless

Mr. Muhtorov seeks notice of "how [the government] obtained much of [the] evidence" in the case, as well as discovery of "an unknown number of [his] communications, which [the government] obtained using an undisclosed set of surveillance techniques." Aplt. Br. at 71. He thus appears to request (1) information about surveillance methods the government may have used, and (2) the fruits of that surveillance.[49]

Mr. Muhtorov relies on due process, 18 U.S.C. § 3504, Rule 16 of the Federal Rules of Criminal Procedure, and CIPA. But these authorities do not support disclosing surveillance methods. The law governing discovery in criminal cases applies to material that was collected, and the government has complied with those obligations.

## A. *Legal Background*

### 1. **18 U.S.C. § 3504**

"In any trial, hearing, or other proceeding in or before any court . . . of the United States," a "party aggrieved" may "claim . . . that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act." 18 U.S.C. § 3504(a)(1). "[U]nlawful act" means "the use of any electronic, mechanical, or other device (as defined in [Title III]) in violation of the

---

collection of cell-site location information violates the Fourth Amendment); *ACLU v. Clapper*, 785 F.3d 787, 810-21 (2d Cir. 2015) (PATRIOT Act § 215 does not authorize the government's bulk call data collection program).

[49] This challenge differs from his FISA disclosure challenge in that he does not seek the applications that justified the government's surveillance but instead the nature of the specific surveillance techniques used as well as evidence derived therefrom.

93

Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto." *Id.* § 3504(b).[50] When such a claim is made, "the opponent of the claim [usually the government] shall affirm or deny the occurrence of the alleged unlawful act." *Id.* § 3504(a)(1).

In evaluating a defendant's § 3504 claim, a court "must consider the specificity of the defendant's allegations of unlawful electronic surveillance and the evidence introduced in support of the allegations." *United States v. Alvillar*, 575 F.2d 1316, 1321 (10th Cir. 1978). The court then "measure[s] the need for specificity in the government's denial and for comprehensiveness in the search of government records on which the denial is predicated." *Id.* Any "quest for certainty in this kind of inquiry [is] futile." *Matter of Grand Jury (Vigil)*, 524 F.2d 209, 216 (10th Cir. 1975) (per curiam). This exercise is a "balancing or weighing evaluation" based on the "individual demands" of the case. *Id.*

The statute thus contemplates a multi-step process. The defendant must allege unlawful use. If the allegations are sufficient to require a response, the government issues a confirmation or denial. The court must then weigh whether disclosure is warranted based on the sufficiency of the government's explanation.

---

[50] "[E]lectronic, mechanical, or other device" means "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

2. **Federal Rule of Criminal Procedure 16**

Federal Rule of Criminal Procedure 16(a)(1)(B)(i) requires the government, upon the defendant's request, to produce, among other things, "any relevant written or recorded statement by the defendant" within the government's possession, custody, or control. Rule 16(a)(1)(E)(i) requires the government, upon the defendant's request, to make available for inspection and copying or photographing "books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control" and "the item is material to preparing the defense." Rule 16(d)(1) states that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."

3. **CIPA**

CIPA, 18 U.S.C. app. 3, governs the use or potential use of classified information in federal criminal proceedings. *See id.* § 2. It "establish[es] procedures to harmonize a defendant's right to obtain and present exculpatory material upon his trial and the government's right to protect classified material in the national interest." *Abu-Jihaad*, 630 F.3d at 140 (quotations omitted). CIPA "does not give rise to an independent right to discovery." *United States v. Lustyik*, 833 F.3d 1263, 1271 (10th Cir. 2016). It simply "provides guidance to trial judges applying [Rule 16(d)] where confidential information is involved." *Id.* "CIPA 'clarifies district courts' power under [Rule 16(d)] to issue protective orders denying or restricting discovery for good cause." *Id.* (quotations omitted).

95

District courts have a "duty [under CIPA] to balance the government's need for confidentiality with the defendant's right to a fair trial." *Id.* CIPA treats classified information as privileged, meaning that it might not be discoverable even if relevant. *See United States v. Yunis*, 867 F.2d 617, 622-23 (D.C. Cir. 1989) (CIPA protects the government's "national security privilege"); *see also United States v. Apperson*, 441 F.3d 1162, 1192 n.8 (10th Cir. 2006) ("By its plain terms, [CIPA] evidences Congress's intent to protect classified information from unnecessary disclosure at any stage of a criminal trial." (alterations and quotations omitted)). CIPA also contemplates that a criminal defendant may need to see classified information. *See* 18 U.S.C. app. 3 § 3 ("Upon motion of the United States, the court shall issue an order to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case in a district court of the United States.").

In lieu of full disclosure to the defendant, CIPA § 4 permits the government to ask the district court for permission "to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove." *Id.* § 4. The court "may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone." *Id.*

Courts frequently cite the D.C. Circuit's decision in *Yunis* for the standard governing a district court's evaluation of a CIPA § 4 motion. *See United States v.*

96

*Amawi*, 695 F.3d 457, 470 (6th Cir. 2012) (Second, Fourth, Fifth, Sixth, and Ninth

Circuits follow *Yunis*).  The district court first must ensure that the information the

government seeks to protect "crosse[s] the low hurdle of relevance."  *Yunis*, 867 F.2d at

623.  Second, the court "should determine if the assertion of privilege by the government

is at least a colorable one," thus preventing the government from "convert[ing] any run-

of-the-mine criminal case into a CIPA action merely by frivolous claims of privilege."

*Id*.  Third, the district court must determine if the evidence is "material[]," meaning

"helpful to the defense of an accused."  *Id.* at 622 (quoting *Roviaro*, 353 U.S. at 60-61).

Various circuits agree that "helpful" is a lower standard than "exculpatory," so the district

court cannot simply look for *Brady* evidence.  *See Amawi*, 695 F.3d at 471; *Aref*, 533

F.3d at 80; *United States v. Mejia*, 448 F.3d 436, 456-57 (D.C. Cir. 2006).

B.  ***Additional Procedural History***

In response to Mr. Muhtorov's motion containing § 3504 allegations, the

government denied that any evidence was derived from surveillance under Executive

Order 12333.  It gave that denial "voluntarily," without conceding that "§ 3504 applies or

[that] either defendant has presented a colorable basis for a claim that such surveillance

occurred."  Aplee. Redacted Classified Ex Parte Br. at A44-45.  It promised to provide

any additional information on this issue to the district court ex parte.  The district court

denied the motion without prejudice to renew it after the conclusion of CIPA § 4

proceedings.

97

The government submitted numerous CIPA filings to the district court. The court held 18 in camera and ex parte classified hearings. It entered seven classified orders. Some were accompanied by an unclassified order describing their general subject matter.

Mr. Muhtorov renewed his motion and again asked the government to confirm or deny under § 3504 whether it used allegedly unlawful surveillance techniques. He also filed an objection to the use of ex parte CIPA § 4 proceedings to determine contested Fourth Amendment suppression issues. He alleged, based on governmental conduct in other cases, that the government "improperly relied on the CIPA process to conceal surveillance." ROA, Vol. III at 482.

The district court denied the motion and overruled the CIPA objection without explanation, stating it would address the government's concerns regarding reference to surveillance techniques as they occur at trial. At a hearing the following month, the court said it was allowing the government to withhold classified information under CIPA, particularly information about how it gathered evidence against Mr. Muhtorov, because it is important to protect methodology in the intelligence-gathering field.

### C. *Standard of Review*

Because Mr. Muhtorov's motion for disclosure of non-FISA surveillance materials was a discovery motion, we review the district court's ruling for abuse of discretion. *See United States v. Bowers*, 847 F.3d 1280, 1291 (10th Cir. 2017) (abuse of discretion standard applies to the denial of a motion for discovery in a criminal case); *United States v. Simpson*, 845 F.3d 1039, 1056 (10th Cir. 2017) (abuse of discretion standard applies to denial of Rule 16 discovery motion); *Apperson*, 441 F.3d at 1193 (abuse of discretion

standard applies to rulings "applying the CIPA to discovery and trial" and denying access to classified information to defense counsel unless the issues "involve interpretation of the CIPA"). We review de novo constitutional issues and questions of statutory interpretation. *See Lustyik*, 833 F.3d at 1267, 1271.

## D. *Discussion*

Mr. Muhtorov argues that due process, 18 U.S.C. § 3504, and Rule 16 required notice of the government's surveillance techniques and discovery of evidence collected. He also argues the government and the district court misused CIPA to withhold necessary information from him. We reject his arguments.

## 1. **Due Process**

Neither the Supreme Court nor this court has recognized a due process right to notice of specific techniques the government used to surveil the defendant in a foreign intelligence investigation, nor to evidence collected when the evidence is not grounded in a specific due process right, such as *Brady*. Mr. Muhtorov cites three Supreme Court cases to support his due process argument: the *Keith* case discussed above; *Alderman v. United States*, 394 U.S. 165 (1969); and *Jencks v. United States*, 353 U.S. 657 (1957). None of these cases entitles Mr. Muhtorov to the disclosure he seeks.

First, in *Keith*, the Supreme Court ruled that the government could not, consistent with the Fourth Amendment, engage in warrantless surveillance for domestic security purposes. The Court ordered disclosure of surveillance transcripts on the basis that the surveillance had been unlawful. *See Keith*, 407 U.S. at 318-24. But it declined to address the government's foreign intelligence surveillance powers. Nothing in *Keith*

99

purported to create a due process right to broad disclosure of foreign intelligence surveillance techniques that may have been used and the evidence collected therefrom.

Second, in *Alderman*, the Supreme Court discussed the scope of the Fourth Amendment exclusionary rule and the district court's role in managing the suppression and disclosure of unlawfully collected evidence in a case touching on national security issues. *See* 394 U.S. at 171. The Court addressed whether, in light of unconstitutional electronic surveillance, the district court should inspect records in camera to determine the necessity of disclosure and what standards the district court should use when considering disclosure. *See id.* at 170 n.4. The Court found that the fruits of the unlawful surveillance should be disclosed to the defendants rather than simply submitted to the district court for in camera inspection so the parties could engage in an adversarial process as to what evidence could be used at trial. *See id.* at 182-84.

The disclosures were "limited to the transcripts of a defendant's own conversations and of those which took place on his premises." *Id.* at 184. The Court reasoned that it could "be safely assumed that much of this he will already know, and disclosure should therefore involve a minimum hazard to others." *Id.* at 184-85. The Court said this disclosure would "avoid an exorbitant expenditure of judicial time and energy and w[ould] not unduly prejudice others or the public interest." *Id.* at 184.

*Alderman* does not help Mr. Muhtorov. In *Alderman*, the defendants and the government agreed there was unlawful surveillance. The question was whether disclosure was necessary so the parties could litigate the scope of the exclusionary rule. Here, the district court carefully inspected the classified record and concluded that no

unlawful surveillance occurred. In addition, Mr. Muhtorov seeks notice of any government surveillance techniques possibly used for national security purposes, not simply the records of his statements. He cannot show disclosure of those materials would "involve a minimum hazard to others." *Id.* at 185.

Third, *Jencks* concerned the government's refusal to produce certain statements of government trial witnesses. 353 U.S. at 671. The Supreme Court held the statements should have been produced, stating the government cannot "invoke its governmental privileges to deprive the accused of anything which might be material to his defense." *Id.* But *Jencks* concerned witness testimony, not surveillance techniques and evidence collected therefrom, and so is inapposite.

Because Mr. Muhtorov cannot point to any authority recognizing the due process right he asserts was violated here, we reject his due process claim.

## 2. **18 U.S.C. § 3504**

Section 3504 does not support Mr. Muhtorov's request for disclosure.

First, Mr. Muhtorov's allegations of unlawful acts were insufficient to trigger the government's obligation to confirm or deny the use of surveillance techniques. On appeal, he lists various non-FISA and non-Section 702 surveillance tools that he suspects may have been used, but he has not distinguished between lawful and allegedly unlawful surveillance methods. He has not alleged unlawful acts with any "specificity," nor has he marshaled any persuasive evidence "in support of the allegations" of unlawfulness. *See Alvillar*, 575 F.2d at 1321.

101

Second, even assuming his general allegations were sufficient, the government's

denial that any evidence was derived from surveillance under Executive Order 12333 was

sufficient to carry its burden under § 3504. *See id.*; *Vigil*, 524 F.2d at 214-16. "Bearing

in mind the extreme difficulty of proving a negative such as that before us," that no

evidence was derived from surveillance under Executive Order 12333, we credit the

detailed and credible assurances here made by "a knowledgeable United States Attorney

in charge of the investigation." *Vigil*, 524 F.2d at 215-16. As for other possible

surveillance methods, we agree with the district court that the government's foreign

intelligence surveillance methodology is classified, so affirming or denying the use of

various surveillance techniques would necessarily divulge classified information.[51]

## 3. **Federal Rule of Criminal Procedure 16**

Mr. Muhtorov argues that (1) he is entitled to discovery of his relevant recorded

statements under Rule 16(a)(1)(B), and (2) notice of the government's surveillance

techniques is "essential to [his] ability to seek suppression," so this information is

"plainly 'material' under Rule 16(a)(1)(E)(i)." Aplt. Br. at 80.

---

[51] Courts have applied this principle in Freedom of Information Act ("FOIA") cases. *See Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009) (discussing the permissibility of a Glomar response in FOIA cases, in which the agency may refuse to confirm or deny the existence of records because answering the FOIA inquiry would cause harm); *see Phillippi v. CIA*, 546 F.2d 1009, 1012 (D.C. Cir. 1976) (allowing the CIA to claim that the "existence or nonexistence of the requested records [pertaining to an oceanic research vessel called the Hughes Glomar Explorer] was itself a classified fact exempt from disclosure under . . . FOIA").

Rule 16(a)(1)(B) concerns a defendant's "statement[s]." Mr. Muhtorov does not specify which subsection of Rule 16(a)(1)(B) he alleges requires disclosure here. He appears to rely on Rule 16(a)(1)(B)(i), which concerns statements "within the government's possession, custody, or control" that the "attorney for the government knows—or through due diligence could know— . . . exist[]." The government provided Mr. Muhtorov's statements to him in voluminous disclosures, and the district court generally found that the government complied with its *Brady* discovery obligations. There is no indication the government withheld any statement by Mr. Muhtorov, no matter how it was collected, that the government "knows—or through due diligence could know— . . . exists." Fed. R. Crim. P. 16(a)(1)(B)(i).

In addition to the statements he alleges the government has withheld, Mr. Muhtorov argues that Rule 16 requires notice of the surveillance methods the government used. But Mr. Muhtorov has failed to carry his "burden to make a prima facie showing of materiality" under Rule 16(a)(1)(E)(i) as to this disclosure. *See Simpson*, 845 F.3d at 1056. His speculation that if novel surveillance techniques were used they were material to his suppression motions is mere assertion and is insufficient to show materiality. *See id.*

The district court acted within its discretion under Rule 16 in denying disclosure of the surveillance methods the government may have used. And there is no evidence the government withheld any "statement" within the meaning of Rule 16.

4. **CIPA**

Mr. Muhtorov argues that "[t]he government appears to have misused CIPA to conceal its use of novel surveillance techniques from the defense." Suppl. Aplt. Reply Br. at 10. He speculates that a violation occurred based on (1) "strong[] suggest[ions]" in the unclassified record, *see* Aplt. Br. at 81; (2) a 2009 report by the DOJ's Inspector General on the government's conduct in the "Stellar Wind" surveillance program,[52] *id.* at 83-84; (3) the government's statement that it summarized, substituted, or deleted some discovery under CIPA, *id.* at 82; (4) a ruling that the government could withhold certain of defendants' recorded statements under CIPA, *id.*; and (5) the district court's statement that the methodology of how the government gathered information is classified and protected by CIPA, *id.*; *see* ROA, Vol. XIII at 415-16. He also guesses about the Fourth Amendment arguments the government "may have advanced" during CIPA proceedings. *Id.* at 86. He thus asks us to review the classified record, to order disclosure of the surveillance techniques used in the investigation of him (under appropriate security measures), and to remand to allow him to challenge those techniques and seek suppression. Aplt. Br. at 87-88.

To the extent Mr. Muhtorov argues the CIPA statute itself requires disclosure, that argument is without merit because CIPA "is a procedural statute . . . that does not give rise to an independent right to discovery." *Lustyik*, 833 F.3d at 1271. To the extent he

---

[52] Stellar Wind was a surveillance program based on Congress's 2001 Authorization for the Use of Military Force ("AUMF"). *See ACLU v. Nat'l Sec. Agency*, 925 F.3d 576, 586 (2d Cir. 2019).

contends the district court and the government misused CIPA, that argument also is without merit. The district court recognized that "*ex parte* proceedings are a difficult pill to swallow in our adversarial system" but deemed them necessary in this case. ROA, Vol. VII at 344. It assured the defendants that "[p]ermitting *ex parte* proceedings does not . . . equate to accepting the government's representations as uncontroverted," that "CIPA compels [the court] to take into account every conceivable argument [they] might put forward," and that it "donn[ed its] defense hat . . . [to] probe[] the government on its grounds for continuing to withhold [a defendant's] statements." *Id*.

Overall, the court correctly performed its role to act as "standby counsel for the defendants" by placing itself "in the shoes of defense counsel, the very ones that cannot see the classified record, and act[ing] with a view to their interests." *Amawi*, 695 F.3d at 471. Our review of the district court record, including transcripts from the CIPA proceedings, shows the court performed its CIPA duties diligently, and that it did not allow the CIPA process to be an improper cover for the alleged used of unlawful surveillance techniques.[53]

The district court applied the three-part test in *Yunis* and determined that the classified materials the government wanted to withhold from discovery were not relevant or helpful to the defense. It found the substitutions offered for the withheld classified information provided Mr. Muhtorov with substantially the same capability to prepare his

---

[53] The Stellar Wind surveillance program is not relevant because the record lacks evidence to suggest that the surveillance of Mr. Muhtorov was part of that program.

defense.  The court did not abuse its discretion in denying Mr. Muhtorov's speculative

demands for notice of additional, unknown surveillance techniques under CIPA.

*    *    *    *

The statutes applicable here—FISA, CIPA, and 18 U.S.C. § 3504—balance the

government's and the public's interest in effective law enforcement against a defendant's

discovery rights embodied in Rule 16 and the Due Process Clause.  None of these

authorities supports disclosure of the government's surveillance methods.  And the

district court did not abuse its discretion in concluding the government complied with

requirements governing discovery in criminal cases, no matter how the evidence was

collected.[54]

## V.  SPEEDY TRIAL

For nearly six-and-a-half years, Mr. Muhtorov remained incarcerated until his

conviction in June 2018.  During this time, he filed unsuccessful motions to dismiss the

indictment on the ground that pretrial delay violated his Sixth Amendment right to a

speedy trial.

---

[54] The dissent contends our Sixth Amendment and Fourth Amendment analyses fail to account for Mr. Muhtorov's lack of access to the classified record.  *See* Dissent at 14-18 & nn.12, 15 (Sixth Amendment); *id.* at 26-31 & nn.22, 25 (Fourth Amendment). We disagree.  Although Mr. Muhtorov's lack of access to the classified record makes this case different from an ordinary criminal case and understandably caused the defense frustration, the district court did not err in denying disclosure under prevailing law.  And we have given Mr. Muhtorov's constitutional challenges appropriate consideration in light of the circumstances.  Moreover, we note that the dissent does not question the district court's denial of his requests for the government's application materials for traditional FISA and Section 702 surveillance or for disclosure of possible novel surveillance methods.

On appeal, Mr. Muhtorov argues the length of time between his arrest and conviction violated his Sixth Amendment right to a speedy trial. The pretrial period was lengthy, particularly given that Mr. Muhtorov was incarcerated the entire time. But we agree with the district court that there was no violation of Mr. Muhtorov's speedy trial right. The length of the pretrial period was due to atypical aspects of the investigation that prolonged the discovery process. The government worked diligently to bring the case to trial, while endeavoring to comply with Mr. Muhtorov's broad discovery requests.

## A. *Background*

We provide background on (1) a defendant's constitutional and statutory rights to a speedy trial, and (2) the district court proceedings.

### 1. **Legal Background**

#### a. *Sixth Amendment*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The right to a speedy trial "attaches when the defendant is arrested or indicted, whichever comes first." *United States v. Medina*, 918 F.3d 774, 779 (10th Cir. 2019) (quotations omitted). "[T]he right detaches upon conviction[.]" *Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016). "[I]t is the prosecution's burden (and ultimately the court's) and not the defendant's responsibility to assure that cases are brought to trial in a timely manner." *United States v. Seltzer*, 595 F.3d 1170, 1175-76 (10th Cir. 2010).

The Speedy Trial Clause "[r]eflect[s] the concern that a presumptively innocent person should not languish under an unresolved charge." *Betterman*, 136 S. Ct. at 1614.

107

"The evils at which the Clause is directed are readily identified. It is intended to spare an accused those penalties and disabilities—incompatible with the presumption of innocence—that may spring from delay in the criminal process." *Dickey v. Florida*, 398 U.S. 30, 41 (1970) (Brennan, J., concurring). "[A]lthough the right is somewhat amorphous, the remedy is severe: dismissal of the indictment." *Seltzer*, 595 F.3d at 1175.

In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court identified four factors that guide our analysis: "(1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant." *Medina*, 918 F.3d at 780 (quotations omitted). This test "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." *Barker*, 407 U.S. at 530. "No one of the factors is necessary or sufficient to conclude a violation has occurred. Instead, the factors are related and must be considered together along with other relevant circumstances." *United States v. Toombs*, 574 F.3d 1262, 1274 (10th Cir. 2009) (citation omitted).

b. *Speedy Trial Act*

The district court pushed back the trial date multiple times under the Speedy Trial Act of 1974 ("STA"), 18 U.S.C. §§ 3161-3174. Although Mr. Muhtorov does not challenge the district court's STA rulings, we provide brief background on the STA.

"Under the [STA], a federal criminal trial must begin within seventy days of the filing of the indictment or from the date of the defendant's initial appearance, whichever occurs later." *United States v. Margheim*, 770 F.3d 1312, 1318 (10th Cir. 2014) (citing 18 U.S.C. § 3161(c)(1)). "Several 'enumerated events' are excluded from the statute's

108

prescribed seventy-day period[.]" *Id.* The district court shall exclude "[a]ny period of delay resulting from a continuance . . . if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). Among the factors the district court "shall consider in determining whether to grant a continuance" is "[w]hether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established" by the STA. *Id.* § 3161(h)(7)(B), (h)(7)(B)(ii). The "delay resulting from any pretrial motion" is also excluded. *Id.* § 3161(h)(1)(D).

2. **Procedural History**

a. *Initial proceedings*

Following Mr. Muhtorov's arrest on January 21, 2012, a grand jury returned an indictment on January 23, which charged Mr. Muhtorov with providing or attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. On February 15, the district court denied Mr. Muhtorov's request for release and ordered him detained without bond. On March 1, the district court set Mr. Muhtorov's case for a two-week jury trial to begin on April 9.

b. *Speedy Trial Act orders*

On March 19, 2012, the district court issued the first of many orders under the STA that continued the trial date. It declared Mr. Muhtorov's case "complex" under the

109

STA and excluded 90 days from speedy trial calculations. *See* 18 U.S.C.

§ 3161(h)(7)(B)(ii). In later tolling motions, the government requested STA extensions

of 90 days (filed Sept. 27, 2012); 120 days (filed Feb. 22, 2013); 120 days (filed June 14,

2013); 120 days (filed Oct. 2, 2013); 180 days (filed May 4, 2016); 137 days (filed Oct.

26, 2016); and 152 days (filed Feb. 28, 2017). In support, the government cited the (1)

complexity of the case, (2) existence of novel questions of law and fact, (3) volume of

intercepted communications that would be disclosed in discovery, (4) scarcity of

translators, (5) need to comply with CIPA, and (6) national security implications of the

prosecution.

Mr. Muhtorov did not oppose five of the tolling motions. He opposed two,

including one that he argued was "unnecessary under the circumstances." ROA, Vol. XI

at 345-46. The district court granted all the STA motions. The extensions tolled the case

until July 2017.

c. *Superseding indictment*

On March 22, 2012, the grand jury returned a superseding indictment containing

the charges that were eventually presented at trial. The grand jury charged Mr. Muhtorov

and Mr. Jumaev with conspiracy to provide material support, providing, and attempting

to provide material support to the IJU. It charged Mr. Muhtorov alone with providing

and attempting to provide material support to the IJU in the form of communications

equipment and services as well as his own personal participation.

d. *Discovery*

The government produced discovery in waves from early April 2012 through January 2018, just months before the trial. It repeatedly pushed back its estimated completion date and ultimately persuaded the district court to impose a discovery deadline of September 1, 2016—four-and-a-half years after Mr. Muhtorov's arrest. The district court closely oversaw the discovery process, particularly with respect to the production of classified materials, the imposition of protective orders, and the government's compliance with its discovery obligations.

e. *Section 702 notice and motion to suppress*

On October 25, 2013, the government gave Mr. Muhtorov notice of its intent to offer into evidence or otherwise use or disclose "information obtained or derived from acquisition of foreign intelligence information conducted pursuant to [Section 702]." ROA, Vol. I at 552.[55]

In January 2014, Mr. Muhtorov filed a motion to suppress all evidence obtained or derived from Section 702 surveillance. The district court denied the motion in November 2015.

---

[55] As explained above, the government had filed, in February 2012, notice that it "intend[ed] to offer into evidence . . . information obtained and derived from electronic surveillance and physical search conducted pursuant to [FISA], as amended, 50 U.S.C. §§ 1801-1811 [governing electronic surveillance], 1821-1829 [governing physical searches]." ROA, Vol. I at 220. Mr. Muhtorov's motion to suppress traditional FISA evidence was denied in September 2012. The government did not indicate in the February 2012 notice that it would use evidence derived from Section 702 surveillance. The record does not explain why the government filed the Section 702 notice when it did. The dissent nonetheless attempts to speculate. *See* Dissent at 5 n.2.

f. *Third superseding indictment and second trial setting*

In May 2016, the government filed a third superseding indictment against Mr. Muhtorov and Mr. Jumaev. It added two counts concerning the government's theory that Mr. Muhtorov and Mr. Jumaev conspired to provide material support to the IJU by arranging for Mr. Jumaev's son to study at a madrassa—an Islamic religious school—in Turkey. On June 7, 2016, the district court set a jury trial for the defendants, to begin on March 13, 2017. In March 2017, the government voluntarily dismissed the two counts added in the third superseding indictment.

g. *Severance and third trial setting*

In November 2016, the district court granted Mr. Muhtorov's motion to sever his trial from Mr. Jumaev's. The court reasoned that the need for separate interpreters for different languages would make a joint trial cumbersome. It also noted that Mr. Muhtorov intended to call Mr. Jumaev as a witness.

In December 2016, the court set a seven-week trial for Mr. Jumaev to begin on March 13, 2017, to be followed by a seven-week trial for Mr. Muhtorov beginning on July 31, 2017.

h. *Fourth trial setting*

On March 13, 2017, the district court denied Mr. Jumaev's motion to dismiss for violation of his Sixth Amendment right to a speedy trial and failure to timely disclose *Brady* materials. It granted his later request for a nine-month continuance to January 8, 2018. Because Mr. Muhtorov intended to call Mr. Jumaev as a witness, Mr. Jumaev's trial needed to precede Mr. Muhtorov's so Mr. Jumaev's "jeopardy would be over."

ROA, Vol. XV at 285 (quotations omitted).  The court therefore reset Mr. Muhtorov's

trial from July 31, 2017, to March 12, 2018.[56]

i.    *District judge's medical condition and final trial setting*

In November 2017, the district judge notified the parties that he needed medical

treatment.  Although reassignment to another judge was an option, the district court told

the parties that it would take at least six months for a new judge to become familiar with

the case.  The government supported reassignment, but Mr. Muhtorov and Mr. Jumaev

asked for the case to remain with the original district judge, which it did.  Mr.

Muhtorov's trial was reset from March 12, 2018, to May 14, 2018, and began on that day,

nearly six-and-a-half years after his arrest.

j.    *Disposition of speedy trial motions*

On March 29, 2017, Mr. Muhtorov filed a counseled motion to dismiss the

indictment on speedy trial grounds.  He argued that Mr. Jumaev's trial setting forced Mr.

Muhtorov to choose between competing constitutional rights:  his right to call Mr.

Jumaev as a witness and his Sixth Amendment right to a speedy trial.  *See* ROA, Vol. XV

at 283.

The district court denied the motion.  On the first *Barker* factor, the court said the

length of delay "weighs very strongly" on Mr. Muhtorov's side because it is emotionally

and physically troubling "to think of people being held in custody for the length of time

that Mr. Muhtorov and Mr. Jumaev have been held, without having a trial on the merits

---

[56] Mr. Muhtorov did not end up calling Mr. Jumaev as a witness at trial.

of the charges against" them. ROA, Vol. XII at 547. On the second factor, the court did not "see this as a question of fault or of deliberate intent to delay," but rather that it was an understandable function of the "enormous amount of electronic generated data" and the complexity of the terrorism-related charges. *Id.* at 548, 550-51. It praised the attorneys for both sides—stating that the government's lawyers had been dedicated and had not deliberately intended to delay this case, while attributing defense counsels' extensive motions practice to "the necessities of the case." *Id*. at 551. The court found the third factor—defendant's assertion of the speedy trial right—favored Mr. Muhtorov. On the fourth factor, it found prejudice based on the "high" cost of "personal investment" and "the mere fact of being kept from one's loved ones." *Id.* at 547. In the end, the court found the delay to be "regrettable" but "legitimate," "justifiable," and based on "reasonable" actions. *Id*. at 552-54.

Mr. Muhtorov renewed his motion to dismiss on speedy trial grounds at the beginning of the trial. In that motion, he focused on the recent death of a "key" defense witness, Vaslia Inoyatova, to argue the delay had caused prejudice from lost testimony. ROA, Vol. XV at 522. The district court denied the renewed motion. It incorporated its previous analysis and reiterated that "the complexities of the case, the matters of first impression, the confrontation of national security with the administration of justice are all matters that militate and justify under [*Barker*] the time that has been spent." ROA, Vol. XX at 149. The court gave limited weight to the loss of Ms. Inoyatova's testimony.

114

k.  *Convictions and sentence*

As explained above, a jury convicted Mr. Muhtorov on June 21, 2018, on three counts, but acquitted him of a fourth.  The district court sentenced him to 132 months in prison, with a recommendation that he receive credit for his pretrial confinement.  He received such credit and completed his sentence in June 2021.

## B.  *Discussion*

On appeal, Mr. Muhtorov argues that the six-and-a-half years it took to bring him to trial and convict him violated his speedy trial right.  He blames the government for the delay and argues that he sufficiently asserted his speedy trial right in the district court.  He contends that he suffered prejudice from his detention—oppressive incarceration, deterioration of his mental health, and the death of an important witness.  We consider the four *Barker* factors and then balance them.

"We review a defendant's claim under the Sixth Amendment's Speedy Trial Clause de novo, accepting the district court's factual findings unless they are clearly erroneous." *Medina*, 918 F.3d at 788 (citation omitted).

## 1.  **First *Barker* Factor:  Length of the Delay**

The length of the delay—six-and-a-half years—strongly favors Mr. Muhtorov.

a.  *Additional legal background*

"The first *Barker* factor involves a 'double inquiry.'" *Medina*, 918 F.3d at 780 (quoting *Seltzer*, 595 F.3d at 1176.).  "First, 'simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay.'" *Seltzer*, 595 F.3d

at 1176 (brackets omitted) (quoting *Doggett v. United States*, 505 U.S. 647, 651-52 (1992)).  Delays "approach[ing] one year" generally are sufficient to trigger review of all the *Barker* factors.  *Doggett*, 505 U.S. at 652 n.1.  The first *Barker* factor is a "gatekeeper" because we examine the remaining factors "only if a delay is long enough to be presumptively prejudicial."  *United States v. Batie*, 433 F.3d 1287, 1290 (10th Cir. 2006).

"Second, if the defendant establishes presumptive prejudice, 'the court must then consider, as one factor among several,' the length of the delay."  *Medina*, 918 F.3d at 780 (quoting *Seltzer*, 595 F.3d at 1176).  The court considers the "extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim."  *Doggett*, 505 U.S. at 652.  "The greater the delay, the more that factor favors the defendant."  *United States v. Hicks*, 779 F.3d 1163, 1168 (10th Cir. 2015).  When deciding whether, "given other factors," a delay is "unreasonable . . . , a court should take into consideration the nature of the charges."  *Seltzer*, 595 F.3d at 1176.

b.  *Analysis*

In May 2017, one year before the trial, the district court found that the length of delay "weighs very strongly" in favor of a speedy trial violation.  ROA, Vol. XII at 547.  We agree.

First, the six-and-a-half-year delay is well beyond the one-year delay that courts have deemed sufficient to clear the "gate" and allow consideration of the remaining three *Barker* factors.  *See Doggett*, 505 U.S. at 652 n.1; *Medina*, 918 F.3d at 780.  The

116

government does not dispute that "the delay here warrants consideration of the remaining *Barker* factors." Aplee. Br. at 72.

Second, the six-and-a-half-year delay weighs strongly in favor of Mr. Muhtorov when considered "as one factor among several." *Seltzer*, 595 F.3d at 1176. The Supreme Court has called a delay of more than five years in a murder trial "clear[ly] . . . extraordinary." *Barker*, 407 U.S. at 533. And we have concluded that shorter delays favor the defendant at the first *Barker* factor. *See Margheim*, 770 F.3d at 1326 (23-month delay "weigh[ed] entirely in [the defendant's] favor"); *Seltzer*, 595 F.3d at 1176-77 (two-year delay "weigh[ed] in favor of a finding of a violation of [the defendant's] speedy trial rights"); *Batie*, 433 F.3d at 1290-91 (17-month delay weighed in the defendant's favor); *Jackson v. Ray*, 390 F.3d 1254, 1261 (10th Cir. 2004) (four-and-one-third-year delay weighed in the defendant's favor).

In *Barker*, the Supreme Court noted that a longer delay would be more justified for a "serious, complex conspiracy charge" than for an "ordinary street crime." 407 U.S. at 531. This consideration cuts in different directions in this case. On the one hand, the investigation included traditional FISA and Section 702 surveillance, which created procedural complexities. The need for the parties and the court to comply with CIPA made this case more complicated than an ordinary prosecution. On the other hand, the

117

underlying charged conduct was straightforward, involving Mr. Muhtorov's intention to assist the IJU through a few discrete transactions and to devote himself to the jihad.[57]

Even assuming that this case was "complex" for purposes of the first *Barker* factor, the six-and-a-half-year delay still strongly favors Mr. Muhtorov. *See, e.g.*, *United States v. Black*, 918 F.3d 243, 255 (2d Cir. 2019) (a five-year-and-eight-month delay in a Hobbs Act conspiracy case was "easily . . . substantial and presumptively prejudicial"); *United States v. Tigano*, 880 F.3d 602, 612 (2d Cir. 2018) ("[N]early seven years of pretrial detention" was an "extreme length of delay" in case alleging marijuana-growing enterprise); *United States v. Velazquez*, 749 F.3d 161, 185-86 (3d Cir. 2014) (a five-year delay in bringing the defendant to trial in a drug conspiracy case was "extraordinary").

2. **Second *Barker* Factor:  Reasons for the Delay**

The delay in this case was principally attributable to a lengthy discovery process necessitated by the nature of the investigation and the breadth of Mr. Muhtorov's discovery requests.  Throughout, the government acted diligently and without bad faith or negligence.  This factor does not support finding a constitutional violation.

a.  *Additional legal background*

"The second *Barker* factor—the reason for delay—is 'the flag all litigants seek to capture.'"  *Margheim*, 770 F.3d at 1326 (brackets omitted) (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)).

---

[57] The conduct underlying Mr. Jumaev's conviction was even more straightforward, consisting of a single $300 payment to Mr. Muhtorov, to be forwarded to the IJU.

118

"Because the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner the burden is on the prosecution to explain the cause of the pre-trial delay." *United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999) (ellipsis and quotations omitted); *see also Dickey*, 398 U.S. at 38 ("[T]he right to a prompt inquiry into criminal charges is fundamental[,] and the duty of the charging authority is to provide a prompt trial."). Even when "there is no evidence that the government intentionally delayed the case for the explicit purpose of gaining some advantage, the government still bears the burden of bringing a case to trial in a timely fashion, absent sufficient justification." *Seltzer*, 595 F.3d at 1179. Nonetheless, "pretrial delay is often both inevitable and wholly justifiable." *Doggett*, 505 U.S. at 656. For example, "[t]he government may need time to collect witnesses against the accused [and to] oppose his pretrial motions." *Id.*

Our cases show that this factor first requires quantifying and then weighing the delay.

i. Quantifying the delay

In the first part of the inquiry we attempt to "divide" the overall delay into discrete "periods during which an indictment was pending against" the defendant to provide manageable units of analysis. *United States v. Black*, 830 F.3d 1099, 1113 (10th Cir. 2016). We determine whether each period should weigh for or against a constitutional violation. *See United States v. Gould*, 672 F.3d 930, 937 (10th Cir. 2012) (engaging in a period-by-period analysis).

119

1) Caused by defendant

If we find the defendant is responsible for the delay, that period "do[es] not weigh against the government" in the speedy trial analysis. *United States v. Abdush-Shakur*, 465 F.3d 458, 465 (10th Cir. 2006). Such delays might include the defendant's "moving to suppress evidence," *Black*, 830 F.3d at 1113, "requesting that the district court extend filing deadlines or continue hearings . . . [, or] chang[ing] counsel several times," *Hicks*, 779 F.3d at 1168.

2) Caused by the prosecution

Delay caused by the prosecution will weigh in favor of finding a constitutional violation. For example, if the prosecution moves for a continuance and the defendant objects or the continuance does not benefit the defendant, that will favor a violation. *See Black*, 830 F.3d at 1118. Similarly, if the government is "negligent in moving the case forward," including in the production of discovery, we attribute that period of delay toward finding a constitutional violation. *United States v. Young*, 657 F.3d 408, 415 (6th Cir. 2011).

3) Caused by neither the defendant nor the prosecution

When neither the prosecution nor the defendant is to blame, the delay can still favor one side or the other. *See Barker*, 407 U.S. at 531 (discussing "neutral reason[s]" for delay like "overcrowded courts"). For example, a delay traceable to limited judicial resources is weighed against the government, though "less heavily" than factors within its control. *Id.* But "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.*

120

4) Overall considerations

Overall, this part of the inquiry "is not a search for a blameless party." *Wilson v. Mitchell*, 250 F.3d 388, 395 (6th Cir. 2001). Instead, for each discrete period, the question is "whether the government or the criminal defendant is more to blame for [the] delay." *Doggett*, 505 U.S. at 651.

ii. Weighing the delay

After "numerically assess[ing] the reason-for-the-delay factor," *Black*, 830 F.3d at 1120, we must then "determin[e] how heavily the delay weighs" in the overall constitutional analysis, *Gould*, 672 F.3d at 937. When the government and the defendant each contributed to the delay, "the second *Barker* factor isn't purely an arithmetic exercise where the party responsible for less of the delay prevails under the factor." *Black*, 830 F.3d at 1120. "The root cause of the delay is equally important." *Id.* For example, "even if the defendant is responsible for a majority of the delay, we could weigh the second *Barker* factor against the government if the government delayed the trial to gain an advantage over the defendant or to deprive the defendant of his ability to defend himself at trial." *Id.*

In conducting this part of the inquiry, we look to the circumstances that caused the delay to determine how strongly to weigh it.

> A deliberate attempt to delay the trial in order to hamper the
> defense should be weighted heavily against the government.
> A more neutral reason such as negligence or overcrowded
> courts should be weighted less heavily but nevertheless
> should be considered since the ultimate responsibility for
> such circumstances must rest with the government rather than

121

with the defendant.  Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531 (footnote omitted).[58]

> b.  *Additional procedural background – discovery*

The partially classified nature of the record prevents discussion here of some details surrounding the government's discovery productions.  The following summary is sufficient for us to rule on the speedy trial issue.

The discovery process began almost immediately.  The parties filed a joint report under Federal Rule of Criminal Procedure 16 in February 2012.  At a status conference in May 2012, the government represented it had already produced summary translations of intercepted communications to the defendants.

In September 2012, Mr. Muhtorov and Mr. Jumaev jointly moved for broad discovery of their "statements."  ROA, Vol. I at 463.  They clarified "they mean not just the statements made or given to government investigators or agents, but also all recorded conversations or communications including e mails and other written communications that they are alleged to have authored, as well as any statements made to third parties in whatever form."  *Id*.  They added that the motion "also seeks discovery of any

---

[58] Ignoring this passage from *Barker*, the dissent faults us for considering whether the length of discovery was due to a deliberate attempt to delay the trial, negligence, or a valid reason.  Dissent at 9 n.7.  Although good faith alone may not preclude a speedy trial violation, *see Seltzer*, 595 F.3d at 1179, bad faith government delay can weigh "heavily" in favor of a violation, as *Barker* instructs, 407 U.S. at 531.  *See also Doggett,* 506 U.S. at 656 ("[O]fficial bad faith in causing delay will be weighed heavily against the government.").

transcriptions or summaries of any such statements and translations into English thereof." *Id.* At around the same time, Mr. Muhtorov and Mr. Jumaev moved for the disclosure of grand jury materials. *Id.* at 504-05. They also requested exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

Mr. Muhtorov's and Mr. Jumaev's broad requests precipitated a vast and multi-faceted discovery production. Much of it was audio files of intercepted communications in Russian, Uzbek, and Tajik—39,000 of them, spanning 1,862 hours. The government produced summary translations known as "tech cuts" for approximately 150 of those recordings. *See* ROA, Vol. XI at 204-05.

The government repeatedly represented it was producing discovery as expeditiously as possible. It attributed the pace of discovery to the collection of materials under FISA, the need to sort the production into classified and unclassified documents for review at ex parte CIPA hearings, the volume of the material, and the lack of available Uzbek and Tajik translators.[59] Meanwhile, Mr. Muhtorov expressed his dissatisfaction with the discovery production in a series of discovery motions and through counsel's statements at hearings.

A persistent theme before trial was that "the massive volume of intercepted conversations were in Uzbek with others in Russian and Tajik." ROA, Vol. XV at 394.

---

[59] The government also gave these justifications for continuances under the STA, all but two of which Mr. Muhtorov did not oppose.

The government explained that "the overall challenge of the government, the Court, and the defendants in finding linguists caused substantial delay," adding that "one Uzbek translator . . . [even] absconded from a court appointment." *Id*. at 396. The government said, *"*The issue [in finding translators] complicated the government attorneys' review of evidence." *Id*.

At first, in October 2012, the government gave June 2013 as its target deadline for producing discovery in compliance with CIPA. ROA, Vol. XI at 228. This deadline was not met. The record shows that discovery productions were made consistently in the following years except for two periods of time. No discovery was produced between September 2014 and April 2015, and then again between October 2015 and March 2016.[60] *See* ROA, Vol. II at 42; Dist. Ct. Doc. 972 at 2. During this second lull, Mr. Muhtorov and Mr. Jumaev asked the district court to set a discovery deadline. Dist. Ct. Doc. 972.

In June 2016, the district court set a final discovery deadline of September 1, 2016. *See* ROA, Vol. XI at 375, 377. The district court also set a deadline of October 1, 2016, for Mr. Muhtorov to file motions under Federal Rule of Criminal Procedure 12, including motions to suppress, motions for violation of the speedy trial right, and motions to sever. *See id.* at 377. The district court stated, "I don't want to say that these dates are etched in granite, but I mean them." *Id.* The government produced most of the discovery

---

[60] Although document production may have ceased during these times, the record shows that work was ongoing behind the scenes, particularly with respect to translations. A gap in discovery production does not equate to a lack of government diligence.

on September 1, 2016, with follow-up productions thereafter. By contrast, it produced about 1,000 calls and 4,718 pages of discovery between April 2012 and March 2013.

Throughout the six-and-a-half years, the district court's views concerning the pace of discovery evolved. In January 2013, about one year after Mr. Muhtorov's arrest, the court noted that it was "satisfied that discovery is proceeding apace." ROA, Vol. I at 525. At that point, it had already overseen discovery disputes and motions involving the government's *Brady* and *Giglio* obligations, and had overseen the beginning of the CIPA process. *See* ROA, Vol. I at 493 (October 2012 order of the district court noting it had carefully considered the government's obligations under Federal Rule of Criminal Procedure 16, *Brady*, and *Giglio*).

Later, the district court became more impatient with the pace of discovery, though it repeatedly emphasized that any delay was due to the nature of the case, not the conduct of the parties. For example, at a June 2016 conference, the court commented, "The case has dragged on and on and on, and it's not the fault of the prosecution or the defense. It's the essential nature of security belonging to the Executive Branch and constitutional issues belonging to the Judicial Branch." ROA, Vol. XI at 369-70. And in March 2017, the court characterized the discovery process as "opaque and painstakingly slow," and lamented that it "has surely inured to Defendants' detriment." Suppl. ROA, Vol. 2 at 14. But it noted there was no "fault or . . . deliberate intent to delay" by the government, that "the government and its counsel have been dedicated," and the "record shows, beyond any dispute, the due diligence, the extraordinary efforts of the [government] counsel in

125

this case." ROA, Vol. XII at 550-51.[61] Overall, the court found that "[t]he necessities of the case require intense discovery, and that is further complicated by the fact that there are some language difficulties, and the translation of documents and a multitude of electronically generated data." *Id.* at 551.

c. *Analysis*

The government and Mr. Muhtorov blame each other for the pretrial delay. They argue that the necessities of the case explain their own contribution to the delay.

The government points to the "complexity" of the case and the nature of the investigation. Mr. Muhtorov's broad discovery requests required translating voluminous materials from Russian, Uzbek, and Tajik into English and complying with CIPA. The government also notes Mr. Muhtorov's "aggressive" motions practice. Aplee. Br. at 14.

Mr. Muhtorov argues that, despite the case's complexities, the government's discovery productions were unreasonably slow, largely because it failed to find translators. He also points to the nearly two years between his arrest and the notice of Section 702 surveillance. Further, Mr. Muhtorov cites the government's filing and dismissing a third superseding indictment, and the delay caused by the district judge's need for medical treatment.

Although a close question, we find the government has carried its burden "to provide an acceptable rationale for the delay." *Seltzer*, 595 F.3d at 1177. We (i) quantify

---

[61] In its oral ruling, the district court referred to "defense counsel" rather than government counsel. The context makes clear that the district court intended to refer to government counsel.

the periods in which the indictment was pending that favor finding a constitutional violation and those that do not, and (ii) weigh the entire pretrial period as a whole.

i.  Quantifying the pretrial periods

The first step of the second *Barker* factor analysis entails dividing the pretrial period into smaller "periods during which an indictment was pending" and analyzing each in turn. *Black*, 830 F.3d at 1113.  The relevant periods here covered (1) Mr. Muhtorov's arrest in January 2012 until the last discovery production in January 2018;[62] and (2) the district judge's medical treatment, which postponed the trial from March 12, 2018, to May 14, 2018.  Our discussion focuses on the discovery period because the two-month delay caused by the judge's medical treatment was relatively brief.

1)  Discovery period

The discovery process began with Rule 16 discussions about a month after Mr. Muhtorov's arrest and continued until January 2018.  To determine whether this period should weigh for or against a constitutional violation, we consider whether the government has "provide[d] an acceptable rationale for the delay" of the trial.  *Seltzer*, 595 F.3d at 1177.  The government has justified the length of time for discovery.  *See id.*; *see also Doggett*, 505 U.S. at 656.

We discuss (a) Mr. Muhtorov's discovery requests, (b) the CIPA process, (c) translation issues, and (d) the government's discovery conduct.[63]

---

[62] Discovery in Mr. Jumaev's case continued until February 2018.

[63] Contrary to the dissent's suggestion, the government did not merely "incant[] . . . the phrase 'national security'" to justify the time it took to bring Mr. Muhtorov to

127

a) Mr. Muhtorov's discovery requests

Mr. Muhtorov exercised his right to make broad discovery requests under *Brady*, *Giglio*, and Rule 16. In September 2012, he requested "not just the statements made or given to government investigators or agents, but also *all* recorded conversations or communications including e mails and other written communications that they are alleged to have authored, as well as *any* statements made to third parties *in whatever form*." ROA, Vol. I at 463 (emphasis added).[64] He requested that foreign language materials be translated into English. *Id.*[65] He also requested grand jury materials. *Id.* at 26.

The government's need for time to comply with Mr. Muhtorov's broad requests does not point to a constitutional violation. *See United States v. Johnson*, 990 F.3d 661, 670 (8th Cir. 2021) ("[T]he heavy discovery in this case mitigates the delay's length."); *United States v. Ashford*, 924 F.2d 1416, 1420 (7th Cir. 1991) (finding the defendant's "decision to file numerous discovery requests . . . served to justify appropriate delay"

---

trial. *See* Dissent at 14. If it had, we would reject a bare invocation of national security to justify the length of the pretrial period. The Second Circuit has allowed for "national security . . . [to] justify pretrial delay." *United States v. Ghailani*, 733 F.3d 29, 46 (2d Cir. 2013). But here, there is no indication that national security would have been compromised had Mr. Muhtorov been tried sooner—for example, by hindering the federal government's efforts to prevent a terrorist attack.

[64] In light of the volume of communications involved, these requests were hardly "garden variety," as the dissent contends. Dissent at 3 n.1.

[65] The dissent is thus incorrect that he requested translation only after September 2016. *See* Dissent at 3 n.1.

(brackets and quotations omitted)); *see also Black*, 830 F.3d at 1117 (counting against the defendant time spent litigating a motion to dismiss); *United States v. Carpenter*, 781 F.3d 599, 613 (1st Cir. 2015) (even if an "avalanche of filings" by a defendant is justified, they "cut against" the defendant in the speedy trial analysis). Time for the prosecution to fulfill its discovery obligations is "both inevitable and wholly justifiable." *See Doggett*, 505 U.S. at 656.

### b) CIPA

The district court's and the parties' obligations to comply with CIPA significantly complicated the discovery process.

As explained above, CIPA governs the use or potential use of classified information in federal criminal proceedings. CIPA § 4 permits the district court to "authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery . . . , to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove." 18 U.S.C. app. 3 § 4. The court's review allows for balancing the defendant's interests in accessing discoverable materials against the government's and the public's interest in protecting classified information.

The national security investigation compelled the government and the district court to conduct CIPA proceedings before certain materials could be produced to Mr. Muhtorov. Eight government CIPA filings and eighteen CIPA or other ex parte hearings implicating classification occurred throughout the pretrial period. *See* ROA, Vol. I at

484, 533; ROA, Vol. III at 340; ROA, Vol. IV at 820, 833, 868, 874, 888 (filings); and

ROA, Vol. I at 426; ROA, Vol. III at 155, 343; Dist. Ct. Docs. 1223, 1244, 1269, 1276,

1304, 1369, 1466, 1540, 1552, 1564, 1620, 1621, 1657, 1691, 1854 (hearings). CIPA

compliance was a "valid reason" for the length of the discovery period. *See Barker*, 407

U.S. at 531; *id.* at 522 (*Barker* requires a "functional analysis of the [speedy trial] right in

the particular context of the case").

The dissent contends the government did not diligently manage the CIPA process

because it failed to file § 4 motions until January 2016. Dissent at 22. We disagree. The

government submitted procedural CIPA filings in September 2012, *see* ROA, Vol. I at

484, and April 2013, *see id.* at 533. These procedural filings necessarily preceded

substantive CIPA motions. In addition, before prosecutors file CIPA motions, they work

with the intelligence community under Department of Justice procedures to identify

materials responsive to a discovery request and, if possible, declassify the materials. *See*

Kris & Wilson § 26:3. Only if declassification is not possible does CIPA review occur

before discovery. *See id.* That process take time. Overall, the classified record shows

the government was diligently working to use the CIPA process to comply with Mr.

Muhtorov's broad discovery requests. The record does not support the dissent's

contention that the government was "sit[ting] on its hands for 46 months" before

beginning the CIPA process. Dissent at 11.

c) Translation issues

The dearth of Uzbek and Tajik translators does not weigh in favor of a

constitutional violation.

130

Since 2009, the government was familiar with the investigation. It would have known about the need for translation and perhaps the shortage of Uzbek and Tajik translators. But the record reveals that the government made diligent attempts to translate the discovery. The pace of translation and Mr. Muhtorov's broad discovery requests were intertwined. Given the volume of materials requested, meeting those requests required time, particularly when the materials had to be translated from uncommon languages—Uzbek and Tajik—by translators with security clearances.

The time needed to translate materials should not count against the government. Unlike delays caused by "mismanagement of resources," *see Harris v. Champion*, 15 F.3d 1538, 1547 (10th Cir. 1994), the time taken to translate materials was needed for the benefit of Mr. Muhtorov and the preparation of his defense, *see United States v. Rice*, 746 F.3d 1074, 1079 (D.C. Cir. 2014) (noting that the need to translate thousands of hours of taped conversations into English justified delay under the STA because defense counsel could not provide adequate representation without the translations). In addition, there is no evidence the government was unwilling to obtain more translation resources. The public and classified record confirms that the government actively sought Uzbek and Tajik translators with clearances.[66]

---

[66] At one point, the district court stated that it could "only surmise . . . that the translations were not done as soon as they could have been." ROA, Vol. XII at 552. The court added that it "d[idn't] know that for a fact," and "[w]hat I do know, for a fact, is that the reasons for the length of time this is taking are palpable and legitimate reasons." *Id.* Thus, though the court observed translation needs slowed the pace of discovery, it did not find the government intentionally or negligently delayed the translation process.

131

The dissent questions "the government's decision to translate the defendants' recorded statements prior to providing them to the defense in order to evaluate them under CIPA," contending "the defense did not request an order to compel the government to translate the discovery." Dissent at 3-4 n.1. The defendants do not raise this argument in their appellate briefs. Nor should they. The defense's joint discovery motion "[sought] discovery of any transcriptions or summaries of any such statements *and translations into English thereof.*" ROA, Vol. I at 463 (emphasis added). The defense also recognized that "receiving the statements without the government's translations makes it impossible for counsel to make any sense of them. . . . No one on the jury will be able to understand the calls unless they are translated. Nor will the Court or counsel. Neither counsel nor the district court will be able to evaluate the calls for compliance with FISA, or, if it applies, with Title III, the constitution, or to determine if they would be admissible under the Rules of Evidence . . . ." *Id.* at 468; *see also* ROA, Vol. V at 440 ("[W]ithout translation, [the statements demanded] are unintelligible to both the government's attorney's and the defense attorneys.").[67]

---

[67] The defense later argued:

> The recordings are gibberish and meaningless to the defense unless they are translated. Unless they are translated, defense counsel cannot discern whether they contain inculpatory statements that the government will introduce in its case in chief, or whether they contain exculpatory statements helpful to the defense. *It is therefore necessary that they be translated by the government.*"

ROA, Vol. V at 526-27 (emphasis added).

132

Whether under the Federal Rules of Criminal Procedure, the *Brady* obligation to provide exculpatory material, CIPA compliance, or the government's search for relevant trial evidence, the case necessitated government translation of the communications as part of the discovery process.[68]  In sum, the challenge of translation was a "valid reason" that "serve[s] to justify appropriate delay."  *See Barker*, 407 U.S. at 531.

### d)  Government's discovery conduct

The combination of Mr. Muhtorov's broad discovery requests, the CIPA process, and translation issues caused the discovery process to take many years.  The record shows that the government worked diligently and promptly to respond to Mr. Muhtorov's broad discovery requests and the district court actively oversaw the discovery process.

The district court found no government "fault or . . . deliberate intent to delay," but instead found the government was "dedicated" and had displayed "due diligence." ROA, Vol. XII at 551.  The court made this finding after having reviewed numerous disclosures during in camera and ex parte CIPA proceedings for several years.  As a CIPA gatekeeper, the court's role was to "protect and restrict the discovery of classified information in a way that does not impair the defendant's right to a fair trial."  *United States v. Stewart*, 590 F.3d 93, 130 (2d Cir. 2009) (quotations omitted).  In that role, the

---

[68] For example, as Mr. Jumaev pointed out in his opening brief, he "had found significant exculpatory evidence that could only have been discovered through a full translation of recorded conversations."  Jumaev Aplt. Br. at 18.  He also recognized that the government "could not present classified materials to the court without also preparing translations of the classified materials, because neither the court nor the government lawyers could speak the relevant languages."  *Id.* at 48.  There is no indication that the lawyers in this case were fluent in Russian, Uzbek, or Tajik, let alone all three.

court was in the best position to determine whether the government was diligent in managing sensitive and voluminous discovery while complying with its discovery obligations, including under *Brady*. There is no basis in the public or classified record to question the court's finding that the government was diligent.[69]

Mr. Muhtorov, adopting Mr. Jumaev's more extensive briefing on the issue, makes conclusory and unsupported allegations about "the government's administrative failures" and "discovery delays." Aplt. Br. at 90. Mr. Jumaev's primary argument is that "[t]he government's dump of more than 39,000 recordings of the defendants' statements *on* the [September 1, 2016] deadline, which admittedly includ[ed] *Brady* materials, further shows that the government did not meet its discovery obligations earlier in the case." Jumaev Br. at 35. But the record—including the classified record—tells a different story: the government worked diligently to fulfill its discovery obligations under Rule 16, *Giglio*, and *Brady*.

Although the district court noted in March 2017 that discovery had "dragged on and on and on," ROA, Vol. XI at 369, that comment was consistent with a process in

---

[69] The dissent erroneously states that "the trial court sanctioned the government for discovery abuse which directly caused at least one year of delay." Dissent at 1; *see also id.* at 8 ("The district court sanctioned the government for this belated discovery production [on the eve of Mr. Jumaev's trial], which occurred well after the discovery deadline."). As explained in our separate *Jumaev* opinion, the district court imposed only two sanctions on the government: (1) it precluded the admission of evidence collected for counts 5 and 6 of the third superseding indictment; and (2) it instructed the jury about "the information that was belatedly disclosed by the government and not elicited during [the] deposition of [Ilkohm Sobirov]." *Jumaev*, slip op. at 9-10 (quotations omitted). The court did not attribute a time of delay to the government's conduct in either instance, and neither involved delay in production of the voluminous communications.

which the government had collected voluminous materials, much of them classified; Mr.

Muhtorov demanded to see all of them; and the government needed to translate them

while complying with CIPA. Despite making this observation, the district court denied

Mr. Muhtorov's motion to dismiss the indictment on speedy trial grounds that same

month. It found the length of the discovery process was "not the fault of the prosecution

or the defense." *Id.* at 370.[70] The length of time was instead due to "[t]he necessities of

the case[, which] require intense discovery." ROA, Vol. XII at 551. Similarly, the court

noted the length of the discovery period was due to "the essential nature of security

belonging to the Executive Branch and constitutional issues belonging to the Judicial

Branch." ROA, Vol. XI at 370.[71]

*    *    *    *

In sum, the first period from the arrest through the date of the last discovery

production in January 2018 does not favor finding a constitutional violation. During this

time, discovery logistics—including CIPA and translation necessities—drove the pace of

---

[70] The dissent's reliance on the district court's comments about the slow pace of discovery is therefore misplaced. No one disputes that discovery took a long time. But the question is whether the *reason* discovery took a long time was due to a "deliberate attempt to delay the trial" or "negligence" as opposed to a "valid reason" that justifies delay. *See Barker*, 407 U.S. at 531.

[71] The dissent's suggestion that the "admittedly difficult discovery tasks" could have been completed "in the first year following [Mr.] Muhtorov's arrest," Dissent at 10, strains credulity. No one—not Mr. Muhtorov, not the government, and not the district court—believed the case could go to trial that quickly when the prosecution began in 2012. Mr. Muhtorov did not object to most of the government's requests for continuances, and he sought broad discovery early on.

135

proceedings.[72]  The question is whether the government has carried its burden to explain why discovery took as long as it did.  It has, by pointing to Mr. Muhtorov's broad discovery requests, the CIPA requirements, and the need to translate voluminous materials.  In the face of those challenges, the government and the district court moved diligently to bring the case to trial as quickly as possible.  Under the unique circumstances of the case, the reasons the trial occurred when it did were "valid" and "justif[ied]."  *See Barker*, 407 U.S. at 531.

### 2)  District judge's medical condition

We next consider the two-month delay due to the district judge's need for medical treatment.  In *United States v. Gomez*, 67 F.3d 1515, 1522 & n.8 (10th Cir. 1995), we found a three-week delay due to the district court's scheduling conflict weighed only slightly in favor of finding a constitutional violation, as the two months should here.

The Seventh Circuit has defined "institutional delay" as delay that is "not attributable to the ordinary demands of the judicial system."  *Williams v. Bartow*, 481 F.3d 492, 505 n.6 (7th Cir. 2007) (quotations omitted).  Courts have found a judge's illness to be an institutional delay that weighs against the government.  *See United States v. Carini*, 562 F.2d 144, 149-50 (2d Cir. 1977); *United States v. Lane*, 561 F.2d 1075, 1079 (2d Cir. 1977); *Francis v. People*, 63 V.I. 724, 751 (2015) (holding that "delays

---

[72] Contrary to the dissent's suggestion otherwise, we have "critically assess[ed]" the government's account of discovery logistics and have found ample support for it in the record.  *See* Dissent at 9.

caused by both the judge's and prosecution's family emergencies are attributable to the [government], although the weight of these delays is treated as minor").

The government states it is "unclear why [it] would be faulted here," Jumaev Aplee. Br. at 32, but this is not a matter of fault. *Barker* itself instructs that institutional delays within the judiciary count against the government, though "less heavily" than other delays. *See Barker*, 407 U.S. at 531; *cf. United States v. Tranakos*, 911 F.2d 1422, 1428 (10th Cir. 1990) ("The difficulty in finding a judge to handle the case weighs against the government."). Although the government believed the case should have been transferred to another judge, we understand Mr. Muhtorov's wanting to keep the case with the judge who had overseen complicated proceedings for more than six years. It is unlikely that any transferee judge could have become familiar with the case in less time than the roughly 10 weeks the district judge was absent.

We thus consider the delay due to the judge's medical treatment to have minimal weight.

3) Overall quantification

Based on the foregoing, the length of time that elapsed for discovery did not weigh in favor of a constitutional violation. The two-month delay from March 12, 2018, to May 14, 2018, due to the district judge's medical treatment weighs only slightly in favor.

ii. Weighing the pretrial periods

"We've now numerically assessed the reason-for-the-delay factor. But 'in determining how heavily the delay weighs . . . we must also assess the cause of the delay.'" *Black*, 830 F.3d at 1120 (quoting *Gould*, 672 F.3d at 937).

Here, the primary reason the trial started in May 2018 was the discovery process. Discovery unfolded at a pace proportional to the necessities of the case, including Mr. Muhtorov's broad discovery requests, the need to comply with CIPA, and the dearth of translators. Also, the two-month delay due to the district judge's medical treatment does not tip this factor in favor of Mr. Muhtorov. Thus, the second factor weighs against finding a constitutional violation.

d. *The Dissent*

The dissent takes a different view of the pretrial period. It contends that (1) the government's "delay" in giving § 702 notice is "uncontestably attributable to the government" in the speedy trial analysis, Dissent at 4; (2) the government's decision to file and then dismiss the third superseding indictment caused "significant delay," *id.* at 21; and (3) a "primary concern is the government's opposition to defense motions for the appointment of cleared defense counsel," *id.* at 14. We disagree that these considerations tip the second *Barker* factor in favor of Mr. Muhtorov.

138

As to the first two contentions, even if the government could be criticized for the timing of its Section 702 notice and for filing—and then dismissing—a third superseding indictment against Mr. Muhtorov and Mr. Jumaev, those actions did not extend the pretrial period, and the dissent fails to explain otherwise.[73]  Rather, the vast and multi-faceted discovery process—fueled by Mr. Muhtorov's exhaustive discovery demands that enmeshed the parties and the court in CIPA and translation necessities—caused the trial to begin after January 2018.  As explained above, the time for the discovery process was valid and justified.  Given that the discovery process happened before, during, and after those events, Mr. Muhtorov would not have "faced trial . . . earlier than he did but for" the timing of the Section 702 notice and the filing and dismissing of the third superseding indictment.  *See Doggett*, 505 U.S. at 657.

The dissent also contends that the government should be faulted because it opposed Mr. Muhtorov's requests for defense counsel to receive security clearances.  Neither Mr. Muhtorov's nor Mr. Jumaev's opening brief raises this issue.  Mr. Muhtorov therefore waived this argument, and we need not consider it.  *See United States v. Bowline*, 917 F.3d 1227, 1231-32 (10th Cir. 2019).[74]

---

[73] The dissent seems to assume that anything that could have caused delay should count against the government in the second *Barker* factor analysis.  *See* Dissent at 5 n.2, 12 n.10.  But, as explained above, the Section 702 filing and the third superseding indictment did not delay the trial date.

[74] Defense counsel moved for access to classified pleadings and security clearances.  The district court denied the motion after full briefing.  Whether or not defense counsel were "privy to the classified record" does not excuse Mr. Muhtorov's

Even so, the dissent fails to explain how granting defense counsel security clearances would have expedited the trial date. As the government explained when it opposed this request, "the mere possession of a clearance does not entitle defense counsel access to classified information. Counsel must also have a 'need to know.'" ROA, Vol. I at 912 (citing Exec. Order No. 13,526). Having cleared defense counsel would not have eliminated the need for the district court to determine, on a document-by-document basis, what should be disclosed to Mr. Muhtorov's counsel. Any notion that having cleared defense counsel would have hastened the trial date is wholly speculative.[75]

### 3. Third *Barker* Factor: Assertion of Speedy Trial Right

Mr. Muhtorov sufficiently asserted his speedy trial right in the district court in counseled and pro se filings. This factor weighs in favor of finding a constitutional violation, though it does not weigh heavily, as we explain.

a. *Additional legal background*

The defendant has the "burden of showing he desired a speedy trial." *See Gould*, 672 F.3d at 938. "The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right."

---

waiver of the issue in his appellate briefing on speedy trial or "provide[] the basis for asserting this argument on appeal." Dissent at 14 n.12.

[75] Equally speculative is the dissent's comment that "the delay in beginning the [CIPA] § 4 process was a strategic decision, either to compel a guilty plea or out of an expectation that [Mr.] Muhtorov would plead guilty." Dissent at 11 n.9.

*Barker*, 407 U.S. at 531-32.  Conversely, the Supreme Court has emphasized, "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."  *Id.* at 532.

In *Barker*, the Supreme Court explained that there is a fundamental "difference between the right to speedy trial and the accused's other constitutional rights."  *Id.* at 521.  Although pretrial delays can harm the defendant, sometimes "deprivation of the right may work to the accused's advantage."  *Id.*  For example, "witnesses may become unavailable or their memories may fade," which may weaken the prosecution's case if it depends on witness testimony.  *Id.*

In recognition of this double-edged nature of trial delay, the *Barker* Court rejected a rule whereby "a defendant waives any consideration of his right to speedy trial for any period prior to which he has not demanded a trial."  *Id.* at 525.  First, "presuming waiver of a fundamental right from inaction . . . is inconsistent" with the maxim against "[p]resuming waiver from a silent record."  *Id.* at 525-26 (footnote and quotations omitted).  Second, although there is no "precise time in the process when the right must be asserted or waived, . . . the State has th[e] duty [to bring the accused to trial] as well as the duty of insuring that the trial is consistent with due process."  *Id.* at 527.  Third, such a rigid rule "places defense counsel in an awkward position" because "[u]nless he demands a trial early and often, he is in danger of frustrating his client's right," but "[i]f counsel is willing to tolerate some delay . . . he may be unable to obtain a speedy trial for his client at the end of that time."  *Id.* at 527.

141

Instead, the *Barker* Court found the "defendant's assertion of or failure to assert

his right to a speedy trial is one of the factors to be considered in an inquiry into the

deprivation of the right." *Id.* at 528. In line with this approach, we have said that the

ultimate inquiry is "whether the defendant's behavior during the course of litigation

evinces a desire to go to trial with dispatch." *Batie*, 433 F.3d at 1291. "[W]e may weigh

the frequency and force of his objections to the delay." *Margheim*, 770 F.3d at 1328

(brackets and quotations omitted). "A defendant's early and persistent assertion of his

right to a speedy trial will tip the third factor in his favor, but efforts to stall the

proceedings, such as moving for many continuances, will tip the balance of this factor

heavily against the defendant." *Medina*, 918 F.3d at 781 (quotations omitted).

b. *Additional procedural history*

In addition to the two counseled motions asserting a speedy trial violation—filed

in March 2017 and in May 2018 at the start of trial—Mr. Muhtorov asserted his speedy

trial rights in pro se filings.

In February 2017, he filed a pro se motion titled "Motion to Assert Speedy Trial

Violation and Dismiss." *See* ROA, Vol. XV at 305-07. The motion included analysis of

the four *Barker* factors. It included the following statement on the third factor:

> Defendant's assertion may not have been made in Court,
> however, he has numerous times asked Counsel and
> expressed his desire to a prompt disposition of his case.
> Throughout the time period of five years, Defendant has
> made repeated request to his Attorneys that he wants a speedy
> trial, and therefore, these assertions should weigh in his favor.
> Defendant reminds the Court he does not speak nor
> understand the English language, or the law for that matter.
> As such, the failure to properly assert through a Motion

should be excused under these circumstances.  Defendant has
not been allowed to speak in Court, his letters to the Court
and Counsel have been ignored.

*Id.* at 306.

Mr. Muhtorov filed additional pro se motions asserting his right to a speedy trial,

including several in May 2017.  These motions expressed his frustration with delays.

They revealed an apparent divide between his counsel's trial strategy and his own desire

to proceed to trial forthwith.  Mr. Muhtorov even alleged ineffective assistance of trial

counsel.[76]

In June 2017, Mr. Muhtorov filed a pro se habeas application under 28 U.S.C.

§ 2241.  *Muhtorov v. Choate*, No. 1:17-cv-01527-LTB (D. Colo. June 22, 2017), Dist. Ct.

Doc. 1.  He asserted a violation of his constitutional right to a speedy trial, stating that he

had been in detention for five-and-a-half years and his trial was about to be reset again.

*Id.* at 2.  He blamed the delay, in part, on ineffective assistance of trial counsel.  *See id.* at

3-4.  The district court dismissed the application.[77]

---

[76] On appeal, Mr. Muhtorov does not present an ineffective-assistance-of-counsel
claim.  Nor would we address this argument or claim if he had.  "[A] defendant must
generally raise claims of ineffective assistance of counsel in a collateral proceeding, not
on direct review."  *United States v. Porter*, 405 F.3d 1136, 1144 (10th Cir. 2005); *see
also United States v. Galloway*, 56 F.3d 1239, 1242 (10th Cir. 1995) (en banc).

[77] On appeal from the dismissal, this court called "the length of delay . . .
troubling," but affirmed the dismissal without prejudice for "substantially the same
reasons" stated by the district court.  *Muhtorov v. Choate*, 697 F. App'x 608, 609 (10th
Cir. 2017) (unpublished).

c. *Analysis*

Mr. Muhtorov argues that he asserted his constitutional right to a speedy trial by (1) filing two counseled motions to dismiss, (2) filing pro se motions seeking similar relief, and (3) objecting to the slow pace of the government's discovery efforts throughout the proceedings. Like the district court, we find that this factor weighs in Mr. Muhtorov's favor.[78]

Beginning in February 2017 and continuing until the May 2018 trial, Mr. Muhtorov repeatedly asserted his right to a speedy trial. When he raised the speedy trial issue in February 2017, the trial date was set for July 2017. This assertion of his speedy trial right weighs in favor of Mr. Muhtorov because it was made five months before the then-trial date, and it thus shows that he did not intend on waiting until the eve of trial to assert the right for the first time. *See United States v. Banks*, 761 F.3d 1163, 1183 (10th Cir. 2014) (weighing this factor against the defendants where they "waited until trial to assert their right to a speedy trial" after requesting continuances). He continued to assert the right in May 2017 after the district court reset the trial date from July 2017 to March 2018. These assertions further demonstrate Mr. Muhtorov's commitment to bringing the speedy trial issue forcefully to the attention of the district court in advance of the trial date.

---

[78] Mr. Muhtorov offers no authority that his objections to the slow pace of discovery productions are akin to the assertion of a speedy trial right.

Overall, the multiple counseled and pro se motions showed that Mr. Muhtorov wished to proceed to trial quickly. *See Brown v. Bobby*, 656 F.3d 325, 332 (6th Cir. 2011) (the third factor weighed in the counseled defendant's favor because he "asserted his right to a speedy trial several times," including in a "pro se motion to dismiss the indictment on speedy trial grounds").[79]

Mr. Muhtorov's speedy trial right assertions have force because his other conduct throughout the pretrial proceedings did not "indicate[] a contrary desire" to delay proceedings. *Tranakos*, 911 F.2d at 1429. For example, he did not request any continuances. *See United States v. Dirden*, 38 F.3d 1131, 1138 (10th Cir. 1994) (weighing this factor against a defendant who moved for a continuance); *Batie*, 433 F.3d at 1291-92 (same). Rather, the STA continuances were always granted at the government's insistence. This case is different from *Margheim*, in which we faulted a defendant for asserting a speedy trial objection late in the proceedings and where the defendant's conduct, including "sever[ing] ties with three attorneys," undermined any argument that he was "focused completely on proceeding to trial." *Margheim*, 770 F.3d at 1329-30.

---

[79] Although we are under no obligation to consider pro se motions by a represented defendant, *see United States v. Dunbar*, 718 F.3d 1268, 1278 (10th Cir. 2013), pro se filings in which a defendant asserts the speedy trial right are relevant to the third *Barker* factor, *see United States v. Battis*, 589 F.3d 673, 681 (3d Cir. 2009) (noting a counseled defendant's pro se letter and motion "indicate[d] that [he] was concerned that his trial happen promptly"); *Tigano*, 880 F.3d at 618 ("[A] defendant's assertion of his own right to a speedy trial—even though ignored or contravened by his counsel—is the relevant fact for purposes of Sixth Amendment analysis.").

The government argues that Mr. Muhtorov's assertions of his speedy trial right came too late. It notes, for example, that Mr. Muhtorov did not object to the declaration of complexity on five of the seven STA tolling motions. The government is correct that Mr. Muhtorov could have asserted his right earlier than more than four years into the proceedings. Mr. Muhtorov does not satisfactorily explain why he did not do so.

His failure to object sooner was understandable in light of pending motions to suppress FISA-acquired evidence (filed Feb. 8, 2012) and Section 702-derived evidence (filed Jan. 29, 2014). The district court did not resolve the latter until November 2015. Some of the government's tolling motions were superfluous because the STA excludes periods of delay resulting from a pretrial motion. *See* 18 U.S.C. § 3161(h)(1)(D). Further, it may have been pointless for him to object to the STA continuances given the pending suppression motions.[80]

But other evidence suggests Mr. Muhtorov was concerned about the delays before February 2017, yet he did not raise the objection sooner. And when Mr. Muhtorov asserted the speedy trial right in February 2017, the trial date was set for only a few months later, in July 2017. Although an assertion five months in advance of a trial date is entitled to some weight because it was not the eve of trial, the timeline does not

---

[80] This case highlights the "awkward position" defense counsel often find themselves in. *See Barker*, 407 U.S. at 527. Faced with voluminous discovery and the responsibility to a client to make non-frivolous motions under FISA and Section 702, defense counsel here was undoubtedly "willing to tolerate some delay because [they found] it reasonable and helpful in preparing [their] own case." *See id.* In those circumstances, *Barker* does not require a "*pro forma* demand [for a speedy trial] made immediately after appointment of counsel." *See id.* at 528.

146

demonstrate full diligence on Mr. Muhtorov's part. His assertions are therefore entitled to some weight but "are reduced in weight by their proximity to trial" relative to the total six-and-a-half-year pretrial period. *Hakeem v. Beyer*, 990 F.2d 750, 766 (3d Cir. 1993). We thus weigh this factor in favor of finding a constitutional violation, but "we do not think it weighs heavily." *Id.*

4. **Fourth *Barker* Factor: Prejudice to the Defendant**

The fourth factor favors Mr. Muhtorov because he suffered prejudice due to six-and-a-half years of incarceration and the untimely death of a defense witness on the eve of trial.

a. *Additional legal background*

The fourth factor considers "prejudice to the defendant" from the delay. *Barker,* 407 U.S. at 530. "The individual claiming the Sixth Amendment violation has the burden of showing prejudice." *Toombs*, 574 F.3d at 1275; *see also Medina*, 918 F.3d at 781. A defendant can establish prejudice by two different means: (1) a presumption of prejudice, or (2) specific evidence of prejudice.

i. Presumption of prejudice

In cases of "extreme delay, the defendant need not present specific evidence of prejudice and may instead rely on the presumption of prejudice created by the extreme delay." *Toombs*, 574 F.3d at 1275. "Generally, the court requires a delay of six years before allowing the delay itself to constitute prejudice." *Seltzer*, 595 F.3d at 1180 n.3. This rule stems from *Doggett*, in which the Supreme Court found an "extraordinary" delay when more than eight years passed between indictment and arrest, six of which

147

were attributed to the government's "inexcusable oversights."  505 U.S. at 652, 657-58 (quotations omitted).  Thus, for purposes of establishing presumptive prejudice, "we should consider only the delay attributable to the government, and not the delay attributable to the defendant."  *Hicks*, 779 F.3d at 1168-69 & n.2.[81]

### ii. Specific evidence of prejudice – three types

Absent presumptive prejudice, the defendant must provide evidence of prejudice with "sufficient particularity."  *Margheim*, 770 F.3d at 1329. "[I]n most circumstances, failure to specify prejudice will eviscerate the defendant's claim."  *Id.*; *see also United States v. Nixon*, 919 F.3d 1265, 1278 (10th Cir. 2019) ("No single factor is a necessary or sufficient condition to the finding of the deprivation of the right of speedy trial.  But the lack of prejudice is nearly fatal to a claim." (citation and quotations omitted)).

The Supreme Court has identified three interests relating to specific prejudice: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."  *Barker*, 407 U.S. at 532.

### 1) Oppressive pretrial incarceration

After impairment to the defense, the "second most important [prejudice] factor" is oppressive pretrial incarceration "[b]ecause the seriousness of a post-accusation delay worsens when the wait is accompanied by pretrial incarceration."

---

[81] Both the first and fourth *Barker* factors involve "presumptive prejudice," but the analysis differs between the two.  *See United States v. Jackson*, 473 F.3d 660, 664 (6th Cir. 2007) (cautioning against conflating prejudice at the first and fourth factors).

*Jackson*, 390 F.3d at 1264; *see also Seltzer*, 595 F.3d at 1180 ("[P]rolonged pretrial incarceration is a well-established type of prejudice that a defendant may rely upon in making a Sixth Amendment speedy trial claim.").[82]

### 2) Anxiety and concern

A defendant must allege "special harm suffered which distinguishes his case from that of any other arrestee awaiting trial." *Dirden¸* 38 F.3d at 1138. "[G]eneralized and conclusory references to the anxiety and distress that purportedly are intrinsic to incarceration are not sufficient to demonstrate particularized prejudice." *United States v. Larson*, 627 F.3d 1198, 1210-11 (10th Cir. 2010).

### 3) Impairment to the defense

The "most serious" interest is impairment to the defense because a defendant's inability to prepare and present his case "skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

Impairment of the defense can be the result of lost witnesses, *see id.*, "defense witnesses [who] are unable to recall accurately events of the distant past," *id.*; *see Seltzer*, 595 F.3d at 1172 n.2, or lost evidence, *see Toombs*, 574 F.3d at 1275. Courts require the following three showings to establish impairment from lost testimony.

---

[82]As the Supreme Court has explained, the speedy trial right detaches upon conviction. *See Betterman*, 136 S. Ct. at 1613. Thus, the relevant period of incarceration is preconviction incarceration, not pretrial incarceration. But because most of the cases talk about "pretrial" incarceration, we do as well when discussing prejudice.

### a) Particularity

We have required "a defendant [to] state with particularity what exculpatory testimony would have been offered." *Jackson*, 390 F.3d at 1265 (brackets and quotations omitted). In more recent cases, though still requiring the defendant to identify lost testimony with particularity, we have not required the testimony to be exculpatory, and we have instead required the defendant to explain how the lost testimony was "material," *Margheim*, 770 F.3d at 1330, or "meaningful," *Medina*, 918 F.3d at 782.

The particularity requirement thus ensures both that the lost testimony itself is sufficiently important to the defense to cause impairment and that the defendant is not speculating about the testimony by "merely conjuring up potential witnesses." *Jackson*, 390 F.3d at 1265.

### b) Causation

The defendant must also "present evidence that the delay caused the . . . unavailability." *Jackson*, 390 F.3d at 1265. The defendant must show (1) "the government's delay caused evidence to be unavailable," and (2) "the evidence was actually irretrievable for trial." *Medina*, 918 F.3d at 782.

### c) Steps to preserve evidence

A final requirement is that the defendant "take steps, when possible, to preserve testimony." *Jackson*, 390 F.3d at 1265; *see United States v. Neal*, 27 F.3d 1035, 1043 (10th Cir. 1994) (finding no prejudice where the defendant did not explain "why neither he nor his attorney took steps to preserve the witnesses' testimony for trial"). But when a defendant is not "on notice of the need to preserve testimony" or has no "realistic

150

opportunity to do so," we have declined to view the failure to preserve testimony as fatal to a claim of prejudice. *Jackson*, 390 F.3d at 1265.

### b. *Additional procedural history*

In support of his second motion to dismiss, Mr. Muhtorov outlined the credentials of Ms. Inoyatova, who was supposed to travel from Uzbekistan to testify in his defense. She died unexpectedly during an operation a month before trial. Mr. Muhtorov discussed her international reputation as "a world famous champion of human rights in her home country of Uzbekistan." ROA, Vol. XV at 524. He proffered that she would have testified about his human rights work in Uzbekistan for her organization from 2001 to 2005. He said the repressive Karimov regime persecuted both of them for their human-rights work, so she "would have borne witness to the truth of Mr. Muhtorov's experience and been a counterweight to the government's attempts to paint him as a bearded 'jihadi.'" *Id*. at 528.

The district court denied the second motion to dismiss, reasoning that the proffer of Ms. Inoyatova's testimony "goes to an explanation of motivation and of background and not to the essence of the charge." ROA, Vol. XX at 149. The court also suggested that Mr. Muhtorov make "an offer of proof . . . and see what the government's position is about admitting that statement from the now-deceased witness." *Id*. at 149-50.[83]

---

[83] Mr. Muhtorov never made such an offer.

c. *Analysis*

Mr. Muhtorov cannot demonstrate presumptive prejudice, but he can demonstrate specific prejudice based on oppressive pretrial incarceration and loss of witness testimony.  This factor thus weighs in Mr. Muhtorov's favor, though the weight is lessened due to the non-exculpatory nature of Ms. Inoyatova's proffered testimony.

### i. Presumptive prejudice

Mr. Muhtorov cannot demonstrate presumptive prejudice.  Based on our discussion of the second *Barker* factor, we cannot attribute six years of delay to the government.

### ii. Specific prejudice

#### 1) Oppressive pretrial incarceration

Mr. Muhtorov first points to the oppressiveness of his six-and-a-half years in pretrial incarceration, including specific facets that prejudiced him.  He argues that his time in custody was not typical or easy because he is an Uzbek- and Russian-speaking Muslim, and the experience as a whole "was well beyond the norm—substantively and temporally."  Aplt. Br. at 94.[84]  For the first two months, he was in 24-hour lockdown with no access to a telephone or religious or other reading materials.  He was moved to numerous facilities and spent years with no physical contact with his family, including a

---

[84] The government notes that Mr. Muhtorov's presentence report shows that his religious preferences were respected, and he had no serious problems when detained.  But Mr. Muhtorov does not argue that jail personnel discriminated against him.  Rather, he alleges that his status as a non-English speaking Uzbek- and Russian-speaking Muslim made his stay in jail more difficult.

daughter born after he was imprisoned.  He was unable to hold his daughter for the first

six years of her life, seeing her only through the glass barrier in the jail's visiting room.

Meanwhile, his wife worked two jobs to support herself and their three children.

Mr. Muhtorov has established that the oppressiveness of his pretrial incarceration

weighs in his favor.

First, the mere fact of his incarceration for six-and-a-half years weighs in favor of

finding prejudice.  *See Barker*, 407 U.S. at 533 (noting the "serious" "consequences" of

incarcerating someone "who has not yet been convicted").  By any measure, six-and-a-

half years of pretrial incarceration is extraordinary.

Second, Mr. Muhtorov claims prejudice from the restrictive environment due to

the separation from his family, the animus he experienced due to his religion, and the

time spent in lockdown.  "[W]e credit his claim[s]."  *United States v. Cone*, 310 F. App'x

212, 220 (10th Cir. 2008) (unpublished) (crediting claims about the restrictive nature of

the incarceration).[85]  *Barker* itself noted that time in jail for a pretrial detainee can disrupt

family life and thereby be prejudicial.  *See* 407 U.S. at 532.  In addition, the two months

spent on 24-hour lockdown count towards establishing prejudice.  *See Margheim*, 770

---

[85] Unpublished cases cited in this opinion are not binding precedent, but we may consider them for their persuasive value.  *See* Fed. R. App. 32.1(a); 10th Cir. R. 32.1(A).

F.3d at 1329-30 (noting that time spent in 18-hour lockdown supports a finding of actual prejudice).[86]

Third, all but a few weeks of Mr. Muhtorov's pretrial incarceration was in county penal facilities, which supports a finding of prejudice due to the lack of rehabilitation programs and visiting privileges in local jails that are offered by state and federal penal systems. *See Barker*, 407 U.S. at 520 (noting that confinement "in a local jail . . . has a destructive effect on human character and makes the rehabilitation of the individual offender much more difficult" (quotations omitted)); *Tigano*, 880 F.3d at 618 ("In addition to the sheer passage of time, a defendant's confinement in local jails makes those years particularly oppressive."); *United States v. James*, 712 F. App'x 154, 163 (3d Cir. 2017) (unpublished) ("We have recognized that there may be cognizable prejudice stemming from being confined to a local jail rather than a state (or, presumably, federal) prison better equipped for long-term incarceration."). Mr. Muhtorov's time spent in "pretrial detention in local jails—before the defendant has been convicted of any crime— is precisely the type of prejudice contemplated by the right to a speedy trial." *Tigano*, 880 F.3d at 618.

In sum, Mr. Muhtorov has established prejudice due to the nature and length of his six-and-a-half years of incarceration.

---

[86] The government objects that details about his first two months are not part of the record, but we may take judicial notice of district court filings containing this information. *See* Dist. Ct. Doc. 56 at 10.

2) Anxiety and concern

Mr. Muhtorov's anxiety-and-concern argument is not well supported. He argues that his mental health suffered while he was deprived of family contact. He reports that for the first time in his life, he was prescribed medication for depression and anxiety five years into his pretrial detention. He further advises that a case worker remarked that he did not look like he was coping well, as reflected in the presentence report.

As the government points out, however, Mr. Muhtorov reported to the probation officer who prepared the presentence report that he had not participated in mental health treatment and did not believe he needed any. *See* Aplee. Br. at 78-79. Without more, we cannot conclude that Mr. Muhtorov has established "special harm . . . which distinguishes his case from that of any other arrestee awaiting trial." *See Dirden*, 38 F.3d at 1138.

3) Impairment of the defense

The last and "most important" type of specific prejudice is impairment of the defense. *Larson*, 627 F.3d at 1209. Mr. Muhtorov points to the "obvious" prejudice he suffered due to the death of Ms. Inoyatova. Aplt. Br. at 94-95 (quoting *Barker*, 407 U.S. at 532). He characterizes her lost testimony as "vital to explaining [his] past and how his hatred of the [repressive] Karimov regime explained his interest in conversing with a group like the IJU." Aplt. Reply Br. at 46.

The government responds that Ms. Inoyatova's testimony would have been cumulative because other evidence about his human rights work in Uzbekistan was presented at trial. In addition to Mr. Muhtorov, who testified on his own behalf, at least three defense witnesses testified on this topic: his brother, Asil; Steve Swerdlow, a

155

researcher and director at Human Rights Watch; and Michael Andersen, a journalist and human rights worker.

We find Mr. Muhtorov has established prejudice due to lost testimony because he has met all three requirements discussed above to establish impairment of the defense. He has first identified Ms. Inoyatova's lost testimony with necessary particularity. Though Ms. Inoyatova's testimony was akin to that of a character witness, it was at least "material to his case," *Margheim*, 770 F.3d at 1330, and it arguably "would have aided [his] defense," *United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir. 1998). Mr. Muhtorov has sufficiently explained that he has been "hindered in the sense that he was not able to defend the charges against him to the extent he desired." *Toombs*, 574 F.3d at 1275; *see also Larson*, 627 F.3d at 1209; *Seltzer*, 595 F.3d at 1180 (concluding that the defendant "suffered an impairment of his ability *to defend and prepare his case*" (emphasis added)). He also has provided a description of the prejudice that goes beyond the "hazy description[] of prejudice" we cautioned against in *Margheim*. *See* 770 F.3d at 1331. "[T]here is no allegation that [Mr. Muhtorov] is merely conjuring up potential witnesses." *See Jackson*, 390 F.3d at 1265. Because the lost testimony was at least "material" and Mr. Muhtorov has sufficiently identified the lost testimony, he has carried his burden on the particularity requirement.

Mr. Muhtorov also has met the second and third requirements because he has shown Ms. Inoyatova died on the eve of trial that had been delayed, and his failure to preserve Ms. Inoyatova's testimony is excusable considering the timing and unexpectedness of her death. Her travel arrangements were in place, and preserving her

156

testimony for trial would have been difficult given that she lived halfway around the world.

Although Mr. Muhtorov has satisfied all three requirements and has therefore established prejudice, we do not weigh this prejudice heavily. The only source of impairment he identifies is the loss of Ms. Inoyatova's testimony, and this testimony would not have been exculpatory or central to the defense.

First, as the district court noted, Ms. Inoyatova's testimony would not have gone to the "gravamen" of the case. ROA, Vol. XX at 149. Her testimony would not have directly contradicted the terrorism charges against Mr. Muhtorov, as he was not performing human rights work when he corresponded with the IJU. She was not a "key witness," *Jackson*, 390 F.3d at 1265, nor would she have been exculpatory.

Second, the government is correct that Ms. Inoyatova's testimony attesting to his human rights work would likely have been cumulative of the testimony of his brother, Mr. Swerdlow, and Mr. Andersen.[87]

---

[87] The government also points out that the prosecutor acknowledged Mr. Muhtorov's human rights work during closing argument, when he said that Mr. Muhtorov "rejected his prior human rights worker self, and he chose an entirely new path, radical Islamic jihadism." Aplee. Br. at 80-81 (quoting ROA, Vol. XX at 1553). But evidence "has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." *Old Chief v. United States*, 519 U.S. 172, 188 (1997). In other words, although the government's closing statement may have weakened the prejudice, it did so only slightly, because Mr. Muhtorov had the right, not simply to put certain facts before the jury, but to paint a broad narrative picture about his own life.

Still, as explained above, Mr. Muhtorov has carried his burden to establish prejudice by establishing all three requirements. Viewing Ms. Inoyatova's death as prejudicial is consistent with the Supreme Court's statement that "time can tilt the case against either side, [and] one cannot generally be sure which of them it has prejudiced more severely." *Doggett*, 505 U.S. at 655 (citation omitted). But for the reasons discussed, we do not find this prejudice substantial.

*    *    *    *

Mr. Muhtorov's six-and-a-half years of incarceration, most of it in county jail, is plainly a strong consideration in the prejudice analysis. That length is highly unusual and should not be tolerated without good reason, especially when, as here, Mr. Muhtorov lost a witness, Ms. Inoyatova. This factor thus weighs in favor of finding a constitutional violation due to the nature and length of Mr. Muhtorov's incarceration and the loss of a witness, though not as much as if Ms. Inoyatova had been an exculpatory witness.

5. **Balancing the *Barker* Factors**

In review, (1) the first factor—length of the delay—weighs heavily in favor of finding a constitutional violation; (2) the second factor—reasons for the delay—does not weigh in favor of a violation; (3) the third factor—the defendant's assertion of the speedy trial right—weighs in favor of a violation, although not heavily; and (4) the fourth factor—prejudice to the defendant—weighs in favor of a violation due to the oppressive pretrial incarceration and the loss of a witness, though it does not weigh as heavily as it would had Ms. Inoyatova's testimony been central to his defense.

158

In balancing the factors, we are mindful that "none of the four factors . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Barker*, 407 U.S. at 533. Under the circumstances of this case, a primary consideration is that the delay was attributable to necessities of the discovery process untainted by government bad faith or negligence. Two relevant cases provide guidance for our conclusion that the second factor tips the overall balance of the four factors against finding a constitutional violation.

First, in *United States v. Casas*, 425 F.3d 23 (1st Cir. 2005), the First Circuit rejected a speedy trial claim. The court found that the first and third *Barker* factors weighed in favor of the defendants, who spent 41 months of pretrial delay incarcerated. *Id.* at 33-34. The court did not weigh the fourth factor in favor of the defendants, rejecting claims of oppressive incarceration and the loss of witnesses. *Id.* at 34-36.

At the second factor, the First Circuit rejected the defendants' argument that "delay was caused largely by the unpreparedness of the government, and the inability of the judicial system to cope with their case," and instead found that the delay was justified because the case was a "complex drug conspiracy" with "over 350 pretrial motions," there was "no bad faith effort by the government to delay the proceedings," and the district court "moved the case along to trial." *Id.* at 33-34. In balancing the *Barker* factors, the First Circuit noted that "[t]he forty-one months that passed between appellants' initial indictment and trial constituted an unusually long wait, particularly for defendants held in pretrial detention," but it found that "the large and complex nature of the proceedings and the district court's obligation to consider the multitude of pretrial

159

matters" resulted in "no violation of the Sixth Amendment as a result of pretrial delay." *Id.* at 36.

Second, in *Tigano*, the Second Circuit found a speedy trial violation and dismissed the indictment. It noted that "no single, extraordinary factor caused the cumulative . . . years of pretrial delay." 880 F.3d at 606. It found that seven years of delay was "the result of countless small choices and neglects, none of which was individually responsible for the injustice suffered by [the defendant], but which together created [an] extreme instance of a Sixth Amendment violation." *Id.* There, "[a] review of the procedural history reveal[ed] . . . poor trial management and general indifference at every level toward [a] low-priority defendant in a straightforward case." *Id.*

*Casas* and *Tigano* help demonstrate why the second factor tips the balance in this case. As in *Casas*, the first and third factors weigh in favor of Mr. Muhtorov. Although the *Casas* court found the fourth factor did not weigh in favor of a constitutional violation, that case is analogous to ours because in both the defendants were incarcerated during the pretrial period, and here we do not weigh the loss of Ms. Inoyatova's testimony heavily.

The second factor drove the outcome in *Casas* due to the complexity of the case and the government's and the district court's diligence in bringing the case to trial. Here, too, there was undoubtedly substantial delay. Six-and-a-half years in pretrial detention is unusually long. But very little about this prosecution was usual. The complexity of pretrial discovery, beset by CIPA requirements, translation issues, and Mr. Muhtorov's own broad discovery requests, created unavoidable delays. Throughout it all, the

government did not act in bad faith, and the district court did a commendable job, under difficult circumstances, to bring the case to trial.  Thus, it is appropriate for the second factor to drive the balancing analysis here, just as it did in *Casas*.

In another respect, the six-and-a-half-year delay here mirrored the seven-year delay in *Tigano*.  As in *Tigano*, the delay here was not the result of a "single, extraordinary factor," but instead was the result "of countless small choices" that built up over years of a complicated discovery process.  880 F.3d at 606.  Unlike in *Tigano*, however, where the reason-for-delay factor tipped the balance in favor of a constitutional violation given the "poor trial management and general indifference at every level toward [a] low-priority defendant in a straightforward case," *id.*, this case was not "straightforward," not marked by "poor trial management," and not beset by "general indifference."  Although Mr. Muhtorov's underlying criminal conduct was straightforward, the quantity and nature of the discovery was significantly greater and more complicated than a typical criminal case.  And because the discovery delays were attributable to general necessity rather than "poor trial management" or "general indifference," we find no violation of Mr. Muhtorov's speedy trial right.

On the distinctive facts of this case, we find the second *Barker* factor tips the balance in favor of not finding a constitutional violation.  The district court recognized the challenges of the discovery process and properly applied the STA to push back the trial date.  Mr. Muhtorov does not challenge the district court's application of the STA, and it is "unusual to find a Sixth Amendment violation when the Speedy Trial Act has been satisfied."  *United States v. Koerber*, 10 F.4th 1083, 1109 (10th Cir. 2021)

161

(quotations omitted). There was no Sixth Amendment violation. This is so even though six-and-a-half years of pretrial delay is concerning, particularly when the defendant was incarcerated for that entire period. Due to the record-intensive nature of this case, this length of time does not, as the dissent contends, "set[] a new Sixth Amendment 'standard of speed.'" Dissent at 5. The pretrial period was lengthy. But given the quantity and nature of the discovery, and the overall good faith and diligence of the government and the district court in bringing this case to trial, we affirm the district court's conclusion that there was no violation of Mr. Muhtorov's speedy trial rights.[88]

---

[88] Though the six-and-a-half-year delay in this case was significant, courts have found that similar or longer delays do not warrant dismissal of the indictment. *See, e.g.*, *Hicks*, 779 F.3d at 1169-70 (finding a delay of five-and-a-half years during which time the defendant was incarcerated did not violate the Sixth Amendment); *Tillman v. Kansas*, 274 F. App'x 706, 707-08 (10th Cir. 2008) (unpublished) (finding a state court's determination that a nine-year delay did not violate the defendant's speedy trial right was not an unreasonable application of *Barker*); *United States v. Duran-Gomez*, 984 F.3d 366, 380-81 (5th Cir. 2020) (reversing the district court's dismissal of the indictment on speedy trial grounds when nine years elapsed between the indictment and the district court's dismissal, during which time the defendant was incarcerated), *cert. denied*, 2021 WL 4507949 (U.S. Oct. 4, 2021); *Boyer v. Vannoy*, 863 F.3d 428, 445 (5th Cir. 2017) (finding a state court's determination that a seven-year delay did not violate the defendant's speedy trial right was not an unreasonable application of *Barker*); *United States v. Young*, 657 F.3d 408, 420 (6th Cir. 2011) (finding that an eleven-year delay, while "atypical," was "not unconstitutional"); *United States v. Zedner*, 401 F.3d 36, 48-49 (2d Cir. 2005) (finding a seven-year delay between indictment and trial did not violate the Sixth Amendment), *rev'd on other grounds by* 547 U.S. 489 (2006); *United States v. Gibson*, 353 F.3d 21, 28 (D.C. Cir. 2003) (assuming that a speedy trial claim could be asserted for a delay between conviction and sentence, and finding that a seven-year delay was not a constitutional violation); *United States v. Saglimbene*, 471 F.2d 16, 18 (2d Cir. 1972) (finding a six-year delay did not violate the Sixth Amendment); *Page v. Lockyer*, 200 F. App'x 727, 728 (9th Cir. 2006) (unpublished) (finding a six-year delay did not warrant habeas relief on speedy-trial grounds).

## CONCLUSION

We affirm Mr. Muhtorov's convictions and the district court's judgment.[89]

---

The *Barker* analysis is fact-intensive, and each of these cases differs from this case. But they suggest that lengthy delays do not ineluctably compel dismissal of the indictment.

[89] We grant Mr. Muhtorov's motion to file a supplemental reply brief.

18-1366, <u>United States v. Muhtorov</u>
**LUCERO**, Senior Judge, dissenting:

Because of the extreme departure by my respected colleagues from accepted norms of constitutional and procedural law affecting this case, I must respectfully dissent. This extraordinary divergence falls into three distinct categories in which the majority: (1) Improvidently evaluates the criteria set forth in <u>Barker v. Wingo</u>, 407 U.S. 514 (1972), and declares a trial that commenced six years and four months after the date of arrest to be an acceptable speedy trial under the Sixth Amendment (this, notwithstanding that the trial court sanctioned the government for discovery abuse which directly caused at least one year of delay); (2) Purports to rely on the classified record to avoid recognition that the record below is insufficient to resolve the derivative evidence inquiry required by the Fourth Amendment; and (3) Relies upon an impermissible advisory opinion from the Foreign Intelligence Surveillance Court ("FISC") to conclude that § 702 surveillance was reasonable.

Rarely do we have before us a criminal case that does not involve countervailing considerations of the respective rights of a defendant balanced against the duties and obligations of the government. This case presents no exception. Before us is a case involving the conviction of defendant Jamshid Muhtorov of national security crimes. He appeals denial of his right to a speedy trial under the Sixth Amendment and claims violations of the Fourth Amendment and a violation of the Article III prohibition on advisory opinions. Counter to those allegations is the assertion by the government that national security interests outweigh any claims of the defendant.

## I

The right to a speedy trial, embodied in the Sixth Amendment, is straightforward:

"*In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . .*"

U.S. Const. amend. VI.  This fundamental right "has its roots at the very foundation of our English law heritage," extending back to the Assize of Clarendon and the Magna Carta, and is part of the common law heritage upon which our Constitution and Bill of Rights were based.  Klopfer v. North Carolina, 386 U.S. 213, 223-24 (1967).  Although this right has been described as "amorphous, slippery, and necessarily relative," Vermont v. Brillon, 556 U.S. 81, 89 (2009) (quotations omitted), its "core concern is impairment of liberty."  United States v. Loud Hawk, 474 U.S. 302, 312 (1986).  "[C]onsistent with delays and depend[ent] upon circumstances," Barker, 407 U.S. at 522 (quotation omitted), its "essential ingredient is orderly expedition and not mere speed."  United States v. Ewell, 383 U.S. 116, 120 (1966) (quotation omitted).

Counterbalancing the right to a speedy and just trial in this case is the significant governmental interest in protecting national security information.  See Haig v. Agee, 453 U.S. 280, 307 (1981) (there is "no governmental interest . . . more compelling than the security of the Nation," and "[m]easures to protect the secrecy of our Government's foreign intelligence operations plainly serve these interests").  No governmental interest, however, not even the most compelling interest of national security, permits the government to disregard fundamental constitutional rights of individuals.  The Constitution places both the duty to promptly bring a defendant to trial and the duty to

ensure that the trial is consistent with due process squarely upon the government. See

Barker, 407 U.S. at 527; see also United States v. Ingram, 446 F.3d 1332, 1337 (11th Cir.

2006) ("Because the prosecutor and the court have an affirmative constitutional

obligation to try the defendant in a timely manner the burden is on the prosecution to

explain the cause of the pre-trial delay." (alteration adopted) (quotation omitted)).

I am well cognizant that the government has a "compelling interest in

protecting . . . the secrecy of information important to our national security." Snepp v.

United States, 444 U.S. 507, 509 n.3 (1980).  In respecting this governmental interest,

however, we must not overlook the constitutional promise that a "presumptively innocent

person" should not languish in confinement under unresolved charges.  Betterman v.

Montana, 136 S. Ct. 1609, 1614 (2016).  For the reasons that follow, it is my conclusion

that the progress of this case was deficient in both speed and orderly expedition.  See

Ewell, 383 U.S. at 120.  As a result, Muhtorov has completed his prison sentence before

his appeal becomes final.  Assuredly, as my respected colleagues note, some of the delay

is attributable to Muhtorov's discovery practice and the necessary provision of translation

services.  But regrettably, too much of the delay is directly attributable to discretionary

decisions of the government.[1]  Those decisions needlessly delayed commencement of the

trial and caused the delay that is glaringly before us.

---

[1] My colleagues excuse the trial delay by pointing to "the vast and multi-faceted
discovery process—fueled by Mr. Muhtorov's exhaustive discovery demands that
enmeshed the parties and the court in CIPA and translation necessities" as the cause of
the trial's delay until after January 2018.  (Op. at 139.)  These "exhaustive discovery
demands," however, were garden variety requests under Federal Rule of Criminal

## A

I begin with approximately two years of delay that are uncontestably attributable to the government. For just over 21 months, the government did not notify Muhtorov of the involvement of § 702 evidence in the case against him. My colleagues contend that this delay "did not extend the pretrial period," because this almost two-year delay was

Procedure 16(b) for discovery of relevant statements of a defendant that were within the possession, custody, or control of the government. Their volume does not transform them into the exotic, or render unexpected the steps required of the government to proceed to trial, steps to be anticipated even before the indictment issued. Seeking to avoid waste "of government resources," the defense did not request an order to compel the government to translate the discovery. Instead, the defense merely sought translations of statements which had already been accomplished by the government because "the time needed to have already translated statements re-translated by the defense causes delay for no good reason." Only after the September 2016 "discovery dump" of tens of thousands of untranslated communications six months before the first scheduled trial did the defense request the government to translate the discovery material belatedly provided. See infra at 7-8.

It is on this post-September 2016 request that the majority premises its determination that "the time taken to translate materials was needed for the benefit of Mr. Muhtorov and the preparation of his defense." (Op. at 131, 132-33 n.67.) To the contrary, it was the government's decision to translate the defendants' recorded statements prior to providing them to the defense in order to evaluate them under CIPA that caused the translation delays. This decision significantly contributed to the trial delay. At the origin of the case in May 2012, the government represented that it could provide the court the "finite number" of items that would have to remain classified because of sources and methods, allowing the court to begin its CIPA evaluation at that time. Yet, despite these representations, the government did not begin that process until after the November 2015 denial of the defendants' motion to suppress, and did not produce significant discovery until September 2016. The defense could not independently translate information that the government had not yet provided.

As is clear from review of the record and the government's assertions in May 2012, the vast majority of discovery information was classified because of the sources and methods by which communications were collected, not their content. And, as discussed infra at 22-23, it was the specific protective technique unilaterally chosen by the government that resulted in the lack of significant discovery production prior to September 2016. Such decisions are weighed against the government.

encompassed within the six-and-one-half-year delay caused by discovery production.

(Op. at 139.)  This approaches double-speak:  what the majority is saying is that any and

all government delay is excusable because of its own delay in discovery production.  As I

note below, the government's delay in discovery production is swept aside by my

colleagues in conclusory terms to the end that nearly six-and-a-half years in bringing

these defendants to trial is excused, thereby setting a new Sixth Amendment "standard of

speed."  Given Barker's instruction that we conduct an ad hoc balancing test in which we

assess "the conduct of both the prosecution and the defendant," this is inexcusable.

Barker, 407 U.S. at 530.  It is axiomatic that withholding the basis of the government's

case against a defendant for two years has a downstream effect of delaying progress to

trial as the defense must start anew once the true basis for the government's prosecution

is disclosed.  The record confirms that is precisely what occurred.  The government offers

no explanation for its belated initial § 702 disclosure.[2]  When the government elects to

---

[2] The District Court pointed out, however, the confluence of the government's
belated § 702 notice on October 25, 2013 and the 2013 Snowden leaks, recognizing that:

> [U]ntil the Snowden leaks in 2013, the American public was led to believe
> that the government did not query or use FAA-acquired surveillance against
> non-targeted U.S. persons.  See Clapper v. Amnesty Int'l, USA, 133 S. Ct.
> 1138 (2013).  The belated notice in this case was part of the Snowden
> fallout and the revelation, post-Clapper, that the Executive Branch does, in
> fact, use FAA-acquired information to investigate U.S. persons for
> suspected criminal activity, and that it intends to use it against Mr.
> Muhtorov here.

That the evidence in this case originated from § 702 surveillance was not a surprise to the
government; it formed the basis of the multi-year investigation of Muhtorov prior to his
arrest.  I need not speculate to conclude that the government's complete failure to explain

bring national security cases, surely it must know, or should know, whether it is going to

present § 702-derived evidence.  The attendant delay in doing so cannot be attributed to

the defendant.

Swallowing this initial 21-month § 702-notice delay, the government also delayed

commencing its CIPA § 4 evaluation of the evidence for 46 months.  Under CIPA § 4,

the government must evaluate all classified evidence to determine what will be disclosed

to the defense and whether it will be provided in its original form or through

substitutions, redactions, or summaries proposed by the government.  In a bizarre

argument, the government justifies its original delay in providing § 702 notice by arguing

that "even after the district court's denial of the defendant['s suppression] motions in

November 2015,  . . . the case still was not close to ready for trial, as discovery was

incomplete and the defendant[] had other pending motions."  Of course discovery was not

complete in November 2015—as I explain below, the government <u>had not even begun</u> the

substantive CIPA § 4 process until <u>after</u> the district court denied Muhtorov's motion to

suppress on November 19, 2015.[3]

---

this 21-month delay does not establish necessity under <u>United States v. Seltzer</u>, which
placed the burden on the government to explain why delay was necessary in a particular
case.  595 F.3d 1170, 1178 (10th Cir. 2010)).  Given the government's duty to "[e]nsure
that the trial was consistent with due process," this delay weighs heavily against the
government.  <u>See</u> <u>Barker</u>, 407 U.S. at 527.

[3] Exacerbating this behavior, the government was aware of the district court's
intent to deny Muhtorov's motion to suppress as early as June 17, 2015, when the district
court gave an oral ruling from the bench detailing its proposed denial.  Even if we were to
accept, which I do not, that it was acceptable for the government to delay the CIPA § 4

Next, the government required four years, seven months, and eleven days to meaningfully respond to the defendant's discovery requests. A relative pittance of information was provided within the first four years followed by massive production in August 2016.[4] At argument, this production of discovery material was described as a "discovery dump." Muhtorov's counsel tell us that only then, after September 1, 2016, were they able to begin to assess the evidence against him. Additional discovery followed, extending well beyond the trial-court-imposed deadlines to the eve of trial in May 2018. Again, I recognize that the extensive nature of Muhtorov's discovery requests can account for part of the delay, but close to five years of delay cannot be explained away by such summary acceptance of governmental excuses.

Furthermore, the effects of delaying meaningful discovery production for 55 months were exacerbated by the continued production of evidence by the prosecution, which extended to the eve of trial. As I discuss in the <u>Jumaev</u> dissent, the government waited to produce evidence that had been in its possession for more than five years until shortly before Jumaev's first scheduled trial in March 2017. <u>See</u> <u>United States v. Jumaev</u>, No. 18-1296, slip op. at 3-4 (10th Cir. [Date TBD]) (Lucero, Senior J., dissenting). Because Muhtorov and Jumaev were charged as co-conspirators, this unexplained belated discovery production on the eve of trial directly caused an additional

---

process until after the motion to suppress was denied, there is no conceivable explanation for this extra five-month delay.

[4] The majority agrees that the government provided <u>no</u> discovery for one year of this pretrial period from September 2014 to April 2015, and October 2015 to March 2016. (Op. at 124.) They excuse the resultant delay.

one-year delay in Jumaev's trial. Muhtorov could not go to trial until after Jumaev's trial was completed, so this necessarily caused an additional one year's delay in Muhtorov's trial as well. The district court sanctioned the government for this belated discovery production, which occurred well after the discovery deadline.[5] This delay remains unexplained by the government in this appeal. It is fundamentally unfair and inconsistent with Barker to suggest, as the majority does in rationalizing their affirmance in this case, that delay in discovery production that led to sanctions on the government can be attributed to the defendant.

My colleagues focus on the second Barker factor, the reason for the delay,[6] and sweepingly conclude that the "government has carried its burden to provide an acceptable rationale for the delay" because "discovery logistics—including CIPA and translation

---

[5] My colleagues parse the district court's response to this eve-of-trial discovery production. (Op. at 134 n.69.) Yet again they ignore the context. After the district court denied the defendants' motion for dismissal for denial of a speedy trial, it informed the defense that although it would not dismiss the case, it would grant a continuance to remedy the due process violations arising from the late production of material evidence. As the majority acknowledges, the district court did sanction the government for this late production, precluding its use of the information in their case in chief, and while the government's conduct did not "involve[] delay in production of the voluminous communications" (id.), that was because more than four-and-one-half years' delay had already occurred. The government was sanctioned for its eve-of-trial production, and that conduct directly resulted in an additional one-year delay in trial, forcing the defendants to trade one constitutional right for another and further eroding their right to a speedy trial. See infra. at 18-19.

[6] In analyzing the remaining Barker factors, the majority concludes that two factors—assertion-of-the-right and prejudice-to-the-defendant—weigh in Muhtorov's favor and another—the length of the delay—strongly weighs in his favor. I agree, although I would weigh the prejudice factor more heavily in his favor because of the oppressive nature of his pretrial incarceration. Muhtorov was denied in-contact visits for six years.

necessities—drove the pace of proceedings." (Op. at 126, 136 (quotations omitted).)  Yet the majority fails to conduct the necessary Barker analysis that would critically assess the government's assertions as to these "discovery logistics."  Five years of delay cannot be justified by superficial assertions, for the government is responsible for "discovery logistics."  Accepting these government excuses without exacting scrutiny denigrates the instruction in Barker that our review "process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." 407 U.S. at 533.  Surely the government, in bringing cases of this type, must be prepared to direct the resources necessary to comply with its constitutional obligations.  Some delay is acceptable.  Close to 55 months to provide constitutionally mandated discovery is not.  My analysis of these aspects of the critical second Barker factor is contained at I.B, infra.

It is the government's burden to make a particularized showing "to explain why such a wait was necessary in a particular case."  United States v. Seltzer, 595 F.3d 1170, 1178 (10th Cir. 2010) (emphasis added).  Bad faith or malevolence on the part of the government is not required to weigh (even heavily weigh) trial delays against it, for it remains the government's duty to bring the defendant to trial in a timely manner.[7] Barker, 407 U.S. at 527; see also Seltzer, 595 F.3d at 1179.

---

[7] The majority seems to misunderstand this fundamental aspect of the speedy trial analysis.  It repeatedly emphasizes the lack of bad faith or negligence on the part of the government in concluding that the second Barker factor favors the government.  (See, e.g., Op. at 159-62.)  My colleagues go so far as to claim that "the question is whether the reason discovery took a long time was due to a deliberate attempt to delay the trial or

9

As I said above, I conclude that the government has failed to establish the necessity of the discovery-related delays in Muhtorov's trial. The government advances no explanation for its tardiness in disclosing the wellspring of the evidence against Muhtorov. Ignoring an almost-two-year delay cannot amount to establishing its necessity. Nor can the factors relied upon by the majority explain the inexplicable: that the government awaited the district court's denial of Muhtorov's second motion to suppress on November 19, 2015 to commence its CIPA § 4 evaluation of the evidence. The government began this necessary process only after Muhtorov had been deprived of his liberty for nearly 46 months. Once it deigned to begin, the government managed to complete the bulk of these evaluations within nine months. If the government could complete all these admittedly difficult discovery tasks in nine months in 2016, why could it not have completed them in the first year following Muhtorov's arrest? Or the second?

---

negligence as opposed to a valid reason that justifies delay." (Op. at 135 n.70 (quotations omitted).) But the absence of bad faith does not resolve the issue as the majority's repeated emphasis implies. Although bad faith is weighed more heavily against the government, and is often dispositive of the issue, a speedy trial violation may exist "even when there is no evidence that the government intentionally delayed the case for the explicit purpose of gaining some advantage." Seltzer, 595 F.3d at 1179. Neutral factors can weigh against the government. At no point do my colleagues engage with Seltzer's holding that it is the government's burden to show that pre-trial delays are necessary under the circumstances. See id. at 1178. They merely summarily conclude that CIPA compliance and the challenge of translation were "valid reason[s]" for the six-and-one-half-year discovery period (Op. at 130, 133, 136), without recognition that these processes were solely within the control of the government. In my estimation, the record amply demonstrates that the government was not diligent in either task. As the majority acknowledges, "factors within its control" are to be weighed against the government. (Op. at 120.)

Or the third?  Reason dictates it could have.[8]  Finally, the government has failed to show the necessity of its delay of 55 months to provide the majority of the discovery to which Muhtorov was constitutionally entitled.

The right to a speedy trial does not allow the government to sit on its hands for 46 months before it begins to perform its duties.[9]  That Muhtorov languished in jail under an unresolved charge while the government actively avoided its constitutional duties is anathema to the Sixth Amendment speedy trial guarantee.

**B**

I also reject my colleagues' acceptance of the government's position that the "complexity of the case," including the national security context, the nature of Mr. Muhtorov's discovery requests, the CIPA obligations, and the need to translate voluminous materials from Russian, Uzbek, and Tajik into English, provide an acceptable rationale for the delay.  (Op. at 128-36.)  Review of the record does not support these

---

[8] Confusingly, the majority asserts that the government was diligent in conducting its CIPA evaluation.  (Op. at 129-31.)  I agree with the majority that this "process takes time."  (Op. at 130.)  In this case it took approximately nine months.  Although the majority attaches great weight to the filing of procedural § 4 motions in 2012 (id.), the classified record unambiguously demonstrates that the government did not begin its substantive CIPA evaluation until after the district court denied Muhtorov's second motion to suppress.  I cannot agree that this record shows governmental diligence.

[9] The record suggests that the delay in beginning the § 4 process was a strategic decision, either to compel a guilty plea or out of an expectation that Muhtorov would plead guilty.  The district court itself commented on the correlation between the failure of earlier plea negotiations and the resultant discovery disclosure.  Although our system has become "for the most part a system of pleas, not a system of trials," Missouri v. Frye, 566 U.S. 134, 143 (2012), the government is not entitled to a plea, nor is it entitled to avoid its fundamental discovery obligations in order to coerce a plea from a defendant incarcerated and awaiting trial.

11

governmental assertions.  My colleagues overlook that these difficulties were well-known to the government during its investigation and prosecution of Muhtorov and in many instances arose from discretionary decisions made by the government.  Because delay stemming from these decisions is attributable to the government, it is properly weighed against it under Barker.

These decisions include (1) opposing the appointment of cleared defense counsel; (2) failing to adequately resource translation services; (3) seeking a third superseding indictment on May 18, 2016 that added charges subsequently dismissed by the government; and (4) discretionary decisions within the CIPA process to restrict or deny information to the defense, including the unilateral implementation of specific techniques to protect a small portion of evidence.[10]  Although some period of time would be required for the "orderly expedition" of this case to trial, Ewell, 383 U.S. at 120, the record shows that much of the delay was both avoidable and directly attributable to these discretionary decisions.

As we all recognize, the Executive appropriately possesses both the authority and the responsibility to take actions to protect national security and classified information, but it must do so within the confines of a constitutional system that reposes a primary

---

[10] Waving away the delay caused by the government's discretionary decisions, the majority boldly states that these choices "did not extend the pretrial period."  (Op. at 139.)  Rather, they claim the date of the trial was due to "the vast and multi-faceted discovery process" which happened "before, during, and after those events."  (Id.)  I am perplexed.  It is simple arithmetic that choosing a course of action that lengthens and delays the discovery process causes the discovery process to take longer.  An end to the discovery process is required in order to proceed to trial.  Therefore, delays in required discovery production ipso facto delay the trial.

responsibility to protect the rights of a criminal accused in the judiciary.  The

government's burden to ensure due process and a speedy trial are not negated by its

responsibilities to protect classified information—if they conflict, due process must

prevail or the prosecution must be foregone.  See United States v. Abu Ali, 528 F.3d 210,

255 (4th Cir. 2008) ("CIPA contemplates and authorizes district courts to prevent the

disclosure of classified information . . . so long as it does not deprive the defendant of a

fair trial.").  When Congress passed CIPA it explicitly recognized that, in some cases, the

Executive would be faced with difficult decisions about whether to protect classified

information or to prosecute a criminal defendant within the bounds of due process

required by our Constitution.  The House Report discussed the CIPA substitution remedy

as a solution to the "disclose or dismiss dilemma" presented by the competing interests of

protecting classified information and prosecuting offenses in accordance with due

process, but required "the statement or summary will provide the defendant with

substantially the same ability to make his defense as would disclosure of the specific

classified information."  H.R. REP. NO. 96-831, Pt. 1, at 7, 19 (1980).  Similarly, the

Senate Report emphasized that the government's right to substitute classified evidence

was subject to it not prejudicing defendant's right to a fair trial.  S. REP. NO. 96-823, at 4

(1980).[11]

---

[11] FISA and the FAA contain the same fundamental due process limitations on government protection of classified information when prosecuting criminal defendants. 50 U.S.C. §§ 1806(f), 1825(g).

CIPA provisions accommodate both the interests of the defendant in a fair and speedy trial and of the government to protect classified information if the government acts expeditiously. Mere incantation of the phrase "national security" does not, and should not, in and of itself justify violations of the speedy trial right. Likewise, the terms "complex discovery" and "translation difficulties" should not stand stead for the term "national security." It is the government's burden under Seltzer to show that the delays resulting from its discretionary decisions were necessary in light of available alternatives. In this case, the record demonstrates that the government made several choices that led to avoidable delays in bringing Muhtorov to trial without advancing persuasive justification why these delays were necessary. I proceed to amplify the four points listed above.

1

Of primary concern is the government's opposition to defense motions for the appointment of cleared defense counsel in 2014 and 2015.[12] Although discretionary, this

---

[12] The majority views this issue as waived (Op. at 139-40, 139 n.74), but the defense was not privy to the classified record which provides the basis for asserting this argument on appeal. Specifically, as to the prejudice and delay resulting from this decision, to hold an issue waived when defense counsel is denied access to the evidence necessary to advance an argument is both unfair and directly contrary to our duty to stand in the shoes of defense counsel in this case. See United States v. Amawi, 695 F.3d 457, 471 (6th Cir. 2012). The majority characterizes as speculative my evaluation that the governmental decisions to oppose cleared counsel and the reasons for its delay in commencing the CIPA § 4 process caused a delay of the trial. (Op. at 140 & n.75.) My inability to quote the classified record in support of this evaluation in this unclassified opinion, however, does not render it speculative. This is particularly so in light of the government's failure to provide any explanation for the 46-month delay in beginning its CIPA § 4 process. These conclusions are fully supported in the classified record.

As it grappled with the competing interests of justice and national security, the district court suggested that having a cadre of cleared defense counsel available who

14

singular decision directly affected the orderly expedition of this case before the district court—and continues to adversely affect our ability to review the constitutionality of Muhtorov's conviction on appeal. The exclusion of defense counsel by the government to the extent accomplished in this case denies courts of the normal honing of issues and sharp presentation of law that our adversarial process is designed to produce[13]—with attendant delays as defense counsel attempted to meet their constitutional responsibilities.

In conducting our balancing under Barker, it is important to recognize that neither CIPA nor FISA mandate the withholding of evidence from the defense or prohibit appointment of cleared defense counsel to access the sensitive information in a classified form. In these circumstances, cleared defense counsel undergo the same background checks, receive the same security clearances, and are subject to the same serious criminal sanctions for unauthorized disclosures of classified information as government

---

would have full access to classified information would make it easier for district courts to navigate these cases. I agree and would join in the district court's suggestion that such a standby list of cleared counsel should be authorized.

[13] See United States v. Cronic, 466 U.S. 648, 655 (1984) ("The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free. It is that very premise that underlies and gives meaning to the Sixth Amendment. It is meant to assure fairness in the adversary criminal process." (cleaned up)); see also Strickland v. Washington, 466 U.S. 668, 685 (1984) ("[A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding."); United States v. Nobles, 422 U.S. 225, 230-31 (1975) ("We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." (quotation omitted)).

15

prosecutors. In other serious terrorism prosecutions, the government has approved full

access to classified evidence for cleared defense counsel, with no apparent detriment to

national security. See, e.g., United States v. El-Mezain, 664 F.3d 467, 523 (5th Cir.

2011); In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 118 (2d Cir.

2008). Providing access to properly cleared counsel under appropriate protective orders

authorized by CIPA is one mechanism available for the government to balance its

responsibilities to protect classified information and provide a speedy trial that comports

with due process.[14]

The government is entitled to decide whether to use CIPA's substitution,

summary, and redaction processes, as well as whether to grant access to classified

information to defense counsel. If its decisions substantially delay the trial, however, that

delay weighs against it. The government's decision to oppose appointing cleared defense

counsel to whom classified evidence could be disclosed delayed this trial substantially.

Ironically, the government itself recognized that having cleared counsel would have

---

[14] Early in this case, the government characterized the issue of clearing defense counsel as "irrelevant" at the time because ex parte CIPA § 4 review would still be required to establish the relevance of the information and defense counsel's "need-to-know" before they could access classified information. In May 2012, it categorically stated that the FISA information was and would remain classified and "be handled in an ex parte in-camera procedure and will not be produced." The district court recognized that it was not a prosecutorial determination by the government to limit contextual information to the defense that was the issue but the prosecution's inability to extract it from the intelligence agencies "that don't want to disclose anything." Nonetheless, it is the government that has the responsibility to promptly proceed to trial and show the necessity for delays. Delays resulting from internal governmental disagreement and bureaucratic disputes appropriately weigh against the government.

facilitated the orderly expedition of this case because it would have avoided defense motions to resolve inconsistencies in the discovery provided after CIPA substitutions. This delay should be weighed against the government.

This brings me to the government's assertion that it is Muhtorov's fault, that it was Muhtorov's "aggressive litigation strategy," that substantially contributed to the delay. It complains that Muhtorov's "unsuccessful efforts to suppress evidence obtained or derived through traditional FISA and Section 702 and to gain access to classified information, including disclosures about the government's investigative techniques, were time-consuming for the parties and the district court." In other words, the government blames the delay on Muhtorov's motion practice, which itself was necessitated by the government's refusal to share the information defense counsel required to fulfill their Sixth Amendment duty to provide effective assistance of counsel. Normally we afford great deference to defense counsel's decisions on what issues to pursue at trial, Strickland v. Washington, 466 U.S. 668, 688-89 (1984), but the defense cannot make informed decisions on what issues to litigate if they are deprived of the evidence on which to base those decisions. Just as we cannot ignore the legitimate interests of the government to protect classified information in conducting the Barker balancing, we similarly cannot ignore the concomitant responsibility of defense counsel to provide effective assistance of counsel under the Sixth Amendment. To the extent that the defense was unable to engage in the normal winnowing of issues because of the redacted or summarized nature of the discovery (and as in this case, its late provision), any delay arising from good faith motions should not be weighed against Muhtorov. Although a criminal defendant may be

17

required to make hard strategic choices in the context of a criminal trial, the government's heads-I-win, tails-you-lose approach to this issue cannot comport with due process.[15] See United States v. Jackson, 390 U.S. 570, 582 (1968); Simmons v. United States, 390 U.S. 377, 394 (1968); Bourgeois v. Peters, 387 F.3d 1303, 1324 (11th Cir. 2004); Bertrand v. United States, 467 F.2d 901, 902 (5th Cir. 1972). "Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." McGautha v. California, 402 U.S. 183, 213 (1971). As explained above, Muhtorov's right to a speedy trial is specifically affirmed in the Constitution to ensure that "a presumptively innocent person should not languish [in prison] under an unresolved charge." Betterman, 136 S. Ct. at 1614. Muhtorov cannot be compelled to forfeit that right in order to gain access to discovery to which he is constitutionally entitled in order to present a defense. As the Supreme Court has forcefully explained, it is "intolerable that one constitutional right should have to be surrendered in order to assert another." Simmons, 390 U.S. at 394.

---

[15] In a January 2016 CIPA ex parte hearing, at which point the defendants had been incarcerated for four years, the district court excoriated the government for the lack of discovery provided to the defendants, and declared that it would not conduct a "Kafkaesque" trial, in which the defendants were unaware of the charges they faced or the evidence against them. I agree that the government must sometimes make a choice between the utmost protection of classified information and the prosecution of a defendant in a case that implicates national security. If the underlying evidence for a charge is so sensitive that the government cannot abide by the Speedy Trial Clause, it is free to forego that particular prosecution.

**2**

My colleagues view the volume of discovery and the need to translate materials from Russian, Tajik, and Uzbek as further justifying delay. (Op. at 131-35.) Yet the government was long aware of the nature of the evidence and the need to review for Brady, Giglio, and Rule 16 material to proceed to trial. Review and translation of these materials was obviously required for any prosecution to occur and was solely within the government's control. After review of both records, I do not find persuasive the government's justifications for taking 55 months to accomplish these tasks. As we know from Barker, although a "more neutral reason [for a delay] such as negligence or overcrowded courts should be weighted less heavily [against the government, it] nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Barker, 407 U.S. at 531. "Where a State has failed to provide funding . . . and that lack of funding causes a delay, the defendant cannot reasonably be faulted. . . . States routinely make tradeoffs in the allocation of limited resources, and it is reasonable that a State bear the consequences of these choices." Boyer v. Louisiana, 569 U.S. 238, 245 (2013) (Sotomayor, J., dissenting) (citation omitted).

As recounted by the district court, this record is replete with the "slow—and maybe even deliberately slow—pace of the Government's efforts to go from tech cuts to

19

summaries to fulsome translations of defendants' statements."[16]  It is apparent that it was

not only the government's prioritization and allocation of translator assets that affected

the orderly expedition of this case, but that additional delays occurred when a key

government translator was determined to have editorialized the translations and been less

than forthcoming in the subsequent government investigation.  The government had

complete control over the translation process and any delay arising from the

government's prioritization of translation tasks and its allocation of resources with which

to accomplish its constitutionally required discovery should be weighed against the

government.  Instead my colleagues use this very excuse to rule against the defendant.[17]

---

[16] The government's production was limited.  As the majority notes, it produced only 1000 calls and 4718 pages of discovery between April 2012 and March 2013, and in the entire four years between filing the case and the end of August 2016, the government had produced only 6270 pages of written discovery, including the 1000 recorded phone conversations, and copies of the computers and phones seized from the defendants at their arrests.  Thus, in the second through fourth year of Muhtorov's incarceration, the government produced only an additional 1552 pages of discovery, and produced no discovery at all for one year of this period.  I cannot agree that this record demonstrates diligence in discovery production.

[17] I do not fault the trial court for this embarrassing delay.  In March 2017, the district court stated that much of this delay was "attributable to an overlapping muddle of translation issues, tactical decisionmaking, and classified information, . . . which resulted in an opaque and painstakingly slow discovery process, one which has surely inured to Defendants' detriment."  Despite what the court described as the "herculean" task of reviewing thousands of communications and other information generated in the investigation and prosecution of Muhtorov, the court noted that there "have been delays and obfuscation in the disclosure of the materials, not all of which have been beyond the control of the government," and "translation and evaluation for Brady material has often taken a back seat to the search for inculpatory material and that the government's standard for what constitutes Brady material has not always aligned with mine."  As described above, on March 13, 2017, immediately prior to denying the defendants' speedy trial motion, the district court stated it was "gravely concerned about the delays

**3**

Additional significant delay was caused by the government's decision to seek a

third superseding indictment on May 18, 2016, <u>almost 52 months</u> after Muhtorov's arrest,

in which it added two new broad conspiracy counts.[18]  As recognized by the district

court, the addition of these new broad charges at this late date "mandated" delay of the

scheduling of a trial.  A little more than nine months later, on March 1, 2017, the

government voluntarily dismissed these charges, in part based on its own expert witness

contradicting the government's theory of liability for the two dismissed counts.[19]  In

imposing sanctions, the district court specifically held that the "conversations on which

those charges were based were intercepted before Mr. Jumaev's arrest and were known to

the Government for four and a half years before the Superseding Indictment was sought,"

and their late addition in May 2016 "caused the defense team to have to revisit and

reevaluate all of the discovery that had been provided to it by the Government before

then."

---

and the slow—and maybe even deliberately slow—pace" of the government's translation
effort.

[18] These charges added claims related to Jumaev's son and an alleged conspiracy
with Muhtorov and others to provide his services as "material support for a terrorist
conspiracy to kill persons abroad" via Sheikh Buhoriy's madrassa in Istanbul, Turkey.

[19] This nine-month delay was followed immediately by the one-year delay caused
by the government's eve-of-trial disclosures to Jumaev.  Because Muhtorov was required
to be tried after Jumaev, Muhtorov's trial was delayed until May 2018 (an additional two
months) as a direct result of the government's belated discovery, raising the total months
of government-caused delay from these two decisions to 23 months for Muhtorov.

I can draw no other conclusion than that the late addition of these charges delayed Muhtorov's trial by an additional 23 months. This delay should weigh heavily against the government. Seeking a third superseding indictment 52 months after Muhtorov's arrest based on evidence in possession of the government before or at the time of his arrest can hardly be characterized as necessary. The government's ability to make discretionary prosecutorial decisions is accompanied by consequences under the Speedy Trial Clause.

**4**

Although the process authorized under CIPA will necessarily require some delay, Barker nonetheless requires that this delay be subject to ad hoc scrutiny in which we weigh "the conduct of both the prosecution and the defendant." 407 U.S. at 530. There is no national security exception to the constitutionally protected right to a speedy trial, nor should there be. Given the government's almost unilateral control of the CIPA processes, it is appropriate that any CIPA-related delays be weighed against the government. This is not to disparage the importance of the Executive's responsibility to appropriately protect classified information and national security, "[b]ut, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." Id. at 533.

After an initial June 2012 orientation for the district court on the types and sensitivity of the evidence involved in the case, the government, as discussed above, did not present its CIPA § 4 motions until January 2016. Its proposed measures on how

22

specific classified information would be protected were not provided to the district court until August 2016, on the eve of the September 1, 2016 discovery deadline. Only then did the district court learn of protective techniques that the government proposed to implement under CIPA § 4 for the evidence in the case. The government did not seek prospective approval of its preferred approach, and the record shows that its approach resulted in a <u>significant</u> delay in the production of all discovery and continued to contribute to delays in the trial of the case even after the September 1, 2016 discovery deadline.

Muhtorov could not go to trial before the government satisfied its constitutional and statutory discovery obligations. Given the existing alternatives available to the government, including clearing defense counsel, the government's decision to choose the most difficult means to accomplish its national security responsibilities does not make the delays resulting from those choices "necessary" for the purposes of the speedy trial requirement. <u>See</u> <u>Seltzer</u>, 595 F.3d at 1178. How and why the government protects classified information is well within its discretion, but when the record shows that those measures significantly and unnecessarily delayed the trial, the resulting delays weigh heavily against the government.

C

When I weigh the foregoing delays as I am required to do under <u>Barker</u>, 407 U.S. at 530, and when I add to them the unexplained delays in providing the initial § 702 notice, the government's belated commencement of its CIPA § 4 evaluation, its third superseding indictment, its eve-of-trial disclosure that delayed the trials of both Jumaev

23

and Muhtorov, and its slow provision of constitutionally required discovery, I must attribute the delay under the second Barker factor heavily against the government.

My Barker analysis is a simple mathematical exercise. Factor one weighs against the government. Factor two weighs heavily against the government. Factor three weighs against the government. Factor four weighs heavily against the government. QED. I would reverse for denial of a speedy trial.

That would end my analysis. Because my colleagues disagree, I proceed to resolution of the other two major issues.

## II

I have serious concerns about the majority's Fourth Amendment and Article III analyses. My respected colleagues avoid difficult constitutional questions by accepting as true unsupported factual assertions that the government makes in its brief on appeal. In my view, our due process obligations receive the majority's boot. My colleagues conclude that advance approval of § 702 procedures by the FISC satisfies the Article III requirement of a comprehensive presentation of adverse legal interests in a concrete case or controversy. In other circumstances, I would remand to allow the district court to further develop the record to allow us to properly decide these issues. However, given my conclusion that Muhtorov's conviction should be vacated on speedy trial grounds,

such action would be unnecessary.[20]  I further discuss these two issues in Parts A and B below.

**A**

Based in part on the government's "affirmativ[e] represent[ation]" in its brief, the majority rejects one of Muhtorov's principal arguments on appeal—that the government violated the Fourth Amendment by querying § 702 data prior to the traditional FISA warrant application.  (Op. at 24.)  In normal circumstances, appellate courts do not and should not rely on unsupported party assertions in their briefs to resolve disputes of fact.  Given our affirmative duty to "place ourselves in the shoes of defense counsel, the very ones that cannot see the classified record, and act with a view to their interests," United States v. Amawi, 695 F.3d 457, 471 (6th Cir. 2012), it is particularly extraordinary that my colleagues should blindly accept and rely on such an assertion.  Although they assert that they have confirmed this representation through a "careful and independent view of the classified record," (Op. at 24 & n.13), that they feel able to do so is surprising.  The classified record is bereft of supporting evidence and the affirmative representation which the majority claims to have confirmed is directly contradicted by other government representations in its classified brief.

---

[20] The majority comments that I do not "question the district court's denial of [Muhtorov's] requests for the government's application materials for traditional FISA and Section 702 surveillance or for disclosure of possible novel surveillance methods." (Op. at 106 n.54.)  Such a lack of questioning does not arise from agreement.  Rather, it proceeds from my conclusion that the government's denial of a speedy trial controls this case.  Moreover, as I am in dissent, silence does not constitute agreement.  I choose not to engage in a tit for tat with the majority as to the remainder of their analysis.

I agree with the majority's conclusion that the incidental collection of Muhtorov's communications with a target of § 702 surveillance is likely reasonable under the Fourth Amendment, but I find unacceptable the majority's decision to accept the government's assertion that no pre-warrant querying took place in light of the complete dearth of supporting evidence in the record.  Querying stored § 702 data has "important Fourth Amendment implications, and those implications counsel in favor of considering querying a separate Fourth Amendment event that, in itself, must be reasonable."  United States v. Hasbajrami, 945 F.3d 641, 670 (2d Cir. 2019).  By accepting the government's bare assertion to resolve this dispute of fact, the majority avoids the thorny constitutional issues that querying presents.  I would not blind myself to the constitutional implications raised by a "vast body of information" that may be "simply stored in a database, available for review by request from domestic law enforcement agencies solely on the speculative possibility that evidence of interest to agents investigating a particular individual might be found there."  Id.  Unfortunately, the current record does not permit us to engage this question in a meaningful way.  Under my resolution of the speedy trial issue, it would be unnecessary to remand for the district court to further develop the record to ascertain whether the government relied in part on evidence derived from querying of raw § 702 data in deciding to pursue a FISA warrant against Muhtorov.  The majority declines to remand and proceeds on an inadequate record.

**1**

Our Fourth Amendment analysis must begin with an acknowledgement that CIPA procedures fundamentally alter the structures of our adversarial process and place courts

26

in a position as uncomfortable as it is unique.  Through passage of CIPA, Congress has

mandated that we step out of our traditional role as neutral arbiters overseeing adversarial

presentation of issues and step into a role much closer to that of an inquisitor.  As

explicitly acknowledged by the government, a district court's role in cases involving

CIPA is to act as "standby counsel for the defendants."  Similarly, on appeal "we must

place ourselves in the shoes of defense counsel, the very ones that cannot see the

classified record, and act with a view to their interests."  Amawi, 695 F.3d at 471.  The

judiciary is neither institutionally suited nor resourced to fulfill this role.[21]  Yet this is the

role that Congress has assigned us.  Our colleague on the trial bench said it well when he

described acting in this role as feeling like "an illegitimate child at a family reunion."

As a result, our review must include a searching inquiry into the existing record to

evaluate defense arguments that might otherwise be considered as lacking specificity or

as being waived or defaulted in other contexts.  If the defense does not have access to the

evidence or to arguments presented by the government in ex parte proceedings because of

CIPA, any failure to make arguments with sufficient specificity, to assert specific

grounds before the district court, or to produce evidence to contradict the government's

presentation cannot be held against the defendant.[22]  The responsibility instead passes to

---

[21] This comment is not to disparage the district court's valiant attempt to perform this function, only to highlight that shoehorning responsibilities that are at odds with our traditional mode of doing justice into the trial of a criminal case creates significant difficulties, not the least of which is the inadequacy of the record on appeal.

[22] Any other approach would make a mockery of our criminal justice system.  We cannot require a defendant to specifically challenge the use of certain evidence when he

us to conduct a thorough review of the record defense counsel cannot see. And if the record, unilaterally created by the government, does not contain sufficient evidence to resolve the issues, then the conviction cannot be sustained, as the inadequacies of the record are the direct result of the absence of adversarial testing of the evidence created by the CIPA procedures chosen by the government. Our decision must, as always, be based on the information available in the record, and we cannot rely on post hoc assertions in appellate briefing to establish key facts that are otherwise unsupported.

### 2

If Congress has declared us inquisitors, then inquire we must. See Amawi, 695 F.3d at 471. Our inquiry, however, is almost immediately stymied by the record's silence on multiple facts that are crucial to the derivative evidence inquiry.[23] Sidestepping our statutory duty to act as standby defense counsel, the majority accepts the government's unsupported assertions that "the Section 702-derived evidence at issue was not obtained

---

does not have access to that very evidence to investigate its origins fully or to test its admissibility. To conclude that a defendant may mount a derivative evidence challenge to the use of § 702-derived evidence only if he has access to the evidence—which he does not—would transform the Fourth Amendment inquiry into a dark comedy.

[23] As we recently explained, "[t]he exclusionary rule generally applied in Fourth Amendment cases requires courts to suppress not only evidence obtained as a direct result of an illegal search or seizure but also evidence later discovered and found to be derivative of an illegality." United States v. Suggs, 998 F.3d 1125, 1141 (10th Cir. 2021) (cleaned up). As is particularly relevant in this case, "this so-called 'fruit of the poisonous tree' doctrine does not demand a particularly tight causal chain between the illegal search and the discovery of the evidence sought to be suppressed." Id. at 1142.

28

or derived from queries using terms associated with Muhtorov."[24]  (Op. at 23 (quotations omitted).)  There is not one whit of evidence in the record to support this statement.  To the contrary, the PCLOB Report, which provides the most-extensive declassified explanation of the § 702 program, indicates that the FBI almost certainly queried terms associated with Muhtorov prior to seeking a FISA warrant.  Evidence in the classified record bolsters this conclusion.[25]

The PCLOB Report explains that "whenever the FBI opens a new national security investigation or assessment, FBI personnel will query previously acquired information from a variety of sources, including Section 702, for information relevant to the investigation or assessment."  The word choice is noteworthy—not "can" or "may,"

---

[24] The majority accepts the government's unsupported assertion that no upstream collection occurred in this case.  The record evidence does not disclose whether "upstream" collection was involved in Muhtorov's investigation, although the prosecution at least purported to provide a response denying its involvement before the district court.  This assertion does not amount to evidence.  However, because the FBI does not receive <u>unminimized</u> upstream collection or have access to databases containing this information, its involvement is less likely.  Access to minimized and subsequently unmasked upstream information, however, remains unresolved in this case, as no evidence in the record excludes it.  <u>See</u> Privacy and Civil Liberties Oversight Board, <u>Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act</u>, 7 (July 2, 2014) (PCLOB Report).

[25] My colleagues accuse me of "join[ing] Mr. Muhtorov in speculat[ion]" and engaging in "conjecture about extra-record occurrences."  (Op. at 23 n.12, 29 n.14.)  These comments demonstrate that the majority pays mere lip service to the requirement that we "place ourselves in the shoes of defense counsel . . . and act with a view to their interests."  <u>Amawi</u>, 695 F.3d at 471.  They cite to non-national security cases to limit their role in this appeal.  The majority fails to recognize that Muhtorov has been unable to fully challenge government assertions that he has never seen.  In these circumstances, the burden is on the government to demonstrate the constitutionality of its actions, and the burden passes to us to hold the government to account when it fails to do so.

29

but the FBI <u>will</u> query stored § 702 information <u>whenever</u> the FBI opens a new national security investigation.  As concerns Muhtorov, we know from the declassified <u>FBI Investigations and Operations Guide,</u> the unclassified record, and the government's brief, that the FBI opened a full investigation a legally significant period of time before it sought a traditional FISA warrant.  See <u>FBI Domestic Investigations and Operations Guide</u>, paras. 5.10, 6.9, 7.9, and 9.7 (2008).[26]  It blinks reality to assert that, in this one

_____

[26] The majority chides me for "speculating" that information obtained by the querying mandated by FBI procedures contributed to the decision to seek the traditional FISA application.  (Op. at 23 n.12.)  Rather than misapprehending whether the traditional FISA evidence was derived from querying (Op. at 23 n.12), my reading of the classified record underscores that is the exact issue that cannot be resolved.  We know that after receiving only a small number of interceptions that led the FBI to open a new national security investigation, the FBI "would have" queried its databases using identifiers associated with Muhtorov and would have had unfettered access to any responsive information, including raw § 702 data.  More intelligence reports periodically followed.  Following these reports, the FBI submitted "some" of the universe of intercepted communications to support the traditional FISA application.  (Op. at 20 (citing Aplee. Br. at 11).)  Yet, the FBI officials preparing the traditional FISA application would have been aware of all, not "some" of the intercepted communications, and the record is silent on whether this universe arose from the querying mandated by the FBI procedures.

Similarly, although the statute did not mandate record-keeping requirements concerning queries of U.S. persons as a distinct category until 2018, the minimization procedures applicable at the time of the investigation into Muhtorov required the maintenance of records of <u>all</u> search terms used to query § 702 databases, which would have included searches using identifiers associated with Muhtorov.  See PCLOB Report, at 58-59 ("FBI minimization procedures also permit the FBI to query unminimized Section 702–acquired data[,] . . . [and requires the FBI] to maintain records of all terms used to query content.").  The classified record is in accord with the requirements that are described in the PCLOB Report.  Far from requiring the government to prove a negative (Op. at 23 n.12), given this record-keeping requirement, the government's failure to provide evidence to disprove that such querying occurred mandates the conclusion that we cannot resolve the derivative evidence question on appeal.  Although we normally require some showing from the defense to place the origin of the government's evidence at issue, Muhtorov was deprived of information necessary to make that showing.  Requiring the government to establish in the trial record that its evidence did not derive

instance, the FBI did not follow its standard operating procedure of querying § 702 data when opening a national security investigation. The majority does not engage with this contradiction, and there is no explanation in the record. Relying on an unsupported assertion in an appellate brief to resolve a disputed issue of fact is inappropriate in any circumstance, but to credit a factual assertion that is squarely rebutted by an official government report is unacceptable.

Understanding this, perhaps, the government tries to narrow our inquiry and contends that we need only be concerned with the specified number of communications that were included in the traditional FISA application—from which it appears the bulk of the evidence at trial derived. Because those communications were incidentally collected during the government's surveillance of the foreign target of the § 702 surveillance, the government argues, they were unaffected by any querying that may have occurred. But this argument subsumes the question we must resolve—was the decision to seek traditional FISA authority influenced by any querying of § 702 databases by the FBI using identifiers associated with Muhtorov? Or by information collected in other intelligence surveillance programs? And if it was the result of querying of § 702 databases, was the specific querying conducted reasonable under the Fourth Amendment

---

from querying, particularly in light of its own "FISC-approved" minimization procedures which required record-keeping of any such queries, is far from speculative; instead it is merely "plac[ing] ourselves in the shoes of defense counsel, the very ones that cannot see the classified record, and act[ing] with a view to their interests." Amawi, 695 F.3d at 471.

under the facts of this case? After full review of the classified record, I cannot resolve this derivative evidence question.

We can glean limited facts from the record. We know that a specified number of incidentally collected communications were submitted to support the traditional FISA application, which in turn led to the evidence at trial. We also know that the FBI had access to additional communications that were <u>not</u> included in the original FISA application.[27] Finally, we know that the agent who prepared and submitted the traditional FISA application (and his supervisors who directed it be sought) had access to a broad array of law enforcement and intelligence information. What we do not know, and what the record is conspicuously silent on, is the sum total of information on which these agents relied when they decided to seek a traditional FISA warrant.[28]

---

[27] <u>See</u> Gov't Br. at 11 ("In this case, the government acquired under Section 702 the communications of a non-U.S. person abroad and, in so doing, incidentally collected communications to which Muhtorov was a party. The government used <u>some</u> of these incidentally collected communications to support its application for traditional FISA orders. The fruits of that traditional FISA collection were therefore partially 'derived from' information collected under Section 702. Evidence obtained and/or derived from that traditional FISA collection was, in turn, used at trial.") (citations omitted) (emphasis added).

[28] Even on painstaking review of the classified record, the sequence of collection of communications and resulting intelligence reporting is hopelessly muddled. The district court shared this view and ordered the government to produce a classified chronology to resolve these issues. It was filed on November 10, 2015. Unfortunately, this chronology fails to provide clarity, and we are left to guess at the answers to critically important questions in the derivative evidence inquiry, e.g., which communications the government received at which times, whether and when querying occurred, and what information motivated the government to seek traditional FISA authorization.

32

Although the government presents the relevant targeting and minimization procedures for the relevant years in its classified record, it never describes in detail how and when the "acquisition" of the information occurred in Muhtorov's case. This may be explained by the FBI's documented history of widespread U.S. person querying and of non-compliance with its record-keeping responsibilities under its own minimization procedures.[29] See PCLOB Report at 59. Perhaps as a result, there is no evidence in the record either that querying did not occur or that the government agents who directed or sought the traditional FISA application did not know of its existence or results. Without that information, it is impossible for us, acting as standby defense counsel, to resolve the derivative evidence question. See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). The government's reframing of the issue—as requiring only our evaluation of the limited basket of intercepted communications it chose to submit to the FISC—borders on disingenuous, given the breadth of the derivative evidence inquiry. Deprivation of liberty based on the government's mere say-so is antithetical to established constitutional order.

---

[29] FISC, Section 702 2018 Certification, 18 Oct. 2018, at 62, 66 ("In 2017, NCTC, the CIA, and NSA collectively used approximately 7500 terms associated with U.S. persons to query content information acquired under Section 702 . . . while during the same year FBI personnel on a single system ran approximately 3.1 million queries against raw FISA-acquired information, including section 702-acquired information." (citations omitted)). The classified record discloses the failure of the government to introduce any evidence that it complied with the record-keeping responsibilities imposed by the minimization procedures applicable at the time of the investigation into Muhtorov, procedures upon which the majority premises its Fourth Amendment reasonableness determination. As the government acknowledges, the classified record in this case does not specifically indicate whether the FBI conducted querying after it learned from reporting that Muhtorov was helping the IJU. See United States Classified Brief at 11.

33

My review shows that it is likely that querying did occur prior to the traditional FISA application, that the FBI had access to unminimized stored § 702 information, and that the record is devoid of any information from which we can determine that evidence introduced at trial was not derived from querying or other § 702 collection involving Muhtorov. The government may have been able to present evidence that none of these aspects of the investigation affected the decision to seek traditional FISA authorization, but it did not do so. Although I conclude that the record as it exists would not allow a thorough judicial inquiry as to these problematic features, the solution is not to agree with the government's artificially narrow framing of the relevant issues. Under CIPA, the government may choose to limit the evidence before the court at trial or on appeal, but, if it does so, it bears the potential consequences of its choice, including failing to sustain a conviction it has achieved. We should not relieve the government of the consequences of its choice by accepting as true its unsupported factual assertions on appeal.

**3**

I briefly address one final Fourth Amendment concern: the troubling implications of failure to conduct separate constitutional analyses of the collection and subsequent querying or use of stored § 702 data.

My colleagues rely on the plain view and incidental overhear doctrines to countenance the use of millions of § 702-acquired communications that are stored in vast databases. This reliance risks fundamentally undermining heretofore reasonable expectations of privacy of U.S. persons whenever they communicate with another person located abroad. Although the majority avoids discussion of the probable querying that

34

occurred in this case, nothing in the majority opinion prevents its application of the plain view and incidental overhear doctrines from being extended to post-collection querying and use of stored § 702 data. According to the majority's analysis, once a communication is collected "lawfully" (because the "target" of the § 702 collection is a person without constitutional protections), subsequent "view" of that communication has no Fourth Amendment implications for the U.S. person who is one of the communicants. But U.S. persons do not lose their protected privacy interests when they communicate with foreigners abroad. See United States v. Ramsey, 431 U.S. 606, 623-24 (1977); Ex parte Jackson, 96 U.S. 727, 733 (1877). The vast scope of this incidental collection and the minimally fettered government access to databases where these communications are stored for years or decades creates the potential for the evisceration of Fourth Amendment protections for U.S. persons who communicate with persons abroad. See Hasbajrami, 945 F.3d at 670 ("[T]he storage and querying of [Section 702-acquired] information raises challenging constitutional questions . . . .").

In 2011, "the government was annually acquiring over 250 million Internet communications, in addition to telephone conversations" under § 702, and the "current number is significantly higher." PCLOB Report at 116. The sheer amount of communications collected by the government overwhelms the majority's analogy of the subsequent use of these communications to "use of seized evidence to prepare affidavits

35

for warrants to obtain additional evidence for trial." (Op. at 50-51.)[30] "Seizure" of § 702

evidence is far different from evidence seized as a result of normal criminal processes.

Section 702 surveillance requires no crime scene from which to collect evidence.

Instead, it authorizes broad collection for foreign intelligence purposes that often involve

no crime at all. In refusing to treat subsequent use of § 702 communications as a separate

Fourth Amendment event, the majority's approach does not distinguish between the

separate Fourth Amendment events of seizure (§ 702 collection) and search (querying).[31]

---

[30] The majority quotes an excerpt of Hasbajrami to support the proposition that
subsequent use of § 702-collected information "is not a separate Fourth Amendment
event." (Op. at 50, 51 n.21 ("[B]oth the collection of such communications and the
dissemination of information from such collection about potential criminal actions within
the country to domestic law enforcement are reasonable under the Fourth Amendment."
945 F.3d at 667-68.").) Utilization of this excerpt is misleading. Despite the majority's
implication that its analysis accords with that of the Second Circuit, the analysis of
Hasbajrami stands in stark contrast with that of the majority: "[L]awful collection alone
is not always enough to justify a future search." Hasbajrami, 945 F.3d at 670.
Hasbajrami proceeds to explain, over several pages, why § 702 data exemplifies "the
need for additional probable cause or reasonableness assessments to support a search of
information or objects that the government has lawfully collected." Id.; see also id. at
670-73. In this analysis, the Second Circuit relied in part on Riley v. California, 573 U.S.
373 (2014), discussed below.

[31] My colleagues attempt to create a distinction between the "querying" of § 702
data and its "use." (Op. at 50, 51 n.21.) In doing so, the majority asserts that the "mere
'use' of already collected Section 702 communications without reliance on querying does
not trigger the Fourth Amendment." (Id. at 50.) That may be so, and it is what the
majority assumes occurred in this investigation. But the record fails to establish that the
§ 702 information, which was available a legally significant period of time after the
initiation of the investigation to the officials seeking the traditional FISA authorization,
did not arise, at a minimum in part, from queries of § 702 information. And as discussed
above, given the applicable minimization procedures, it should.
    Critically, the majority ignores that "use" of a communication first requires law
enforcement to know of its existence. For § 702 evidence, this knowledge of existence is
obtained either through unmasked intelligence reporting or through querying. As

This approach was rejected by the Supreme Court in Riley v. California, 573 U.S. 373

(2014). In Riley, the government analogized a lawfully seized cell phone to a container

that could be searched at will. Recognizing a privacy interest in the vast amount of

information stored in a cell phone, the Court rejected this analogy, distinguishing

between the seizure of a cell phone incident to the arrest of its owner and a subsequent

search of its contents, and required the government to obtain a warrant prior to that

---

explained above, the record in this case does not establish that the information leading the
FBI to seek a traditional FISA application, the relevant inquiry on appeal, was not
obtained through querying. Using the majority's analogy, law enforcement can only
"use" a piece of seized evidence to prepare affidavits for warrants to obtain additional
evidence for trial, because it has already documented the limited number of items of
seized evidence to reference in their warrant application. The 250,000,000+
communications that are collected annually under § 702, however, are not documented in
real time. Instead, they are stored, often without processing, in vast lakes of data, and
their contents are most often obtained through querying. See PCLOB Report at 59, 116.
In effect, rather than citing a known piece of evidence in a subsequent warrant
application, querying is akin to fishing in enormous lakes of data to see what information
one can catch using various search terms as "bait." The subsequent use of the results of
these searches to seek traditional FISA authorization "raises challenging constitutional
questions." Hasbajrami, 945 F.3d at 670. Under the majority's approach, law
enforcement may routinely fish for Americans' data without first bothering to obtain a
license. Although the majority accepts the governmental assertion that the § 702
communications were not derived through queries (evidence of which is lacking in the
record), nothing prevents its use of the plain view and incidental overhear doctrines from
being extended to cases in which querying did occur. After all, communications obtained
through querying have been "collected" under § 702, just the same as those at issue in
this case. What protects these "lawfully collected communications," (Op. at 50), from
subsequent querying and use? The majority does not explain. The better course in this
case is to follow the lead of the Second Circuit and to remand for a determination of
whether querying occurred. That evidence is absent from this record, just as it was in
Hasbajrami. See Hasbajrami, 945 F.3d at 673.

search.[32]  Id. at 393-403.  Section 702 surveillance raises analogous privacy implications.

If anything, the Fourth Amendment questions posed by § 702 are even greater than those

addressed in Riley because § 702 communications may legally be seized without any

showing of probable cause, reasonable suspicion, or even any suspicion of criminal

activity.

Treating querying as a separate search under the Fourth Amendment akin to

targeted searches of seized computers or cellular telephones, as recognized by the Second

Circuit, may be the only constitutional salvation available.  See, e.g., Hasbajrami, 945

F.3d at 672-73; see also Riley, 573 U.S. at 386; United States v. Sedaghaty, 728 F.3d

885, 912 (9th Cir. 2013).  Although this analysis is not possible on the current record, we

must take care to avoid unintentionally eliminating U.S. persons' Fourth Amendment

protections any time they communicate with a person outside of the country.  See United

States v. Tinnie, 629 F.3d 749, 754 (7th Cir. 2011) (Hamilton, J., dissenting) ("The

erosion of Fourth Amendment liberties comes not in dramatic leaps but in small

steps . . . .").

---

[32] I am confused by the majority's assertion that my analysis misapplies Riley.
(Op. at 42, n.18, 51 n.21.)   Under Riley, a subsequent search of the contents of seized
evidence, in that case communications and data contained within a cell phone, required a
warrant.  As the court held in Riley, mere seizure does not authorize search of contents.
Moreover, to the extent that the majority contends that no search occurred prior to the
FISA authorization, their argument once again relies on the government's unsupported
assertion that § 702 communications were not derived through queries.  In my review of
the classified and unclassified record, I find no evidence either testimonial or otherwise
that supports either the government's assertion in its brief, or the majority's reliance on
the governmental assertion in its brief, that no querying took place.

**B**

The majority concludes that, in annually approving the § 702 program certifications, targeting, and minimization procedures, the FISC does not issue an advisory opinion impermissible under Article III.  Because I understand the case or controversy requirement of Article III to require adverseness, I cannot agree.

Nonetheless, the remedy to that violation is not, in my mind, the invalidation of the entire program.  Instead, it requires federal courts, when actually faced with a case or controversy that satisfies Article III, to review the § 702 program de novo in the context of the actual collection and use of the communications in that case.

**1**

The Constitution explicitly limits the judicial power exercised by federal courts to deciding "cases" or "controversies."  See U.S. Const. art. III, § 2.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U. S. 811, 818 (1997).  As the Supreme Court has repeatedly explained, the case or controversy requirement "limit[s] the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process."  Flast v. Cohen, 392 U.S. 83, 95 (1968).  An Article III court may not pass judgment on "a difference or dispute of a hypothetical or abstract character," for its constitutional power only extends to disputes that are "definite and concrete, touching the legal relations of parties having adverse legal interests." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-241 (1937) (quotations omitted)

39

(emphasis added); see also Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 471 (1982) ("The constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity to adjudge the legal rights of litigants in actual controversies." (quotation omitted)).  As the Court recently explained, "[u]nder Article III, a federal court may resolve only a real controversy with real impact on real persons."  TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021) (quotations omitted).

The second function of the case or controversy limitation on the constitutional authority on Article III courts is "to assure that the federal courts will not intrude into areas committed to the other branches of government."  Flast, 392 U.S. at 95.  Article III "ensur[es] that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society" and "[i]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (quotation omitted).  In addition to precluding judicial intrusion into areas constitutionally reposed in the legislature or executive, the case or controversy requirement protects the judiciary from being improperly coopted into roles not appropriately judicial.  See Wellness Int'l Network, Ltd. v. Sharif, 135 S. Ct. 1932, 1955 (2015) (Roberts, C.J., dissenting) ("Because the structural provisions of the Constitution protect liberty and not just government entities, the separation of powers does not depend on whether the encroached-upon branch approves the encroachment." (quotations omitted)).

These two functions of the case or controversy requirement come together in the prohibition against advisory opinions. "[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." Flast, 392 U.S. at 96. Advisory opinions, as "advance expressions of legal judgment," have long been viewed as outside the confines of Article III. United States v. Fruehauf, 365 U.S. 146, 157 (1961). The Supreme Court has "long understood" that the case or controversy limitation in Article III, requiring a "live dispute between adverse parties, . . . prevent[s] the federal courts from issuing advisory opinions." Carney v. Adams, 141 S. Ct. 493, 498 (2020). The prohibition against advisory opinions both ensures that courts do not exceed their "properly limited" role in our tripartite system of government, DaimlerChrysler Corp., 547 U.S. at 341 (quotation omitted), and that courts do not pass upon "issues which remain unfocused" because they are presented without "that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaced situation embracing conflicting and demanding interests." Fruehauf, 365 U.S. at 554 (emphasis added).

In the FAA, "Congress created a comprehensive scheme in which the [FISC] evaluates the Government's certifications, targeting procedures, and minimization procedures—including assessing whether the targeting and minimization procedures comport with the Fourth Amendment." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 421 (2013) (citing 50 U.S.C. § 1881a(a), (c)(1), (i)(2), (i)(3)). The FISC's constitutional determinations, though, involve no adverse parties before the court and are thus

41

unmoored from any case or controversy. Instead, Congress and the Executive rely on § 1881a to provide a judicial imprimatur for an on-going Executive national security-foreign intelligence surveillance program. Absent adverse parties litigating adverse legal interests, the FISC's annual assessments are the epitome of an impermissible advisory opinion. Under the current statutory scheme, no one is "call[ing] upon" the FISC "to adjudge the legal rights of litigants in actual controversies." Baker v. Carr, 369 U.S. 186, 204 (1962) (quotation omitted). Instead, the government submits certifications and targeting and minimization procedures to the FISC, without identifying non-U.S. persons who are to be targeted under § 702 or U.S. persons whose communications may be incidentally collected, and the FISC reviews the government's submission only as to whether the proposed procedures are "reasonably designed" to meet the statutory requirement. See PCLOB Report at 24-31. It is hard to see how this advance review of the Fourth Amendment reasonableness of, among other things, the government's minimization procedures is anything other than a hornbook example of an impermissible advisory opinion that falls outside of the Article III judicial power. The FISC is no more empowered by the Constitution than any other Article III court "to decide . . . abstract propositions, or to declare . . . principles or rules of law" outside of resolving a concrete issue presented by parties with adverse legal interests. California v. San Pablo & T. R. Co., 149 U.S. 308, 314 (1893). There is no adverse legal interest to the government's submission of proposed targeting and minimization procedures, and the FISC opinions therefore amount "to no more than an expression of opinion upon the validity of the acts in question." Muskrat v. United States, 219 U.S. 346, 362 (1911).

42

Additionally, the FISC only reviews the Executive's proposed procedures.  It issues no dispositive judgment, a necessary element of the judicial power.  See Plaut v. Spendthrift Farm, 514 U.S. 211, 218-19 (1995).  Concerningly, the FAA deputizes "federal courts as virtually continuing monitors of the wisdom and soundness of Executive action, . . . [which] most emphatically, is not the role of the judiciary." Hein v. Freedom From Religion Found., Inc., 551 U.S. 587, 612 (2007) (quotations omitted). The FISC's determinations go against the most fundamental intent of the case or controversy requirement:  "to assure that the federal courts will not intrude into areas committed to the other branches of government," Flast 392 U.S. at 95, and to maintain "the proper—and  properly limited—role of the courts in a democratic society." Summers v. Earth Island Inst., 555 U.S. 488, 492-493 (2009).

However convenient the FISC's review may be in assuring the American people that intelligence agencies are not once again violating their Fourth Amendment rights, or however necessary this judicial oversight might be seen to restrain Executive action, convenience and necessity[33] cannot overcome Article III's bedrock requirement that federal judicial power be limited to resolving cases and controversies.

---

[33] I am reminded of William Pitt's speech in the House of Commons decrying the proposed consolidation of powers in the government of India:

> Was it not necessity which had always been the plea of every illegal exertion of power, or exercise of oppression?  Was not necessity the preten[s]e of every usurpation?  Necessity is the plea for every infringement of human freedom.  It is the argument of tyrants; it is the creed of slaves.

William Pitt, Speech, House of Commons, Nov. 1783.

43

**2**

The majority concludes that the FISC's § 702 determinations are not advisory opinions because they "involve the application of specific statutory criteria to the concrete facts of the government's proposed Section 702 surveillance procedures, and those determinations have immediate real-world consequences and legally binding force." (Op. at 63.)  These factors do not create the required adverse legal interests that are necessary for a case or controversy under Article III.  Nor can the FISC's § 702 determinations meet Article III's requirement of a "live dispute between adverse parties" because in those proceedings there is no party adverse to the government.[34]

---

[34] In rejecting the Article III requirement of adverse legal interests, the majority relies upon a 2015 article by Professors James Pfander and Daniel Birk arguing that adverse parties are not required under Article III based on certain historical instances of what they term the "non-contentious" jurisdiction of federal courts.  (Op. at 59 n.29.)  I find much more persuasive Professor Anne Woolhandler's analysis refuting Pfander and Birk's examples, and concluding that they instead demonstrate the long-standing requirement of adverse legal interests for Article III jurisdiction.  See Anne Woolhandler, Adverse Interests and Article III, 111 Nw. U.L. Rev. 1025 (2017).  The majority relies on the existence of ex parte procedures to demonstrate that Article III jurisdiction does not require adverseness.  (Op. at 59 n.29.)  In doing so, the majority truncates the requirement of adverse legal interests to instances "when the court's decision 'will have real meaning.'"  (Op. at 59 n.29 (citing INS v. Chadha, 462 U.S. 919, 939-40 (1983)).  Misapprehending my concern, the majority distinguishes Article III's core requirement from "the 'prudential' preference for the concrete adverseness, 'which sharpens the presentation of issues.'"  (Op. at 59 n.29 (quoting United States v. Windsor, 570 U.S. 744, 760 (2013)).)  This prudential judicial preference, however, presupposes "adequate Art. III adverseness."  Windsor, 570 U.S. at 759 (quoting Chadha, 462 U.S. at 939 (1983)).  It is the lack of the adverseness required under Article III that renders the FISC opinions advisory.  The majority's listing of the government, the ISP companies, and the individuals to be surveilled as parties for which § 702 proceedings will have "real meaning" ignores that at the time of the FISC approvals, no individuals to be surveilled are identified.  Their interests are no more different or concrete than those of every other American whose communications might be collected.  Thus, the § 702 proceedings

44

In Secretary of State Thomas Jefferson's 1793 letter to the Supreme Court, Jefferson sought specific answers to legal questions on the meaning of United States treaties and laws arising from the war between England and France. These questions too required the application of legal criteria to concrete facts. In one question, Jefferson asked, "May we, within our own ports, sell ships to both parties, prepared merely for merchandise? May they be pierced for guns?" Erwin Chemerinsky, Federal Jurisdiction 48 (8th ed. 2021). Had the Court answered, its answers too would have had immediate real-world consequences and binding legal force.[35] But instead, in one of the first

---

conducted by the FISC are advance advisory approvals of the government's proposed procedures. The constitutional flaw in the annual FISC § 702 approvals and certifications is that they are issued absent adverse legal interests, and therefore are advisory opinions which are outside the permissible jurisdictional reach of Article III.

The majority mischaracterizes Muhtorov's argument in his reply brief, as "not object[ing] to the non-adversarial nature of Section 702 proceedings." (Op. at 58 n.29 (citing Aplt. Reply Br. at 24).) Its chosen sentence fragment, however, is taken out of context. In opposing the government's attempt to analogize § 702 proceedings to "individualized review of warrant and wiretap applications," Muhtorov states: "The problem is not that the FISC's review is one-sided, but that it is a free-floating review of general procedures, divorced from any actual case." Exactly. Far from a concession that adverse legal interests are not required by Article III, Muhtorov was rebutting the government's analogy of § 702 surveillance approvals by the FISC to the far different ex parte procedures involved in warrant applications, applications which Muhtorov acknowledged did constitute a case or controversy. Muhtorov was making the argument in this section of his reply brief that adverse legal interests are required for an Article III case or controversy, and that absent those adverse legal interests, FISC opinions are impermissible advisory opinions.

[35] My colleagues' proposed distinction, that "President Washington would have been free to ignore the Supreme Court's advice without immediate legal consequence," (Op. at 63 n.31), rings hollow. So too the Executive here. There is ample evidence that the Executive routinely fails to comply with the FISC-approved procedures without facing any sanction. See, e.g., 2020 FISC Certification Opinion, 39-60 (Nov. 18, 2020), available at

45

articulations of the prohibition against advisory opinions, the Supreme Court declined to answer, because "[the] three departments of the government . . . being in certain respects checks upon each other, and our being judges of a court in the last resort, are consideration which afford strong arguments against the propriety of our extra-judicially deciding the questions alluded to." Id. (emphasis added).

I find the majority's reasoning puzzling. The FISC's application of legal principles to "real-world issues" and the fact that its "determinations have immediate consequences" that are "binding on the executive" do not save those determinations from being advisory opinions. To the contrary, the entire purpose of every executive officer who seeks an advisory opinion—from Jefferson's letter to the Attorney General's certifications to the FISC—is the desire to achieve a "judicial declaration of the validity" of government action that would have immediate real-world consequences and legally binding force. See Muskrat, 219 U.S. at 361. Imagine for a moment that a police department wished to implement a sobriety checkpoint program that included the

---

https://www.intelligence.gov/assets/documents/702%20Documents/declassified/20/2020
_FISC%20Cert%20Opinion_10.19.2020.pdf; Redacted [Oct. 2018 FISC Opinion], 402 F.
Supp. 3d 45, 76-82 (FISC 2018), aff'd in part sub nom. In re DNI/AG 702(h)
Certifications 2018, 941 F.3d 547 (FISCR 2019).

   More concerning under Article III, if President Washington did not ignore the
Supreme Court, he could have produced its "advice" as a definitive pronouncement on
the legality of his actions in any subsequent legal challenge, just as the government does
here. The government briefs are replete with assertions that the FISC approvals are a
legal determination that § 702 surveillance is consistent with the Fourth Amendment.
Just as Washington may have argued when challenged in a subsequent actual case or
controversy, the Executive argues in this appeal that the FISC decisions establish the
constitutional reasonableness of its § 702 activities. Just as with Jefferson's letter, the
Executive's request for advance judicial blessing of its procedures under § 702 seeks an
impermissible advisory opinion.

46

presence of drug dogs and sought an advance determination from an Article III court that such use of a drug dog at a sobriety checkpoint would not violate the Fourth Amendment. Were the court to bless in advance the proposed presence of the dog, this approval would have the same real-world effects and binding legal force as the FISC authorizations, but no one would seriously perceive this as anything other than an impermissible advisory opinion.

The majority's Article III analysis avoids perhaps the most fundamental limitation of Article III: its grant of judicial power only extends to a case or controversy "involving real and substantial rights, between the parties to the record." Little v. Bowers, 134 U.S. 547, 557 (1890). Given the absence of adverse parties or adverse legal interests, I cannot conclude the FISC's programmatic oversight of the surveillance program involves adverse parties or a case or controversy under Article III.

Although I conclude that the FISC's annual reviews violate Article III, I do not believe this necessarily invalidates the entire § 702 program. Instead, I would insist that the Fourth Amendment reasonableness determination be accomplished de novo when an actual case is presented to an Article III court. This determination must be a true de novo evaluation, with no deference given to the FISC determinations of whether the § 702 program is "consistent with the statute and the Fourth Amendment" as required under § 1881a(j)(2)(C), (j)(3).[36] Similar to my Fourth Amendment analysis above, it is

---

[36] The majority's assertion that this proposed remedy "is precisely what courts—including the district court and this court in the present case—already do when a criminal defendant seeks suppression of Section 702-derived evidence," (Op. at 75-76 n.37), is

47

impossible to conduct the necessary review on the current record.  If not for the

unambiguous violation of Muhtorov's speedy trial right that mandates his conviction be

vacated, I would remand for further development of the record.

### III

Muhtorov was not required to trade his right to a speedy trial for his right to be

tried in accordance with due process.  The Constitution protects both.  Confining a

presumptively innocent individual for over six years as the government blocks his path to

a timely trial with obstacles of its own creation is repugnant to the Sixth Amendment.

Muhtorov retained his right to a speedy trial throughout, even though his case implicated

consequential issues of national security.

I find it unacceptable to avoid complicated issues that strike to the core of the

framework of our Constitution by accepting party declarations on appeal that are

unsupported by the record.  But for the speedy trial violation, which in my judgment

requires the vacation of Muhtorov's conviction, I would vote to remand so that we could

properly determine the remaining issues on a well-developed record.

---

disingenuous.  The majority concludes it was reasonable to collect Muhtorov's communications "during the course of otherwise lawful Section 702 surveillance." (Op. at 37.)  It later explains that this surveillance was lawful only if it was conducted under "pre-authorization or a relevant exception." (Op. at 60.)  Given this, any claim that the majority does not, like other courts, rely on and grant deference to FISC determinations is specious.  The continued constitutional viability of the § 702 surveillance program absent the FISC's advisory opinions, upon which much of the government's assertions of Fourth Amendment reasonableness rest, is a significant constitutional question.  However, faced as we are with a criminal prosecution resting upon § 702 evidence, we must evaluate the reasonableness of any searches de novo.  Unfortunately, as I explain above, the record is inadequate to allow us to conduct this analysis.